In re "AGENT ORANGE" PRODUCT
LIABILITY LITIGATION.

MDL No. 381.

United States District Court,
E.D. New York.

Jan. 7, 1985.

As Modified June 18, 1985.

# 1300

Stephen J. Schlegel, Schlegel & Trafelet, Ltd., Chicago, Ill., Benton Musslewhite, Law Offices of Benton Musslewhite, Inc., Houston, Tex., Thomas Henderson, Henderson & Goldberg, Pittsburgh, Pa., Phillip E. Brown, Hoberg, Finger, Brown, Cox & Molligan, San Francisco, Cal., Stanley Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, Ohio, John Q. O'Quinn, O'Quinn and Hagans, Houston, Tex., Neil R. Peterson and Gene Locks, Greitzer & Locks, Philadelphia, Pa., Newton B. Schwartz, Houston, Tex., Irving Like, Reilly, Like and Schneider, Babylon, N.Y., David J. Dean, Dean, Falanga & Rose, Carle Place, N.Y., Aaron Twerski, Hempstead, N.Y., of counsel, for plaintiffs.

Leonard Rivkin, Rivkin, Leff, Sherman & Radler, Garden City, N.Y., Philip Pakula, Townley & Updike, Wendell B. Alcorn, Jr., Cadwalader, Wickersham & Taft, William Krohley, Kelley, Drye & Warren, Thomas Beck, Arthur, Dry & Kalish, Bruce Hecker, Shea & Gould, New York City, for defendants; David R. Gross, Budd, Larner, Kent, Gross, Picillo & Rosenbaum, New York City, Paul V. Esposito, Lewis, Overbeck & Furman, Chicago, Ill., Henry G. Miller, Clark, Gagliardi & Miller, White Plains, N.Y., of counsel.

Arvin Maskin, Dept. of Justice, Washington, D.C., for third-party defendant U.S.

## TABLE OF CONTENTS

I. FACTUAL BACKGROUND ...................... 1301

II. LEGAL STANDARDS FOR AWARDING ATTORNEY FEES ............................. 1303
 A. General Problem ............................ 1303
 B. Fee Award ................................. 1304
 1. "Lodestar" Analysis ....................... 1305
 (a) Billable Hours and Time Records ....... 1306
 (b) Hourly Rate .......................... 1307
 (c) Discretionary Multiplier ................ 1310
 (i) Risk of Litigation ................... 1310
 (ii) Complexity of Issues ............... 1312
 (iii) Demonstrated Skill of Attorneys.... 1313
 (iv) Delay in Payment ................. 1313
 2. Expenses ................................. 1313

C. Fee Award Allocation and Its Effect on Private Fee Arrangements .......................... 1314
 1. Immunity of Represented Class Members and Opt-Outs from Fee Payments from the Fund 1315
 2. Effect of a Fee Award on a Client's Private Fee Liability to a Class Attorney .......... 1317

III. GUIDELINES AND PROCEDURES............. 1318
 A. Guidelines for Fees ......................... 1320
 1. Court Time................................ 1320
 2. Management Committee Meetings .......... 1320
 3. Depositions .............................. 1321
 4. Document Review and Preparation of Legal Submissions .............................. 1321
 5. Other Activities .......................... 1321
 B. Guidelines for Allowable Expenses ............ 1321
 1. Travel ................................... 1321
 2. Telephone, Postage, Duplicating, Photocopying and Book Purchase Charges ....... 1322
 3. Paralegals, Paraprofessionals and Clerks.... 1322

IV. APPLICATION OF LAW TO THE FEE PETITIONS 1322
 A. Independent Counsel ......................... 1323
 B. Lodestar Analysis ........................... 1324
 1. Hours Allowed ........................... 1324
 2. Hourly Rate.............................. 1325
 3. Multiplier ............................... 1328
 4. Interest ................................. 1328

V. FEE AWARDS...................................... 1329
 A. Professors Twerski, Henderson, Jr., Gillette, Arnolds, Kamp and Monaghan................ 1329
 B. Agent Orange Plaintiffs' Management Committee .................................. 1330
 1. Committee Expenses ...................... 1330
 2. Individual Awards to Committee Members .. 1331
 (a) Stanley Chesley, Esq., et al. ........... 1331
 (b) Phillip E. Brown, Esq., et al. .......... 1331
 (c) Benton Musslewhite, Esq., et al. ....... 1332
 (d) Thomas W. Henderson, Esq., et al.... 1332
 (e) Newton B. Schwartz, Esq., et al....... 1332
 (f) John O'Quinn, Esq., et al. ............. 1333
 (g) Gene Locks, Esq., et al. ............... 1333
 (h) Dean, Falanga and Rose ............... 1333
 (i) Schlegel & Trafelet, Ltd................ 1333
 C. Yannacone and Associates ..................... 1334
 1. Burke, Curry, Hammill & O'Brien .......... 1334
 2. Albert J. Fiorella, Esq. ..................... 1334
 3. O'Hagan, Reilly & Gorman, P.C. ........... 1334
 4. Levine & Grossman ....................... 1334
 5. Victor D. Russo, Jr., Esq. ................. 1335
 6. Victor J. Yannacone, Jr., Esq............... 1335
 7. Irving Like, Esq. ......................... 1335
 8. Edward F. Hayes, III, Esq. ................. 1336
 D. Independent Counsel ......................... 1336
 1. Kelly & Luglio; Mokotoff, Mondshine & Aliano; Greenwald & Thompson; Meyerson, Shniper & Gerasimowicz; Marlene Manes and Richard Ellison, Esqs.; Ann Meroney, Esq.; Woll, Crowley, Berman & Olsman; Sullivan & Associates.................................. 1336
 2. Allen H. Kline, Esq.; William J. Risner, Esq.; Ashcraft & Gerel............................ 1337
 E. Independent Counsel Who Did Not Directly Benefit the Class ............................ 1338

VI. TABLE OF ORIGINALLY ALLOWED FEES AND EXPENSES ..................................... 1338

VII. ADOPTION OF MAGISTRATE'S REPORT ON MODIFICATION AND SUPPLEMENTATION OF FEE AWARDS................................... 1341

VIII. FINAL AWARDS AFTER MODIFICATION AND SUPPLEMENTATION .......................... 1344

IX. CONCLUSION ................................... 1346

APPENDIX

Magistrate's Report and Recommendation on
Attorney Fees .................................. 1347

## MEMORANDUM AND ORDER ON ATTORNEY FEES AS MODIFIED AND FINAL JUDGMENT

WEINSTEIN, Chief Judge:

Counsel seek attorney fees and expenses from a settlement fund in this class action by Vietnam veterans and members of their families for injuries said to be caused by the veterans' exposure to herbicides in Vietnam. *See In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740 (E.D.N.Y.1984). A final decision on fairness of the settlement was subject to a satisfactory resolution of the attorney fees issue and to the conclusion that a feasible distribution plan was possible. *Id.* at 862.

As indicated *infra* Part VIII, total fees allowed and expenses are on the order of $10,000,000. Interest earned from the date of the settlement is over $15,000,000 so that the settlement fund, now amounting to considerably more than the original $180,-000,000, is unimpaired.

A number of attorneys who expended time and money in the course of work related to the *"Agent Orange"* litigation waived any right to court-awarded fees and reimbursement of expenses. The court appreciates their generosity.

Because this is a multidistrict litigation, materials developed during discovery are intended to be used by any present or future litigants in related cases. *See In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740, 751–52, 770 (E.D.N.Y.1984). The court will require, as a condition to receipt of payment pursuant to this judgment, that an attorney file with the court all originals or copies of discovery materials in his or her possession obtained during the litigation and not subject to a protective order unless the Magistrate on application directs otherwise. First Amendment and other considerations such as the concern expressed by many class members that the materials be available for historical and scientific study support this condition. *See generally* Cohen, Access to Pretrial Documents Under the First Amendment, 84 Colum.L.Rev. 1813 (1984).

## I. FACTUAL BACKGROUND

This multidistrict litigation began as a series of individual cases in the Eastern District of New York, Southern District of New York and Northern District of Illinois. The first case in this district was *Dowd v. Dow Chemical Co.,* 79–C–467, filed on February 23, 1979 by a local attorney, Victor Yannacone, Jr. Another complaint was filed in this district on March 20, 1979 in *Ryan v. Dow Chemical Co.,* 79–C–747, the docket number under which the case ultimately was to proceed as a class action. On May 14, 1979, the Judicial Panel for Multidistrict Litigation transferred the Illinois and other New York cases to this district for consolidation of pretrial proceedings. Some 600 additional tag-along cases were subsequently transferred under M.D.L. No. 381.

Mr. Yannacone organized a consortium of local lawyers, known variously as the "Long Island Consortium" or "Yannacone and Associates," for the purpose of handling the multidistrict litigation as lead counsel for the plaintiffs. Consortium members were to contribute funding, participate in prosecution of the *"Agent Orange"* litigation, and share in the proceeds of any resulting fees. In Pretrial Order No. 26, the court on December 26, 1980 tentatively ruled that the litigation would proceed as a class action. *See In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762, 787–92 (E.D.N.Y. 1980). At the same time, Yannacone and Associates were designated attorneys for the plaintiff class.

Mr. Yannacone also made case management arrangements with regional counsel representing individual Vietnam veterans and their family members throughout the country. Under these agreements, the "associated" attorneys were to share with Mr. Yannacone's firm any contingent fees re-

covered under their retainer agreements. In return the Yannacone firm was to act as lead counsel in the multidistrict litigation on behalf of those plaintiffs. These agreements were made both before and after provisional class certification in December 1980.

The associated counsel in general contributed nothing of substance to prosecution of the class action. They served primarily as a conduit for information between the class attorneys and some members of the class. Some associated counsel represented plaintiffs in individual lawsuits that were transferred to this court as part of the multidistrict litigation. To the extent that those plaintiffs did not opt out of the class action their individual cases have been dismissed as duplicative of the class action.

As early as 1980 Yannacone and Associates experienced internal dissension. By the summer of 1983 management problems had become serious, in part because of the great difficulty of funding such a massive litigation. At least one law firm, Ashcraft & Gerel of Washington, D.C., and several individual lawyers were consulted about the possibility of restructuring the membership of the consortium. By notice of motion dated September 19, 1983, Yannacone and Associates asked to be replaced as lead counsel. Plaintiff counsel cited inability to bear the financial expense of continued litigation as the grounds for their motion. By undated notice of motion received September 23, 1983, Stephen J. Schlegel of Chicago, Illinois, Benton Musslewhite of Houston, Texas, and Thomas W. Henderson of Pittsburgh, Pennsylvania, jointly moved for an order designating their respective law firms as the new Agent Orange Plaintiffs' Management Committee ("PMC"). Both applications were granted in Pretrial Order No. 60 on September 26, 1983. *See In re "Agent Orange" Product Liability Litigation*, 571 F.Supp. 481 (E.D.N.Y.1983). The members of the original plaintiffs' management committee were directed to cooperate with the new committee. One member of the original committee, David Dean of Carle Place,

New York, remained directly associated with the new committee. Others continued to assist in various capacities.

At pretrial conferences after October 1983, the court indicated that it would hold Mr. Dean directly responsible for taking the lead in preparing and trying the case. Mr. Schlegel assumed the responsibility of "managing partner" of the PMC. On motion of the PMC, by Pretrial Order No. 89 the court on February 2, 1984 approved the expansion of the plaintiffs' management committee to its current membership of nine lawyers who had worked informally as a management group since October 1983. The PMC includes lawyers from Long Island, Philadelphia, Pittsburgh, Cincinnati, Chicago, Houston and San Francisco. It set up a central headquarters two blocks from the courthouse. Monetary contributions of PMC members were used to run this office.

On October 21, 1983, a trial date of May 7, 1984 was set. Between October 1983 and May 1984, the PMC undertook a vast amount of necessary discovery and other trial preparation, laying much of the groundwork essential to prosecution of the case. Settlement negotiations also were commenced between plaintiffs and the defendant chemical companies. On the eve of trial the parties agreed to a $180 million settlement of the plaintiffs' claims against the chemical companies.

Pursuant to the court's direction, on July 23, 1984 the Magistrate issued an order that set forth the procedure for submission of requests for payment of attorney fees and expenses. All fee applications were to be submitted by August 31, 1984 on a form available from the Clerk of the Court. Subsequent fee petitions were accepted by the court if the circumstances excused their lateness. Hearings on attorney fee applications were held on September 26 and October 1, 1984.

More than 100 attorneys have submitted petitions for fees and expenses. Most of them were neither present nor past members of the PMC. A few did not serve as

counsel of record, but assisted in the litigation at the request of the management committee. Fee requests have also been received from lawyers who filed individual lawsuits that were transferred to this court as part of the multidistrict litigation, but who did not work on the class action and did no work at the management committee's request. Still other attorneys seek fee awards who neither assisted in the class action nor filed suit, but who undertook such tasks for their individual clients as monitoring the litigation's progress, assembling medical records, pressing claims for benefits before the Veterans Administration and submitting claim forms in the class action settlement. Many lawyers, both class and nonclass counsel, have previously made private fee arrangements with individual class members.

## II. LEGAL STANDARDS FOR AWARDING ATTORNEY FEES

### A. General Problem

An informed assessment of the fee petitions requires consideration of the system of toxic tort litigation as well as of the unique circumstances of this case. Private enforcement of tort law is at best only a third line of defense against the hazards of toxic substances. *Cf.* Injuries and Damages from Hazardous Wastes—Analysis and Improvement of Legal Remedies, A Report to Congress in Compliance with Section 301(e) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (P.L. 96–510) by the "Superfund Section 301(e) Study Group," 97th Cong., 2d Sess. (Comm.Print 1982). The first and most important protection is government and private testing, control and regulation to prevent harm while affording society the benefits of modern chemical products. A second safeguard is compensation and treatment through government mandated or privately arranged compensation schemes. The third shield is private suits against manufacturers and others.

This last alternative of private tort remedies is necessarily inefficient in several respects: its high ratio of transaction costs to recovery; its hit or miss characteristics, in that some receive very high amounts and some nothing; and its questionable deterrent value in preventing the harm in the first place. Nevertheless, the private tort suit has substantial utility as a backup compensation system with limited value as a deterrent against human exposure to unreasonable hazards when (1) the first two defenses fail through government and private neglect or (2) strict liability is the basis of recovery and the failure occurs through ignorance of the effects of actions taken by manufacturers and others in reasonable reliance on then current knowledge.

■ In general, the desirable prophylactic and cost shifting effects of privately prosecuted individual and class actions probably outweigh the costs to defendants, the court system and society generally. *See, e.g., Dolgow v. Anderson,* 43 F.R.D. 472, 487 (E.D.N.Y.1968), *remanded on other grounds,* 438 F.2d 825 (2d Cir.1971); Some Reflections on the "Abusiveness" of Class Actions, 58 F.R.D. 299 (1972). Given the extensive financing and large numbers of skilled lawyers needed to bring a complex class action and prosecute it to a successful conclusion, and the large risk of no recovery—or of a limited one—even when a case appears to have merit, substantial legal fees must be provided when a substantial fund is created if attorneys are to be induced to prosecute these actions. Nevertheless, the potential for abuse of the class action device exists. Overly generous fee awards may encourage cases without merit to be brought and pressed beyond reasonable limits, forcing defendants to settle to avoid burdensome litigation expenses and adverse publicity. The costs of such dubious litigation in terms of increased insurance premiums and legal expenses may keep useful products out of the marketplace to the detriment of the general public. As the Supreme Court remarked in a related context, " 'a reasonable attorney's fee' is one that is 'adequate to attract competent counsel, but ... [that does] not pro-

duce windfalls to attorneys.'" *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) (42 U.S.C. § 1988 case, quoting S.Rep. No. 1011, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5913); *see also Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 16 (D.C.Cir.1984).

One potential check on abuse is Rule 11 of the Federal Rules of Civil Procedure. It requires belief in the merits of the case. A party or his attorney must sign each pleading, motion, or other paper, thus certifying that

> he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The threshold level of egregiousness required to make out a case under Rule 11 is so high, and the probability of successful motions for improper certification so low, that the Rule in general provides little protection for prospective defendants, the public and the courts.

It is in light of these realities that the court must approach the problem of attorney fees and expenses. At the outset of this litigation it appeared that there might be some basis for believing that the herbicide known as "Agent Orange" had caused widespread damage to Vietnam veterans and, perhaps, to their families. The lawyers who originally brought this suit skillfully used publicity together with legal theory and discovery procedures to mobilize potential class members and carry the case forward through the early pleading and motion stages. The attorneys constituting the PMC, who replaced the original committee in September of 1983, acted with professional skill to conduct discovery and prepare the case for trial. Their work revealed a lack of sufficient factual support

at this time in plaintiffs' claims, but did result in a significant benefit to the class by way of settlement. Under the circumstances, suggestions made at the settlement hearings by some veterans that lawyers are entitled to no fees or reimbursement of expenses are untenable.

### B. *Fee Award*

■ Generally speaking the federal courts have no power to award attorney fees to a prevailing party absent statutory authorization. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). A well-established exception to this rule applies when a common fund has been created in a class action. *See generally Boeing Co. v. Van Gemert,* 444 U.S. 472, 478–79, 100 S.Ct. 745, 749–50, 62 L.Ed.2d 676 (1980); 1 M. Derfner & A. Wolf, Court Awarded Attorney Fees ch. 2 (1983). The common fund doctrine, "part of the historic equity jurisdiction of the federal courts," *Sprague v. Ticonic National Bank,* 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939), contemplates "fair and just allowances for expenses and counsel fees." *Trustees v. Greenough,* 105 U.S. 527, 536, 26 L.Ed. 1157 (1881).

■ This equitable doctrine covers claims "filed not only by a party to the litigation, but also by an attorney whose actions conferred a benefit upon a given group or class of litigants." *City of Detroit v. Grinnell Corp. (Grinnell I ),* 495 F.2d 448, 469 (2d Cir.1974). In addition, the equitable supervisory authority that Rule 23 of the Federal Rules of Civil Procedure grants federal courts in class actions extends to attorney fee questions and itself provides a quasi-substantive predicate for fee allowances. *See, e.g., Vincent v. Hughes Air West, Inc.,* 557 F.2d 759, 768 (9th Cir.1977); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1803 (1972 & Supp.1984). The Rule recognizes applicability of the common fund doctrine to class action cases.

■ Compensation must motivate representation in worthy cases and reflect bene-

fits to the class arising from the attorney's work. As one formulation of the purposes behind a fee award in class actions puts it,

the guiding principles should be to provide compensation sufficient to stimulate the motive for representation of classes and to ensure that the fees awarded are consistent with the benefits bestowed upon the class, insofar as the bestowing of those benefits can be shown to be the product of the lawyer's work.

Manual for Complex Litigation § 1.47 at 67 (5th ed. 1982).

The Court of Appeals for the Second Circuit has pointed out that the existence of a benefit to the class is central to the common fund theory:

[I]ntrinsic in every case is the requirement that benefits must accrue to those against whom expenses are assessed. [*Alyeska*, 421 U.S. at 264 n. 39, 95 S.Ct. at 1625 n. 39.] "The award of fees under the equitable fund doctrine is analogous to an action in quantum meruit: the individual seeking compensation has, by his actions, benefited another and seeks payment for the value of the service performed." *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.* [(*Lindy I*)], 487 F.2d 161, 165 (3d Cir.1973). Those who receive no benefit from the lawyer's work should not be required to pay for it.

*Van Gemert v. Boeing Co.,* 573 F.2d 733, 736 (2d Cir.) (footnote and some citations omitted), *vacated on reh'g on other grounds,* 590 F.2d 433 (1978) (en banc), *aff'd,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). In assessing the attorney fee applications in this case, therefore, it is necessary to focus upon the benefit to the class alleged to have resulted from each applicant's efforts.

### 1. *"Lodestar" Analysis*

■ The current "lodestar" approach to attorney fee awards followed in this and other circuits emphasizes the need to examine the award's fairness to both the attorney and the common fund beneficiaries. As long ago as 1881, the Supreme Court admonished that "fee awards under the

equitable fund doctrine were proper only 'if made with moderation and a jealous regard to the rights of those who are interested in the fund.'" *Grinnell I,* 495 F.2d at 469 (quoting *Greenough,* 105 U.S. at 536). The *Grinnell* opinions, which adopted the lodestar framework for the Second Circuit, require a district court to undertake a factually based analysis. The "touchstone" for the fee award is "the actual effort made by the attorney to benefit the class." *City of Detroit v. Grinnell Corp. (Grinnell II),* 560 F.2d 1093, 1099 (2d Cir.1977). Moreover, the district court in making its decision must "act 'as a fiduciary who must serve as a guardian of the rights of absent class members.'" *Id.* (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)). "The numerous exacting standards that have been set down by the courts should be strictly applied to ensure that [the fee award] aspect of the class action is not subjected to abuse." Manual for Complex Litigation, *supra,* § 1.47 at 67. Care must be exercised to ensure that counsel is compensated only for the benefit received by the class; to protect members of the class a philosophy of adequacy rather than generosity must be followed. *See Grinnell II,* 560 F.2d at 1098. Even the appearance of a windfall to the attorney receiving a fee award must be avoided. *Grinnell I,* 495 F.2d at 469.

■ The lodestar analysis is divided into two steps, the first theoretically objective, the second more subjective. *See generally* 2 M. Derfner & A. Wolf, *supra,* ch. 16. First, "attorney's fees are calculated by multiplying the number of billable hours that the prevailing party's attorneys spend on the case by 'the hourly rate normally charged for similar work by attorneys of like skill in the area.'" *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1140 (2d Cir.1983) (quoting *Grinnell II,* 560 F.2d at 1098). What is appropriately deemed billable and what are normal hourly rates are issues subject to dispute requiring the exercise of some judi-

cial judgment. Second, once the base fee is calculated the district court within fairly broad parameters of discretion may adjust the time-rate figure upward or downward on the basis of other factors reflecting considerations such as risk of litigation and quality of representation.

The lodestar approach was developed by appellate courts in the 1970's to limit the almost unreviewable judgment previously exercised by district courts, supplant the percentage-of-recovery method of awarding fees, and increase the small hourly rate fees then being awarded under fee-shifting statutes. *See, e.g.,* the debate between the majority and dissent in *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4 (D.C.Cir. 1984); *see also* 2 M. Derfner & A. Wolf, *supra,* § 15.01[1]. The lodestar method, however, has significant disadvantages. Because the first step in the process calls for a calculation based on hours worked, counsel has an incentive to expend time and expand effort in order to increase the lodestar figure. *But cf. In re Equity Funding Corp. of America Securities Litigation,* 438 F.Supp. 1303, 1328 (C.D.Cal. 1977) ("counsel will not expend exorbitant amounts of time, for which there is no guarantee of reimbursement, in litigation of a substantially risky nature"). The current lodestar approach thus tends to encourage excess discovery, delays and late settlements, while it discourages rapid, efficient and cheaper resolution of litigation. Not only does lodestar analysis tend to enhance plaintiffs' attorney fees, but it tends to increase enormously the cost of the litigation to the defense in fees and to the court in hours it must spend on supervision.

■ To some extent excessive claims of hours worked can be offset by disallowing hours that produce no benefit for the class or that exceed the limits of reasonableness for a given task. The lodestar figure, moreover, can be decreased for inefficiency in representation. *See infra* Part II.B. 1.c.iii.

Courts are reluctant to cut fee requests on the basis of useful hours worked to the degree required for effective general deter-

rence of inefficiency because of the penal nature of such measures, the need to highlight an attorney's failings in justifying a lodestar decrease and the difficulty of deciding after the event what might have been a more sensible course. Legal research and litigation are to a large degree arts. Like any creative artist, the good litigator may pursue many blind alleys and revise many drafts before producing the convincing brief or argument. In the end, close scrutiny of the work may ameliorate but cannot eliminate the problem of unnecessary work and undue delay under lodestar.

Because the Court of Appeals for the Second Circuit has not yet modified its fee award approach, district courts in this circuit must follow the lodestar analysis. In any event, the result under lodestar in the instant case is consistent with an appropriate award under prior and alternative theories of fee recovery.

*(a) Billable Hours and Time Records*

Attorneys seeking a fee award must submit detailed records. The Second Circuit requires submission of contemporaneous records for work performed after June 15, 1983. *New York State Ass'n for Retarded Children,* 711 F.2d at 1147–48; *Birmingham v. Sogen-Swiss International Corp. Retirement Plan,* 718 F.2d 515, 523–24 (2d Cir.1983). For work prior to that date, reconstructed records are acceptable, "although the absence of contemporaneous records is to be considered in determining the actual time spent in the rendition of services." *Birmingham,* 718 F.2d at 524 (citing, *inter alia, Grinnell I*).

■ A lodestar calculation does not contemplate that a court blindly accept counsel's records. "The calculations made by petitioners are, of course, subject to our own determination of reasonableness." *Van Gemert v. Boeing Co.,* 516 F.Supp. 412, 414 (S.D.N.Y.1981) (citing *Seigal v. Merrick,* 619 F.2d 160, 164 & n. 9 (2d Cir.1980); *Steinberg v. Carey,* 470 F.Supp. 471, 479 (S.D.N.Y.1979)).

■ The district court must review the activities for which time is claimed to ascertain whether they resulted in some compensable benefit to the class. For example, an attorney's work on a fee application is not to be counted when "the fee will reduce the fund obtained in a class action." *Seigal,* 619 F.2d at 165. *See also Grinnell II,* 560 F.2d at 1102 (a firm is not "entitled to compensation from the fund for its efforts in preparing and supporting its fee application in the district court and on appeal"). Fee application efforts are compensable in statutory fee cases. *Gagne v. Maher,* 594 F.2d 336, 344 (2d Cir.1979), *aff'd,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980).

Class actions "doubtless present many instances of duplicative work including the overstaffing of conferences and court appearances." *Seigal,* 619 F.2d at 165. Such duplication is an inherent danger in any litigation run by committee. The problem is especially acute when the case involves an enormous plaintiff class and a turnover in management committee membership. *See Sun Publishing Co., Inc. v. Mecklenburg News, Inc.,* 594 F.Supp. 1512, 1517–18 (E.D.Va.1984) (holding in statutory fee context that no fees would be awarded for duplicative work occasioned by midstream change in counsel and disallowing time expended by previous counsel). "Ample authority supports reduction in the lodestar figure for overstaffing as well as for other forms of duplicative or inefficient work." *Seigal,* 619 F.2d at 165 n. 9. Moreover, "[i]n assessing the extent of staffing and background research appropriate for a given case, a district court must be accorded ample discretion." *New York State Ass'n for Retarded Children,* 711 F.2d at 1146.

■ One instance of duplicative work arising from the nature of a class action, but having little or nothing to do with the committee structure of class representation, concerns the filing of individual lawsuits by class members. Attorneys who file individual suits on the same claims involved in the class action do not substantially aid the prosecution of the class action. These collateral cases ultimately are dismissed as duplicative. An award of fees for such "me too" litigation would encourage fruitless and unnecessary work:

> While there is no first-in-time rule governing the award of counsel fees where multiple litigation is brought, a duplicative action which contributes virtually nothing to the ultimate result cannot justify an award of counsel fees.... Where [the] goal [of the litigation] is fully achieved by a single well-managed action, an award of compensation to latecomers who add nothing of value would encourage the bringing of superfluous litigation solely for an award of fees.

*Gerena-Valentin v. Koch,* 739 F.2d 755, 759 (2d Cir.1984). *See also Lewis v. Teleprompter Corp.,* 88 F.R.D. 11, 22–23 (S.D.N.Y.1980); *In re Master Key Antitrust Litigation,* 1978–1 Trade Cas. (CCH) ¶ 61,-887 at 73,728 (D.Conn.1977); *Crasto v. Estate of Kaskel,* 63 F.R.D. 25, 27 (S.D.N.Y. 1974).

■ Finally, as part of its assessment of the billable hours claimed, a court has a duty to analyze the tasks performed, to assure the class that the various tasks are being performed by individuals with the appropriate skills. For example, paralegal tasks should not be undertaken by senior partners who seek compensation for their time at premium rates. *In re Equity Funding Corp. of America Securities Litigation,* 438 F.Supp. 1303, 1330 (C.D.Cal.1977). Tasks appropriate for paralegals would include substantial time spent in photocopying, making prints of microfilmed documents, organizing files, and other activities of a routine clerical nature. Work accomplished primarily by associates should not be billed at senior partners' rates. The particular task undertaken, hours expended, and number and training of the legal personnel involved are all appropriate subjects of a court's scrutiny in determining the base time-rate figure under the lodestar approach.

(b) *Hourly Rate*

Determining the applicable hourly rate often presents difficult questions. Under

the standard formulation, a district court is to look to "the hourly rate normally charged for similar work by attorneys of like skill in the area." *Grinnell II*, 560 F.2d at 1098, *quoted in New York State Ass'n for Retarded Children*, 711 F.2d at 1140. *See also Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) (in setting statutory fees under 42 U.S.C. § 1988, courts are to look to "the prevailing market rates in the relevant community"). Problems arise in applying this general standard in a complex multidistrict litigation that is national in scope, involves counsel from all over the country and extends over many years during which the rates for particular lawyers and classes of lawyers are changing.

 In a recent case involving nonlocal counsel, the Second Circuit stated that "[n]ormally, a district court ... will consider the prevailing rates in the district in which the court sits." *Polk v. New York State Dept. of Correctional Services*, 722 F.2d 23, 25 (2d Cir.1983) (arising under 42 U.S.C. § 1988, the civil rights fee award statute). *See also Donnell v. United States*, 682 F.2d 240, 251–52 (D.C.Cir.1982) (elaborating on the general rule), *cert. denied*, 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983). Thus the normal guideline looks to a uniform rate based on the hourly rate prevailing in a district court's local community. Obviously such a simple parochial rule is inappropriate in a multidistrict litigation requiring participation of attorneys from many districts.

Courts in civil rights cases have developed several exceptions to the locality rule. First, when a need for "the special expertise of counsel from a distant district" is shown, the appropriate hourly rate is that of the attorney's own community. *Polk*, 722 F.2d at 25 (citing cases). The same broader view is applied when local counsel are unwilling to handle the case. *See Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140–41 (8th Cir.1982) (*en banc*) (stating principle but applying forum rates after finding that competent local counsel were available for less). Second, when a lawyer files a suit in his or her home district that is properly maintainable there, and the case is transferred to the forum district, the attorney should receive fees at the prevailing home rate, "at least in the absence of any indication that the suit was filed in the high-rate district with little prospect of litigation but in the hope of securing a high fee." *Polk*, 722 F.2d at 25.

Assuming that this statutory decisional law serves as precedent for common fund cases, its application to cases involving large numbers of nonlocal counsel is far from clear. On the one hand, the general rule's utility is called into question when few of the many attorneys for whom a rate must be determined come from the forum. On the other hand, the alternative of looking to each attorney's local rates has serious drawbacks when large numbers of nonlocal counsel are involved. First, it would minimize the forum court's presumed familiarity with hourly rates, which forms the basis for the forum rate rule. *See Donnell*, 682 F.2d at 251. Second, it would require an intensive case-by-case inquiry that would be nearly unworkable; ease of administration is a basic reason for the general rule. *See id.* Simplicity becomes an especially important goal in a complex case involving a hundred or more fee applications and tens of thousands of pages of supporting documentation and requiring a number of years for prosecution during which rates for particular attorneys and geographic locations change in different ways. Third, use of individualized rates would negate in large part the neutrality of the forum rate rule, *see id.*, in that it would consistently favor fee applicants at the expense of the fund: nonlocal attorneys with higher individual rates would receive those rates; those with lower individual rates would receive the forum rate.

 A workable and fair compromise may well be to apply a uniform, nationally prevailing rate when such a rate can be developed. This solution has been adopted by courts faced with complex attorney fee distributions of large magnitude. *See, e.g., In re Fine Paper Antitrust Litigation*, 98

F.R.D. 48, 83 (E.D.Pa.1983) (setting uniform rates that were "in conformity with the regular hourly rates billed to noncontingent clients by private law firms in major metropolitan areas"), *rev'd*, 751 F.2d 562, 590–91 (3d Cir.1984) (objecting to the failure of the trial court to determine that national rate through an examination of available data); 3 H. Newberg, Newberg on Class Actions § 6924e (1977).

A national rate approach in special instances recognizes the national character of the lawsuit and of class counsel while retaining a vitally important administrative simplicity together with an essential neutrality of result as between fee applicants and fund beneficiaries. Fortunately too, for purposes of fee determination, a national bar has developed in this country; no longer are the highest paid and most skillful attorneys limited to one or a few great legal centers. For example, there are specialists commanding substantial fees in each of the cities from which lead counsel come—and they earn high fees for work all over the country.

■ In litigation stretching over a number of years, a question arises about whether current or historical rates should be used to calculate attorney fees. In a recent decision involving a civil rights fee award under section 1988 of title 42 of the United States Code, the Second Circuit held that historical rates should be considered in multi-year cases:

> If the services were rendered over two or three years, relevant figures for the current year will normally still be appropriate. Even in protracted cases, it will be sufficient to divide the litigation into just two phases and use one rate for the early phase and a current rate for the later phase.

*New York State Ass'n for Retarded Children*, 711 F.2d at 1153. The Second Circuit has permitted the application of a single rate for as long a period as seven years. *See United States v. Bosurgi*, 750 F.2d 216, 218–20 (2d Cir.1984) ($125 for partners and $75 for associates during the period from 1965 to 1971).

Lower court decisions have applied historical rates in common fund cases as well. *See, e.g., Desimone v. Industrial Bio-Test Laboratories, Inc.*, 83 F.R.D. 615, 621 (S.D. N.Y.1979); *Weiss v. Drew National Corp.*, 465 F.Supp. 548, 552–53 (S.D.N.Y.1979); *cf. Kane v. Martin Paint Stores, Inc.*, 439 F.Supp. 1054, 1056–57 (S.D.N.Y.1977) (historical rates used for fee award charged to defendants in antitrust case under 15 U.S.C. § 15), *aff'd mem.*, 578 F.2d 1368 (2d Cir.1978). *But see Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1096 n. 26 (5th Cir.1982) (15 U.S.C. § 15 case stating in dicta that prevalent practice of federal courts today is to use current rates "to compensate counsel for inflation and delay in receipt of payment"), *modified on other grounds*, 701 F.2d 542 (5th Cir.1983) (*en banc*); *City of New York v. Darling-Delaware*, 440 F.Supp. 1132, 1134 (S.D.N.Y. 1977) (applying present rates for seven years of litigation "to compensate for lost interest and inflation").

As the Second Circuit has noted, "[n]either historic nor current rates are ideal. Historic rates have the advantage of precision . . . [but] do not reflect inflation or the cost of foregone interest. . . ." *New York State Ass'n for Retarded Children*, 711 F.2d at 1152. The Court of Appeals settled on an historical rate approach because it "at least conforms to Congress' instruction to avoid windfall awards through use of higher current rates" under 42 U.S.C. § 1988; although current rates incorporate inflation into fee awards, the incorporation is imprecise and may overcompensate a fee applicant. 711 F.2d at 1152–53. In *Darling-Delaware*, by way of contrast, the district court justified a current rate calculation in part on the grounds that it would cost more to award separate compensation for delay. 440 F.Supp. at 1134.

The Second Circuit's concern with avoiding windfall fee awards through use of higher current rates applies with equal force in common fund cases. *See, e.g., Grinnell I*, 495 F.2d at 469. Nevertheless, the court in *New York State Ass'n for Retarded Children*, disapproving applica-

tion of a flat current rate, made an assumption not generally applicable to common fund cases. It assumed no cost in waiting for a fee, writing:

> the premise underlying use of current rates—that the firm would have billed and collected from the client during the litigation and therefore had the use of the money—is not true for non-profit law offices and frequently not true for private firms, especially in civil rights litigation.

711 F.2d at 1153. The court's assumption, whatever its soundness in civil rights cases, does not apply in commercial or tort actions. Tort cases normally are prosecuted by private firms for profit on a contingent fee rather than an hourly rate basis. If a fee award in a tort case is to be calculated by use of an hourly rate that in reality is never charged in tort actions, then the fact that tort lawyers usually do not bill and collect fees during the litigation has little relevance. Contingent fees often reach one-third to one-half of the recovery; they usually are significantly higher than would be fee awards based on an hourly rate. Contingent fees take into account not only the risk of nonrecovery, but the fact that the lawyer must wait for years before collecting a fee to cover long-paid out-of-pocket expenses, overhead costs and living costs. A lawyer who borrows to pay these advances pays interest; a lawyer who uses her or his own capital loses interest that would have been earned. The premise underlying use of current rates, which holds true for most commercial litigation, remains valid for tort cases in a period of inflation during which the cost of money is closely tied to the rate of inflation.

The delay or opportunity cost factor, of course, could be considered in determining whether to award a multiplier. *Weiss*, 465 F.Supp. at 552; *see also Lindy II*, 540 F.2d at 117. Nevertheless, so long as the rate of increase in the applicable hourly rate does not significantly differ from the costs of delay in payment, it does not make an appreciable difference whether the opportunity cost factor is taken into account at the lodestar or the multiplier stage of anal-

ysis. Moreover, ease of administration, an ever-present concern in the fee award process in a large, complex case, favors the application of a uniform rate throughout based on present hourly rates if the result is reasonable. Courts must recognize that the entire process of fee fixing is so imprecise and has so many arbitrary and subjective aspects that pretensions of exactitude about any element leads to illusory accuracy. Ultimately the good sense and experience of the trial bench and bar must be relied upon for a reasonably acceptable result.

### (c) *Discretionary Multiplier*

 After the time-rate figure has been calculated, the district court in its discretion may adjust it upward or downward on the basis of frankly subjective factors. Such considerations include "the risk of litigation, the complexity of the issues, and the skill of the attorneys." *New York State Ass'n for Retarded Children*, 711 F.2d at 1140 (citing *Grinnell II*, 560 F.2d at 1098). The court must set forth specific facts supporting such an increase or decrease in an attorney's compensation. *Gagne v. Maher*, 594 F.2d 336, 345 (2d · Cir.1979), *aff'd*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Grinnell II*, 560 F.2d at 1098; *Grinnell I*, 495 F.2d at 473. Applying a multiplier that increases the lodestar is not mandatory. *See Zeffiro v. First Pennsylvania Bank, N.A.*, 581 F.Supp. 811, 813 (E.D.Pa.1983). Such adjustments will not be made without good reason. Generally, an "attorney will receive an otherwise reasonable compensation for his time from the lodestar figure alone." *Grinnell II*, 560 F.2d at 1099. *Accord, Lindy I*, 487 F.2d at 168.

### (i) *Risk of Litigation*

 Precedent indicates that in general, the greater the contingent nature of success—that is, the risk of failure—the more weight that a district court may place upon this factor in increasing the lodestar figure. *See, e.g., Grinnell I*, 495 F.2d at 471. In general, the court is sympathetic to the use

of a risk multiplier. Yet, as indicated in the discussion that follows, the present law on the subject is far from settled. Thus, in the instant case a risk multiplier has not been granted. Instead, for reasons suggested *infra* Part II.B.1.c.ii and iii, a multiplier for demonstrated skill has been granted.

As a preliminary matter, application of the general rule depends on how "success" is defined. In assessing the risk of success, a court may look to the probability of a partial recovery by compromise rather than the probability of a complete recovery upon the eventual conclusion of the case. "The greater the probability of success, of either ultimate victory on the merits or of settlement, the less this consideration should serve to amplify the basic hourly fee." *Grinnell I*, 495 F.2d at 471. Judge Gibbons has pointed out "that in a case where some recovery is virtually certain, the fact that the total recovery may be uncertain cannot, consistent with the spirit of *Lindy Brothers I*, justify a substantial departure from the lodestar of reasonable value of services computed on a time basis." *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp. (Lindy II)*, 540 F.2d 102, 128 (3d Cir.1976) (Gibbons, J., concurring in part and dissenting in part). Certainly a case may involve a high level of contingency, in the sense that the chances of complete triumph—a finding of one-hundred percent liability on all claims at the end of a trial— are remote. Yet the result in fact obtained—for example, a comparatively modest compromise settlement before trial that takes into account the numerous unresolved hurdles to full recovery—may be much less unlikely: that defendants would consider settlement to avoid the further burden of litigation and to improve their respective financial pictures might fairly be anticipated. From this perspective, the risk of triumph may not have been so high at the beginning of a lawsuit that it necessarily warrants a contingency or risk-of-litigation multiplier.

Looking beyond this preliminary point, a blind application of the contingency multiplier doctrine in high-risk cases might raise serious problems. First, it might lead to a sharp, troublesome disparity of treatment for cases at the highest level of the risk spectrum: an attorney who brought an extremely high-risk lawsuit that was not quite frivolous under Rule 11 of the Federal Rules of Civil Procedure would be rewarded with a very high contingency multiplier, perhaps as much as four or more times the base lodestar figure. *Cf. Fried v. Utilities Leasing Corp.*, [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,695 (E.D.Pa.1976) (quadrupling thought to be warranted by contingency and by quality of counsel's work). Yet an attorney who prosecuted a similarly high-risk case that fell on the other side of the Rule 11 threshold would not only receive no fee award, but might face an assessment of defendant's own legal expenses as a penalty.

Second, as noted above, a case involving dim prospects for ultimate victory on the merits nevertheless may hold out a significant possibility of settlement. Rewarding the filing and prosecution of large, complex lawsuits with poor prospects for success arguably risks fueling the growth of "nuisance" or "strike" litigation, in which settlement becomes the main object and attorney fee awards an overpowering motivating force. *See Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 27 (D.C.Cir.1984); Leubsdorf, The Contingency Factor in Attorney Fee Awards, 90 Yale L.J. 473, 491– 97, 499 (1981); *cf.* 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1803 at 270–71 (Supp.1984) ("the class action device must be protected against the taint that it is a source of strike suits promoted by attorneys who simply are seeking fat fees" even in the absence of significant empirical evidence of such behavior).

To avoid these two problems, in marginal cases—particularly those in which a comparatively modest compromise settlement has been reached—many courts would probably conclude today that the base lodestar fee should not be increased to account

for the contingent nature of success. Instead, unless other multiplier factors such as quality of representation are relevant, they probably would conclude that the fee award should be based on the straight time-rate figure. *See Tornabene v. General Development Corp.*, 88 F.R.D. 53, 61–64 (E.D.N.Y.1980) (noting "substantial obstacles" to proof of plaintiff's case and relatively small size of class settlement, and holding that "the results achieved do not warrant approval of the fees sought," notwithstanding the risk of success, magnitude and complexity of the litigation, and quality of representation), *aff'd mem.*, 657 F.2d 265 (2d Cir.1981); *cf. Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1550 n. under 42 U.S.C. § 1988 whether an increase for risk of litigation is ever warranted); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1940–41, 1943, 76 L.Ed.2d 40 (1983) (limited success in relation to scope of litigation in civil rights case requires reduction in lodestar award under § 1988); *Selzer v. Fleisher*, 629 F.2d 809, 814 (2d Cir.1980) ("any award must be proportionate to the result achieved"), *cert. denied sub nom. Berkowitz v. Selzer*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981); *Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355, 364 (E.D.N.Y.1982) (denying adjustment in lodestar figure, because, *inter alia*, "the settlement represents a compromise—plaintiffs did not 'win' " a final verdict on the merits), *aff'd*, 721 F.2d 881 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984). *See also Laffey*, 746 F.2d at 26–27 (criticizing the contingency multiplier doctrine); Leubsdorf, *supra*, 90 Yale L.J. at 485–88 (same).

It might be claimed that failure to grant a contingency multiplier to an attorney who brought suit on, and successfully settled, a high-risk claim would undercut the economic motivation to accept meritorious cases despite their limited chances of success. But other considerations reduce the persuasive power of this contention. First, a refusal to grant contingency multipliers in high-risk cases merely increases the contingent nature of the multiplier, not that of the fee award itself; it does not affect an attorney's entitlement to compensation based on time expended at the allowed hourly rate, a payment that constitutes "otherwise reasonable" compensation. No empirical evidence suggests that this approach will so discourage the legal profession's efforts on behalf of common fund plaintiffs that it should not be entertained.

Second, and more fundamentally, the contingency multiplier serves in part to regulate the volume of litigation; it presents the question of the extent to which society should encourage litigation of claims the merits of which are obscure. Concededly, an increase in the lodestar award to reflect the "risk of litigation" does make some sense on a policy basis; counsel has an incentive to pursue meritorious claims despite factual and legal obstacles. *See* Leubsdorf, *supra*, 90 Yale L.J. at 480–82. Nevertheless, this rationale must be balanced against the overall public interest in efficient judicial administration, if not in legal morality. At some point, the latter considerations suggest that the legal profession should be encouraged to think at least twice before initiating sprawling, complicated cases of highly questionable merit that will consume time, expense and effort on the part of all concerned, including the courts, in a degree vastly disproportionate to the results eventually obtainable.

At the very least, then, in borderline cases a rule is supportable providing that counsel's activities should neither be rewarded with a contingency multiplier nor be penalized by Rule 11 sanctions. It is not necessary to decide this issue in the context of the instant litigation since a skill rather than a contingency multiplier is being awarded.

### (ii) *Complexity of Issues*

 Complexity is not an independent consideration in the multiplier calculus. It simply represents an aspect of each of the risk and quality factors. The more novel and complex the issues, the greater the risk of litigation, and "for counsel to bene-

fit in their fee request by the existence of novel questions of law, it should appear that counsel's treatment of these issues materially assisted the Court in resolving them." *Pollard v. United States,* 69 F.R.D. 646, 648–49 (M.D.Ala.1976). *Cf. Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 954–55 (1st Cir.1984). In this sense, therefore, the novelty and complexity of the issues are taken into account in deciding whether counsel "demonstrated a high level of skill and expertise throughout the pendency of th[e] lawsuit." *Pollard,* 69 F.R.D. at 649. *See also Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1548–49, 79 L.Ed.2d 891 (1984) (stating in statutory fee context that complexity of issues presumably is fully reflected in number of billable hours and therefore no upward adjustment can be awarded on this basis, absent unusually efficient and skilled efforts by counsel).

#### (iii) *Demonstrated Skill of Attorneys*

 The "quality of representation" factor is intended to permit a district court either to reward "particularly resourceful" legal work that "secures a substantial benefit ... with a minimum of time invested," or to decrease "the objectively determined fee where the benefit produced does not warrant awarding the full value of the time expended." *Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 168–69 (3d Cir.1975), quoted in *Lindy II,* 540 F.2d at 112. "Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good." *Lindy I,* 487 F.2d at 168. *See also Grinnell II,* 560 F.2d at 1100. A quality multiplier in general should not be awarded for the level of skill normally expected of counsel, because it will have been accounted for already in the computation of the hourly rate usual for such a lawyer. *See* Manual for Complex Litigation § 1.47 at 71 (5th ed. 1982); *supra* Part II.B.1.b; *cf. Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984) (statutory fee applicant must show that quality of services rendered was superior to that reason-

ably to be expected given the hourly rate allowed).

 In considering whether to adjust the lodestar figure, a court may look to, among other things, (1) the result obtained, evaluated in terms of (a) the extent of possible recovery compared with the amount of actual verdict or settlement, and (b) the benefit conferred on the class, as well as (2) the efficiency of "the professional methods utilized in processing the case." *Lindy II,* 540 F.2d at 118.

Although not generally considered an aspect of proficiency, related criteria such as tenacity, demonstrated ability to bear strains attendant upon preparation of a difficult case for trial under the pressure of short time schedules, and skill shown in coordinating the work of many attorneys also may be taken into account. These qualities of character and administrative skill often make the difference between success and failure in a lawsuit. They are properly considered lawyer's skills.

Perhaps of even greater value as compensable skills are those related to settlement negotiation and settlement. Public policy clearly favors settlements at the earliest practicable stage of a dispute. Assuming, for example, that counsel was so skillful in negotiating a settlement that the case was settled after a few hundred hours of lawyer's work rather than after many thousands of hours, a multiplier of ten or more would appear to be justified. This answer would allow some escape from the present lodestar disincentive to early settlement.

That a settlement has been arrived at notwithstanding the formidable factual and legal obstacles to recovery does not, however, necessarily reflect skill by the attorneys. A case may be settled for "reasons that had little, if anything, to do with the quality of the performance of plaintiffs' counsel." *Pollard,* 69 F.R.D. at 649. *See generally* Dawson, Lawyers and Involuntary Clients in Public Interest Litigation, 88 Harv.L.Rev. 849, 858–59 (1975) ("Dawson II"). The fee applicant desiring an in-

crease in his or her lodestar award to reflect highly skilled and efficient representation bears the "heavy burden of proving entitlement to such an adjustment." *Lindy II*, 540 F.2d at 118, quoted in *Grinnell II*, 560 F.2d at 1100.

■ A quality multiplier need not be granted for all counsel or for all tasks. *See Donnell v. United States*, 682 F.2d 240, 255 n. 49 (D.C.Cir.1982) ("The special quality of one lawyer's services provides no logical basis for granting all the lawyers a quality adjustment."), *cert. denied*, 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983); *Seigal v. Merrick*, 619 F.2d 160, 165 (2d Cir.1980) (suggesting that district court could award or withhold a multiplier based on relative productivity of legal theories propounded); *In re Equity Funding Corp. of America Securities Litigation*, 438 F.Supp. 1303, 1337–38 (C.D.Cal.1977) (awarding different multipliers to different attorneys based on the quality of their work and its importance to the case); *cf. In re Fine Paper Antitrust Litigation*, 98 F.R.D. 48, 83 (E.D.Pa.1983) (setting different rates for lead and nonlead counsel), *rev'd on other grounds*, 751 F.2d 562, 590–91 (3d Cir.1984).

Quality of representation can justify a decrease as well as an increase in the lodestar figure. *See In re Fine Paper Antitrust Litigation*, 98 F.R.D. at 84–85, *rev'd on other grounds*, 751 F.2d 562, 600–01 (3d Cir.1984). *Cf. Arizona v. Maricopa County Medical Society*, 578 F.Supp. 1262, 1278 (D.Ariz.1984) (disallowing time in lodestar calculation in lieu of "a substantial negative multiplier").

### (iv) *Delay in Payment*

■ Delay in payment may be considered by a court in awarding a multiplier. *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 588–89, 601–02 (3d Cir.1984); *Lindy II*, 540 F.2d at 117; *Weiss v. Drew National Corp.*, 465 F.Supp. 548, 552 (S.D. N.Y.1979). Under certain circumstances, delay in payment instead may be taken into account in determining the appropriate hourly rate. *See supra* Part II.B.1.b and

*infra* Part IV.B.2. The court's task is not necessarily limited to "a mechanical calculation of the delay factor on the basis of interest rates"; rather, allowance for delay in payment is subject to the court's discretion. *In re Fine Paper Antitrust Litigation*, 751 F.2d at 601–02 (Becker, J., concurring).

### 2. *Expenses*

■ Upon submission of adequate documentation, plaintiffs' attorneys are entitled to reimbursement of those reasonable and necessary out-of-pocket expenses incurred in the course of activities that benefited the class. *See, e.g., In re THC Financial Corp. Litigation*, 86 F.R.D. 721, 740 (D.Hawaii 1980); *In re Armored Car Antitrust Litigation*, 472 F.Supp. 1357, 1388–89 (N.D.Ga.1979), *modified and remanded on other grounds*, 645 F.2d 488 (5th Cir. 1981). Expenses must be both reasonable in amount and reasonably related to the interests of the class:

> As a premise the petitioners should assume their class clients have agreed to pay modest to moderate travel and per diem costs when the trip served their beneficial interests. Petitioners should not expect to recover from their involuntary clients for unnecessary or extravagant travel and related expenses. Overstaffing at meetings, conferences, or court appearances [and the consequent expense] will not be rewarded, ... lavish dining ... will not be underwritten. As time spent in conferences with individual clients has been reduced, so too will travel expenses to meet with these clients.

*Id.* at 1388–89 (citation omitted). *See also In re Fine Paper Antitrust Litigation*, 98 F.R.D. 48, 85 (E.D.Pa.1983), *rev'd on other grounds*, 751 F.2d 562 (3d Cir.1984). Counsel must submit detailed documentation in support of their expense reimbursement requests. *In re Armored Car Antitrust Litigation*, 472 F.Supp. at 1389.

### C. *Fee Award Allocation and its Effect on Contingent Private Fee Arrangements*

■ Once the fee award has been determined under the lodestar analysis, its bur-

den on the fund must be allocated among the fund beneficiaries. This normally straightforward task becomes complicated when some class members are represented by attorneys other than class counsel. In addition, a question may arise about whether individuals who opted out of the class remain potentially liable for some of the costs of class discovery. Finally, the court must determine the fee award's impact upon class counsel's own private fee arrangements.

1. *Immunity of Represented Class Members and Opt-Outs From Fee Payments From the Fund*

Courts have held that class members other than the representative plaintiffs can avoid court-awarded fee disbursements from their portion of the fund "by hiring their own attorneys and participating in the litigation." *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 771 (9th Cir.1977). *See* Dawson, Lawyers and Involuntary Clients: Attorney Fees from Funds, 87 Harv.L.Rev. 1597, 1647–51 (1974) ("Dawson I"). According to Professor Dawson, the represented class member enjoys this immunity because "the ride for him is not free and [because] he becomes a contributor to the final result, so that two essential bases of the [common fund] doctrine are eliminated." *Id.* at 1647. *See also In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019 (5th Cir.1977) (approving exclusion of active counsel from fee contributions on the basis that "[o]ne who hires and pays his own lawyer is not a free rider if the attorney is a contributor to the final results").

The *Lindy* district court found that some lawyers benefited the class by filing many individual suits against the defendants, which "necessarily helped bring about the settlement agreement which produced the substantial settlement fund." *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 341 F.Supp. 1077, 1085–86 (E.D.Pa.1972), *rev'd on other grounds*, 487 F.2d 161 (3d Cir.1973). The decision on this point was not reviewed on appeal. See *Lindy I*, 487 F.2d at 164; *Lindy II*, 540 F.2d at 121. It has, however, been rejected in this circuit. *See, e.g., Gerena-Valentin v. Koch*, 739 F.2d 755, 759 (2d Cir.1984); *see also* 3 H. Newberg, Newberg on Class Actions § 6980f at 1282–83 (1977); *cf. In re Fine Paper Antitrust Litigation*, 98 F.R.D. 48, 234–35 (E.D.Pa. 1983) (immunity rule applies only to those class members "who had filed suit and *participated* in the litigation" (emphasis added), *rev'd on other grounds*, 751 F.2d 562 (3d Cir.1984).

According to the Ninth Circuit in *Vincent*, courts have created an exception to the general rule of immunity from fee assessment that applies when the individual client's counsel makes a relatively small contribution to the litigation so that

> the contributions of the original or lead attorneys and the attorneys hired by the "stranger" beneficiaries are unequal.... The purpose of this exception is of course identical to the purpose of the broader common fund doctrine itself: avoidance of unjust enrichment, or as it has been referred to in this litigation, "coattailing."

*Vincent*, 557 F.2d at 772 (citations omitted). *See also In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1019–21 (inactive counsel must contribute from their fee receipts); *Doherty v. Bress*, 262 F.2d 20, 22 (D.C.Cir.1958) (same), *cert. denied*, 359 U.S. 934, 79 S.Ct. 649, 3 L.Ed.2d 636 (1959); *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 1973–1 Trade Cas. (CCH) ¶ 74,350 at 93,641 (S.D.N.Y.1972) (entry of appearance by class members through their own counsel does not negate obligation to contribute through settlement fund to class counsel's fee award); 3 H. Newberg, *supra*, §§ 6960a, 6980d, 6980g (courts have required litigants to contribute when no significant independent benefit was conferred on the class); *cf. Grinnell I*, 495 F.2d at 470 (quoting *Lindy I* on the purpose of fee award as being compensation for legal services benefiting a claimant but deleting restriction to unrepresented claimants).

One way of dealing with the problem is to allow reasonable out-of-pocket expenses to those attorneys for independent class member claimants whose contribution to the class result was inchoate and indirect. *Cf.* Dawson I, *supra*, 87 Harv.L.Rev. at 1649 (suggesting that a court could "undertake to apportion fees according to the relative contributions of active and less active counsel"). *See infra* Part IV.A.

■ The exception to the general rule of immunity from the assessment clearly applies in the instant case. The contributions of class counsel—including those lawyers who assisted in the class action at the management committee's request—dwarf the contributions, if any, made by associated and forwarding attorneys—who, as noted *supra* Part II.B.1.a, did not substantially benefit the class by efforts on behalf of individual clients. That "the disparity in effort between lead counsel and non-lead counsel" may have arisen from the structure of the litigation rather than voluntary choice is immaterial. *Vincent,* 557 F.2d at 772. Accordingly, a class member represented by an associated or forwarding attorney or by any other lawyer who did relatively little for the class, remains subject to a pro rata assessment of the overall fee award against his share of the class settlement.

To the extent that the class member has an enforceable private fee arrangement with the attorney for benefits arising from the attorney's efforts, the sums "owed to" the attorney may in some litigations be decreased by that fee award assessment. *See In re Air Crash Disaster at Florida Everglades,* 549 F.2d at 1019–21; *Doherty v. Bress,* 262 F.2d at 22. In the instant litigation, it is clear that any benefit received by a class member resulting from the creation and distribution of the settlement fund arises from efforts by the relatively few attorneys receiving fees for time spent in prosecuting the class action. *See* Table of Allowed Fees and Expenses, *infra* Part VI. The efforts of any other lawyer on behalf of an individual class member client at best contributed less than marginally toward any recovery ultimately to be received by that class member from the fund.

Some attorneys filed individual lawsuits on behalf of their clients, but those cases have been dismissed as duplicative of the class action to the extent that those plaintiffs did not opt out of the class. These actions resulted in neither a benefit to the class for which a fee award is due, *see supra* Part II.B.1.a, nor an individual recovery for any plaintiff for which a private fee is payable. *See, e.g., Krause v. Rhodes,* 640 F.2d 214, 219–20 & n. 7 (6th Cir.), *cert. denied sub nom. Sindell, Lowe & Guidubaldi v. Attorney General of Ohio,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); *Allen v. United States,* 606 F.2d 432, 435–36 & n. * (4th Cir.1979); R. Aronson, Attorney-Client Fee Arrangements: Regulation and Review 103 (Federal Judicial Center 1980).

Some lawyers did not file individual actions. Instead, they undertook tasks such as monitoring the progress of the class action, assembling medical records, and filing claim forms on their clients' behalf— routine administrative tasks requiring little professional skill. These attorneys did not substantially benefit the class through these activities and so earned no fee award from the fund for them. Their efforts did not contribute in any meaningful way to any benefit that their class member clients may receive from the fund and so nothing can be charged as a fee approved by the court at this time. *See, e.g., Allen,* 606 F.2d at 436; *Hoffert v. General Motors Corp.,* 656 F.2d 161, 165–66 (5th Cir.), *reh'g denied,* 660 F.2d 497 (1981), *cert. denied sub nom. Cochrane & Bresnahan v. Smith,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982); *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1109–10, 1112 & n. 9 (3d Cir.1979); ABA Code of Professional Responsibility DR 2–106(A), (B). The court notes that it has received submissions indicating a 50% contingent fee agreement in one case, and requesting $2,500.00 in another, apparently for doing nothing more than submitting a claim form—a task ac-

complished by tens of thousands of claimants without a lawyer's intervention.

The fee awards granted by this order represent the fair value of the legal services rendered in prosecuting the class action and creating the settlement fund. They will be paid "off the top" of the fund, *see infra* Part II.C.2, leaving the remainder of the settlement fund for disbursement to the class pursuant to court order. The only fee or expense award recoverable from the settlement fund or a class member's individual recovery is one awarded in this judgment or by further court order.

 A problem related to the issue of how a fee award affects those class members represented by their own private attorneys concerns those putative class members who opted out of the class. If they use the product of the class representatives' discovery efforts in the subsequent prosecution of their individual opt-out lawsuits, the question arises of whether they should be charged with some of the class's costs of discovery. This issue is particularly important in multidistrict litigations in which attorneys representing individual clients share in the benefits of joint discovery without participating in it. Those putative class members who opt-out and use MDL discovery materials could be assessed a reasonable fee, to be paid back into the fund as their fair share of the legal expenses assumed by the class. *Cf., e.g., In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019–21 (5th Cir.1977) (requiring those who benefit from lead counsel's work in consolidated litigation to bear a portion of the fee award and reducing their contingent fee liability to their nonparticipating attorneys accordingly); *Doherty v. Bress*, 262 F.2d 20, 22 (D.C.Cir.1958) (requiring inactive counsel to contribute from his fee receipts), *cert. denied*, 359 U.S. 934, 79 S.Ct. 649, 3 L.Ed.2d 636 (1959); *Heart Valve Cases*, M.D.L. No. 367 (E.D.N.Y. 1983) (orders charging individual attorneys with costs of joint discovery).

Most if not all opt-out claimants would be represented on a contingent fee basis. One method of dealing with the problem would be to require counsel in such cases to report to the court any fee received so that an appropriate percentage could be ordered paid to the class, which bore the expense of joint discovery. Another method of allocating discovery costs would be to assess the amounts to be paid by opt-out plaintiffs at the time that they make use of MDL discovery materials, regardless of the outcome in their individual cases. This alternative seems more equitable, because the benefit to the individual plaintiffs will accrue whether or not they ultimately succeed on the merits; use of multidistrict discovery avoids discovery expense in the individual cases that otherwise would be incurred.

Any use of MDL discovery materials in an *"Agent Orange"* opt-out case shall be reported to the court so that an appropriate order to pay into the fund an appropriate assessment can be arranged.

2. *Effect of a Fee Award on a Client's Private Fee Liability to a Class Attorney*

 A class attorney may receive fees from that share of the fund attributable to class members other than his or her own private clients, whether or not those other class members are themselves represented by counsel. Two conceptual issues are posed: first, whether class members who are class counsel's private clients can be charged with a pro rata share of the total fee award to all attorneys, and second, whether those class members have a right to contribution from the rest of the class towards payment of their own attorney fees and if so how that contribution right should be taken into account by a court. *See Trustees v. Greenough*, 105 U.S. 527, 532, 26 L.Ed. 1157 (1881) (recognizing that when a plaintiff wins a judgment creating a fund that benefited others as well as himself, the plaintiff is entitled to contribution from the other fund beneficiaries toward his litigation expenses including attorney fees); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 28 L.Ed.

915 (1885) (extending the common fund doctrine to permit a plaintiff's lawyer to make a direct claim for a fee, over and above the fee due from the lawyer's client, against other fund beneficiaries for the reasonable value of those services to them); Dawson II, *supra*, 88 Harv.L.Rev. at 849–51; Dawson I, *supra*, 87 Harv.L.Rev. at 1601–12; *supra* Part II.C.1. *See also Lindy II*, 540 F.2d at 120; *Lindy I*, 487 F.2d at 169; 3 H. Newburg, *supra*, § 6928b; Manual for Complex Litigation § 1.47(b)(2) at 74 & n. 181 (5th ed. 1982). *Cf. In re Continental Vending Machines Corp.*, 318 F.Supp. 421, 432–33 (E.D.N.Y.1970) (granting a lawyer's fee award request but ordering the award paid directly to the client). *See generally Wallace v. Fiske*, 80 F.2d 897, 909–12 (8th Cir.1936).

The problem of dealing with class counsel's private fee arrangements is difficult in theory. In the instant case, the Gordian knot can readily be cut because no class attorney requesting a fee award has claimed the right to a contractual fee from a client. Thus, any lawyer receiving a fee or expense award from the fund will be deemed to have waived any private contractual right to a fee from individual class members. *See, e.g., Pollard v. United States*, 69 F.R.D. 646, 652 (M.D.Ala.1976); 3 H. Newberg, *supra*, § 6928b. Serious doubt exists in any case about whether any such fee agreement could be enforced to the extent that it provides for a fee percentage of the client's recovery that exceeds a pro rata percentage of the total fee award granted by this judgment. *See, e.g., Wheatley v. Ford*, 679 F.2d 1037, 1041 (2d Cir.1982); *Cooper v. Singer*, 719 F.2d 1496 (10th Cir.1983); *Krause v. Rhodes*, 640 F.2d 214, 218–20 (6th Cir.), *cert. denied sub nom. Sindell, Lowe & Guidubaldi v. Attorney General of Ohio*, 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); *Magana v. Platzer Shipyard, Inc.*, 74 F.R.D. 61, 75 (S.D.Tex.1977); Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1611 (1976). *See generally* R. Aronson, *Attorney-Client Fee Arrangements: Regulation and Review* 74–118 (Federal Judicial Center 1980). *But see Dunn v. H.K. Por-*

*ter Co., Inc.*, 602 F.2d 1105, 1111–12 (3d Cir.1979).

### III. GUIDELINES AND PROCEDURES

The deadline for filing petitions for attorney fees and expenses was August 31, 1984. Petitions that were submitted after this date were originally denied on the grounds of untimeliness. Subsequently this court withdrew the denials and permitted filing of late submissions for fees and expenses incurred prior to August 31, 1984. To date all petitions received—121 in all—have been examined by the court. In some cases, supplemental or revised petitions were submitted, and these too have been reviewed.

At the request of the court, the Magistrate developed a form for submission of fees and expenses. Attorneys were directed to follow this form. A number of them ignored the direction. Although it increased the burden of review, the court nevertheless accepted fee petitions in any form submitted.

The fee and expense petitions can be broken down into three categories: (1) submissions by members of the Agent Orange Plaintiffs' Management Committee, (2) submissions by members of Yannacone and Associates, the consortium of lawyers who acted as lead counsel for the class from 1980 until resignation in September 1983, and (3) the petitions of approximately 100 individual attorneys who were never on any court-approved committee that represented the class. Many of these independent counsel filed cases on behalf of individual clients. The actions of individual class members who did not opt-out of the class were dismissed as duplicative of the class action. Some independent counsel did not file individual actions on behalf of their class member clients; some of these lawyers have submitted petitions for fees and expenses for representing class member clients who did not retain those attorneys until after the May 7, 1984 settlement.

The amount of material that the court was required to study under the lodestar

approach used in this circuit was substantial. For each of the attorneys who submitted a petition, every hour claimed had to be reviewed and every task purportedly undertaken had to be evaluated in order to determine whether the time claimed was spent in activities that advanced the interests of the class as a whole.

In addition, every expense had to be evaluated under this standard. Vouchers and receipts substantiating the expenses claimed had to be examined and matched to these expenses. In some instances the vouchers and receipts had to be painstakingly put into an order corresponding to that in which expenses were listed.

To assist the court, the District Executive requested permission from the Administrative Office to hire three temporary assistant clerks. These clerks—law school graduates awaiting admission to the bar—worked full-time under the court's direction for more than three months on the fee and expense petitions. With the aid of a senior law clerk familiar with the *"Agent Orange"* litigation working full-time on fees, they reviewed the petitions using guidelines established by the court. Another law clerk worked full-time on legal and other research connected with the petitions. A member of the Clerk's Office staff devoted a large part of her time during this three-month period to keeping track of fee petitions and related attorney submissions. Apart, therefore, from the substantial judicial time required to consider fee questions, thousands of court-personnel hours were required for this difficult task.

The court closely supervised and reviewed the clerks' work making numerous changes. The material was checked and rechecked repeatedly to minimize inadvertent errors in computation.

In some respects reviewing the petitions was largely a clerical exercise. Meaningful analysis, however, required a thorough knowledge of the history of this case and of the individual lawyer's work reached through direct observation and evaluation of attorneys by the court over many months. For this reason, a two-step process was used. First, a petition was reviewed by one of the assistant clerks. Following guidelines provided by the court, the clerk examined the number of hours claimed and by whom, the type of task for which time was sought and the expenses and accompanying vouchers and receipts. A recommendation was made concerning what hours and expenses were compensable. Using calculating machines furnished by the Clerk of the Court, for each petition the assistant clerks added first the number of hours recommended as compensable and next the amount of expenses recommended as compensable. Second, every petition, supporting documents and all adding machine tapes showing hours and expenses were examined by the court and revised and recomputed when the court, based on its direct involvement in the case, deemed it necessary.

The assistant clerks used two sets of guidelines, one for determining the numbers of compensable hours, the other for determining allowable expenses. Both are set out below so that the method of review can be understood. These guidelines were designed to be used by the assistant clerks only in their preliminary review. Obviously, a great deal of somewhat arbitrary discrimination was necessary. In general, however, the use of these semi-mechanical criteria resulted, in the court's judgment, in a fair and uniform evaluation of reasonable time and resources spent in aid of the class. The results obtained by the clerks were repeatedly revised during the enterprise based on the court's knowledge of the case and lawyers' work habits. As finally fixed—pursuant to individual review by the court—they are set out *infra* Part VI.

All fee petitions submitted to and reviewed by the court have been filed in the Clerk's Office in two filled five-drawer legal-sized file cabinets as an unpublished exhibit to this opinion. This exhibit is deemed a part of this opinion. Each attorney's fee petition has been placed in one or more file folders and loose-leaf books, together with all supplementary papers received by the court in connection with that

attorney's petition. Notations on the pages of the petitions indicate which hours and expenses were allowed. Included with the petition are the original adding machine tapes that also show which hours and expenses were allowed and a cover sheet that indicates the total hours allowed, the total expenses allowed and the total fee award to that attorney. Separate filing cards summarize this information. It is thus possible to see exactly how the court computed the award for each attorney.

### A. *Guidelines for Fees*

■ Fees were awarded only for that work in furtherance of the class action. No fees for the period after June 15, 1984 were granted because of the practical need for a cutoff date. There may be a valid claim for hours subsequent to that cutoff date, but it seems useful to deal with any post-June 15 applications at one time.

Most of the labor by the PMC was necessarily in furtherance of the class action. Nevertheless, exercise of judgment regarding the amount of time claimed for any given activity was still necessary. In every instance counsel indicated the hours spent on a particular task (*e.g.,* reviewing depositions—2 hours). To simplify computation, for each entry only one of five determinations was made regarding how much of the time requested to allow: none; one-quarter; one-half; three-quarters; or all. The following instructions were developed after a review by the court of the fee petitions, departures being allowed on the basis of special considerations based on the court's knowledge of the case.

### 1. *Court Time*

Only one-half of the time requested for review of court orders was allowed because most of the rulings that were the subject of court orders were made in open court after oral argument or extensive discussion as well as briefing.

All of the time claimed for telephone conferences with the court, the Magistrate or the Special Master was allowed with one general exception. Many conferences with the then Special Master took place in the summer and fall of 1983. No time was allowed if the conference related to internal management committee problems. A typical entry falling into this category is "TC with SM about Management Committee Organization."

All of the time claimed for preparation and attendance at hearings was allowed. For purposes of allowing time for review of hearing transcripts by the lawyer who attended the hearing, a distinction was made between hearings held before February 1984 and those held after February 1984. For pre-February hearings, all of the time requested for review of transcripts was allowed. For post-February hearings, review of transcripts was unnecessary because the Magistrate issued detailed orders that included her rulings at hearings held before her within a few days of those hearings; only half of the review time requested was allowed. When review time was requested by attorneys who did not attend the hearing half of the time requested was allowed. Half of the time claimed for travel to and from hearings was allowed. *See Society for Good Will to Retarded Children v. Cuomo,* 574 F.Supp. 994, 997–98 (E.D.N.Y.1983) (50% of hours claimed for travel time allowed), *remanded on other grounds,* 737 F.2d 1253 (2d Cir.1984).

### 2. *Management Committee Meetings*

All of the time claimed was allowed for substantive meetings, at which management committee members reviewed legal issues and discussed trial strategy. An individual attorney's entry indicating attendance at a management committee meeting was compared with other committee members' entries for that day to arrive at a fair assessment of allowable time. Half of the time claimed was allowed for travel to and from committee meetings. *See Society for Good Will to Retarded Children,* 574 F.Supp. at 997–98. No time was allowed for nonsubstantive meetings at which committee members aired their disputes with one another and haggled over finances. Such meetings were especially

numerous from the spring through the fall of 1983. No time was allowed for attendance by associates at management committee meetings.

For telephone conferences between committee members, the same substantive-nonsubstantive distinction was made. Many telephone conferences during the spring, summer and fall of 1983 concerned the management committee's internal problems and no credit was given for these conferences.

### 3. *Depositions*

Half of the time requested was allowed for travel to and from depositions, for attendance at depositions by nonparticipating attorneys, for summarizing depositions or reading deposition summaries, or for reading and reviewing depositions. *See New York Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146–47 (2d Cir. 1983). No more than 9 hours per lawyer per day were allowed for a deposition.

### 4. *Document Review and Preparation of Legal Submissions*

All of the time claimed was allowed for document review, for research, and for preparation of pleadings, briefs, and memoranda of law. No time was allowed for preparation of documents relating to the internal organization of the plaintiffs' management committee.

### 5. *Other Activities*

Some exceptionally vague entries were not credited—for example, "various conferences, 8 hrs." or "several TC, 2 hrs." Certain catch phrase entries also were too vague to credit—for example "in-office work," "review of correspondence," and "reviewed papers or pleadings." When an entry contained more than one description, each description was considered in determining how much time to allow. For example, one entry read "TC with Tom Henderson [a member of the PMC]; review correspondence—1 hr." Here, half of the time claimed was allowed because "review correspondence" was too vague.

Mail required some discrimination. If the entry indicated review of many letters and one-half hour was claimed in all, the lawyer probably was doing no more than opening his or her mail, a task that did not significantly further the class action. No credit for time was given. On the other hand, if the attorney claimed substantial time for review of one letter, the time was credited. Some of the letters in this litigation were long and were often mini-briefs that related to substantive legal issues. In general, no time was allowed for discussions among lawyers of the same firm. Much of the productive discussion reappeared in other contexts as when a number of lawyers attended the same deposition or court hearing. *See, e.g.*, analysis of multiple attendances in Defendants' Memorandum Concerning Plaintiffs' Lawyers' Applications for Attorneys' Fees and for Reimbursement of Expenses, Ex. C.

### B. *Guidelines for Allowable Expenses*

For much the same reasons as are described *supra* Part III.A, no expenses for the period after June 15, 1984 were allowed. The PMC, however, was allowed expenses incurred up to September 3, 1984 and paid by October 2, 1984. The PMC incurred substantial post-settlement expenses for informing the class members about the settlement and making presentations at the Fairness Hearings.

### 1. *Travel*

This category includes expenses for transportation, lodging and meals. The reason for travel had to be determined; in some cases, time records had to be checked. For example, a request for $150 for "travel to Washington, D.C." was not sufficiently detailed. Time records had to be consulted to determine why the lawyer went to Washington. If the purpose of the trip was to attend a deposition, for example, the expense was allowed after checking the lawyer's time records for the deposition. Travel costs for depositions, court appearances, hearings, "regional counsel" meetings, meetings with members of Yan-

nacone and Associates or the PMC and meetings with clients were allowed.

Travel for the purpose of attending conferences required discrimination. Expenses for travel to general legal education conferences or seminars were not allowed (nor was the actual cost of the conference). In 1983–1984, the PMC organized a few conferences on such matters as liability and proof. Travel costs for PMC members to attend these conferences were allowed.

Reasonable costs for meals and lodging in connection with travel were allowed; reasonable costs included a $50 per day limit for meals and a $90 limit per night for lodging. Time records were consulted to determine length of stay; if necessary, the amount was reduced to reasonable costs. Twenty cents (20¢) per mile for car travel was deemed reasonable. Costs for parking were also granted. Some lawyers submitted a lump sum request for all expenses incurred on a single trip; this sum was allowed if the amount appeared reasonable, given the length of the trip and distance traveled. No allowance was made for incidental travel expenses.

### 2. *Telephone, Postage, Duplicating, Photocopying and Book Purchase Charges*

Costs for long distance calls to clients or lawyers, to hospitals for medical records and the like generally were allowed. Calls made for the purpose of general "Agent Orange" education were not allowed. If there was doubt about the reason for a call, it was allowed. Postage charges, including costs of express delivery and messenger services, were allowed. Duplicating and photocopying costs also were allowed. No allowance was made for the purchase of books, even those related to "Agent Orange" or Vietnam.

### 3. *Paralegals, Paraprofessionals and Clerks*

Generally, this court would favor reimbursing lawyers for paralegal time at a rate that reflects the costs of salary, overhead and a profit. This would result in a rate per hour of about $40. Providing a profit for these services encourages use of the lowest paid employees for clerical and repetitive work and discourages assigning the work to more highly compensated associates and partners. In this case, this general policy could not be followed because expenses only are being allowed for most attorneys and the expense to the attorney is the out-of-pocket payment to the paralegal. The amount of paralegal work allowed for those attorneys being awarded fees was relatively small so that a single across-the-board rate for paralegals had considerable advantages in simplifying checking and computations. In addition, this circuit appears to favor limiting reimbursement for paralegal time to out-of-pocket expense. *See Grinnell I,* 495 F.2d at 473.

For these reasons legal assistant expenses were treated as costs. The lawyer was reimbursed for the hourly wage paid to the paralegal, not for the billing rate. A rate of $20 per hour for paralegal and law clerk time was used. According to a recent article in the American Bar Association Journal, the average paralegal billing rate now being charged is $36. *See* Reskin, Law Poll, 70 A.B.A.J. 52, 52 (Dec. 1984). This $20 reimbursement rate therefore appears adequate when overhead and profit are eliminated. As an expense, paralegal personnel and law clerk hours generally were not evaluated individually; rather, for most petitions the total number of hours claimed for such time was accepted at face value, multiplied by $20 and added as an expense. Sometimes a lawyer only sought reimbursement for the actual amount paid to the paralegal. When the actual expenditure was less, that figure was used.

## IV. APPLICATION OF LAW TO THE FEE PETITIONS

The legal principles applicable to fee petitions have been discussed in Part II of this opinion. This Part explains the treatment of the independent counsel fee petitioners and sets forth some general comments that apply to all the petitions.

## A. *Independent Counsel*

 As noted in Part I of this opinion, attorney fees and expenses may be awarded only for those activities that can be characterized as having substantially benefited the class. Unless a petition revealed that an attorney spent time on an activity that furthered the interests of the class, such as taking a deposition, or writing a brief that was submitted to the court, no fee award could be made. Not surprisingly, most of such work was done by the PMC, as lead counsel for the class in preparing for trial of all issues on a date certain, and to a lesser extent by Yannacone and Associates.

The majority of independent counsel did not perform work that benefited the class in this sense. Simply filing a suit on behalf of a class member, for example, may help to gauge the potential size of the class, but it does not substantially further the class action. Independent counsel were awarded fees only when the court found that tasks they performed contributed substantially to the prosecution of the class action.

This is not to deny that it is sometimes an important part of a lawyer's work to interpret what is happening to a client, to transmit the client's wishes to attorneys managing a litigation and even to publicize the proceedings to other members of the class and to the public generally. Some of the independent counsel undoubtedly accomplished such tasks. It may even be that their work in starting some 600 independent actions served to put pressure on the defendants to settle. In general, however, the benefit to the class from these activities was relatively negligible.

The lawyers who will not be receiving fee awards may have accomplished something of value to their individual clients, but any benefit to the class deriving from their efforts is too subtle, indirect, remote and speculative to permit quantification in the form of a fee award. The practical needs of administration, and fairness to other fee applicants and to the settlement fund beneficiaries, necessitate a showing of some concrete, measurable, objective contribution to the creation of the settlement fund arising from work on the lawsuit from which a fee award can be calculated. Abandonment of this touchstone would require speculation about the nature and degree of class benefit attributable to a given attorney's efforts, to the detriment of simplicity, certainty, uniformity and fairness of result in the fee award process.

These independent lawyers, however, have labored in good faith on matters related to the *"Agent Orange"* litigation. Many have advanced their own money for certain expenses, such as filing fees, photocopying and long distance telephone calls, including calls to the Veterans Administration regarding a client's service history. The possibility remains that their efforts did help the class in some remote way, although not so directly and visibly that a fee can be awarded. Accordingly, reasonable expenses actually paid by independent counsel on behalf of their *"Agent Orange"* clients have been awarded where those expenses were substantiated by vouchers and receipts. *See Baron v. Commercial & Industrial Bank of Memphis,* [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,132 at 96,243 n. 14 (S.D.N.Y.1979) (application for attorney fee denied because attorney was never appointed class counsel and court was "not satisfied that his efforts were of any benefit to the class members"; nevertheless, expense reimbursement "presents a different question and the Court would be inclined to grant a properly documented request for expenses incurred in litigation of the class action"); *supra* Part II.C.1.

As indicated *supra* Part III.B.3, paralegal and law clerk time was regarded as an expense, payable at $20 per hour unless the actual expenditure was less. In some cases, independent counsel sought compensation for substantial paralegal or law clerk time that was logged after the settlement. Because it is difficult to see what benefit to the class resulted from tasks performed by paralegals after the settlement, expenses for that time were not granted.

### B. *Lodestar Analysis*

■ The first step in the lodestar approach requires a court to calculate attorney fees "by multiplying the number of billable hours by the 'hourly rate normally charged for similar work by attorneys of like skill in the area.'" *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1190 (2d Cir.1983) (quoting *Grinnell II*, 560 F.2d at 1098). This procedure requires decisions to be made about what hours to allow and what hourly rate to use. The lodestar method's second step allows the court to adjust the lodestar figure upward or downward by use of a multiplier or divisor. Finally, the question of what to allow as interest from the date of judgment must be considered.

### 1. *Hours Allowed*

Specific criteria used to assess time claimed have already been discussed in Part III.A of this opinion. These criteria were based on the legal standards for fee awards set forth in Part II, including whether an activity benefited the class, whether it was adequately documented, and whether the time claimed for it was reasonable. Some general legal requirements bearing on what hours to allow are now discussed.

Since June 1983, the law of this circuit has required attorneys to submit contemporaneous time records for all work performed after June 15, 1983. *See New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147–48 (2d Cir. 1983); *Birmingham v. Sogen-Swiss International Corp. Retirement Plan*, 718 F.2d 515, 523–24 (2d Cir.1983). This requirement primarily affected the members of the PMC because they have done the bulk of the work since July 1983.

The PMC submitted one petition for fees and expenses on behalf of all its members. This petition consisted of twelve large three-ring notebooks containing typed, "reconstructed" time records, as well as schedules of expenses and accompanying receipts. Subsequent to the submission of this joint petition, and at the request of the Magistrate, members of the PMC individually submitted their original "contemporaneous" time records. As the work of checking progressed, further verification was requested by the court and supplied.

The court's review of hours requested was based on the typed records submitted in the PMC joint petition because they were much easier to read. In each case, a spot check of the contemporaneous records was made to assure that the reconstructed records accurately reflected the original entries. If contemporaneous time records were not submitted for work done after June 15, 1983, that fact was considered in determining compensable hours. Especially vague or repetitious entries in reconstructed records for this period were strictly scrutinized and hours claimed for such time severely limited.

Unfortunately, not all of the other attorneys seeking fee awards used the form drafted by the Magistrate which provided space for describing those activities for which time was requested. This failure made the task of reviewing and evaluating time more difficult. Since many of the attorneys who submitted fee petitions usually work on a contingent fee basis rather than charging an hourly rate and consequently they are not in the habit of keeping detailed time records, the court did not reject their petitions.

Several attorneys submitted only the briefest description of their activities on any given day. Entries such as "read and reviewed pleadings—8 hours" (a description that often appeared on time records for days at a time) or "set up and organized files—8 hours" did not assist the court in determining whether the time was spent in activities that furthered the interests of the class. Accordingly, such vaguely described or insufficiently documented time was not granted. *See In re Fine Paper Antitrust Litigation*, 98 F.R.D. 48, 81–82 (E.D.Pa.1983) ("'[t]he burden is clearly on counsel to file adequately-documented applications for fees and those who fail to meet that burden do so at their own risk,'" quoting *In re Equity Funding*

*Corp. of America Securities Litigation,* 438 F.Supp. 1303, 1327 (C.D.Cal.1977)), *rev'd on other grounds,* 751 F.2d 562, 596 (3d Cir.1984).

When a lawyer is preparing for trial, especially when substantial discovery must be accomplished within a limited time, as in the four months preceding settlement in this case, it may be that not an hour in twenty-four passes that he or she has not given some thought to the case. Nevertheless, not all time spent on *"Agent Orange"* matters could be compensated. Judgments had to be made about how time was spent and whether a given activity furthered the interests of the class. Almost without exception time record entries that indicated hours spent researching a particular issue or writing a brief or legal memorandum were awarded in full, since it is generally not possible to say that the work could have been accomplished in less time.

Duplication of attorney work may be inevitable in any large class action run by committee. The potential for duplication and overstaffing is especially great when, as here, the case involves an enormous plaintiff class that is national, even international in scope, and a number of turnovers in management committee membership have taken place. To some extent these factors caused a lack of effective central organization in the *"Agent Orange"* litigation that gave rise to not infrequent repetition and duplication of effort.

To reduce the effect of this duplication of attorney work, time spent reading and reviewing specific documents or legal memoranda was awarded in full only when the review was undertaken by the lawyers who had primary responsibility for that particular set of documents or for that particular issue. *See In re Equity Funding Corp. of America Securities Litigation,* 438 F.Supp. at 1329 ("The 'review' work of plaintiffs' counsel should legitimately be limited and compensated for when it had a direct bearing upon the responsibility being undertaken by such counsel during the course of these proceedings."). To guard against overstaffing, time spent in confer-ences between partners and associates was not allowed.

Throughout the *"Agent Orange"* litigation, even after the PMC took over as lead counsel, organization of the management committee and financing of the litigation appear to have been constant topics of discussion and, not infrequently, sources of friction. Especially in the spring and summer of 1983 many management committee meetings were devoted to problems having more to do with the committee than with the litigation. These internal difficulties—disputes about who was running the litigation and mounting pressures in the face of financial constrictions—did not further the class action; the acrimony in fact probably hindered prosecution of the case. When time record entries revealed that management committee meetings were devoted to internal problems, time was not allowed. *See supra* Part III.A.2.

### 2. *Hourly Rate*

As a general rule, a court calculates the lodestar figure using the hourly rate "normally charged for similar work by attorneys of like skill in the area," that is, the district in which the court sits. *Grinnell II,* 560 F.2d at 1098; *Polk v. New York State Dept. of Correctional Services,* 722 F.2d 23, 25 (2d Cir.1983). When a need for nonlocal counsel's special expertise is shown, or local counsel is unavailable, or an action properly filed and maintainable in a lawyer's home district is transferred to the forum district, courts instead may use the hourly rate prevailing in the nonlocal lawyer's own community. *Polk,* 722 F.2d at 25; *Avalon Cinema Corp. v. Thompson,* 689 F.2d 137, 140–41 (8th Cir.1982) (*en banc*). In a case involving large numbers of specialized nonlocal attorneys, however, policy considerations suggest the application of a uniform hourly rate based on national legal rates if such a rate can be reasonably developed. *See supra* Part II. B.1.b.

The *"Agent Orange"* case from the beginning was handled by local attorneys from this district, and class counsel re-

mained largely local in origin until the original plaintiffs' management committee abdicated in 1983. Thereafter, class representation took on a predominantly national look; new committee members were drawn from locations across the country, as were many of those attorneys who worked on the case at the new committee's request. A number of original committee members, local attorneys, continued to assist as well.

No showing has been made that this case required the expertise of any particular attorney, and the transfer of cases from across the nation to this court as part of the multidistrict litigation carries little weight. A lawyer receiving a fee from the fund earned it by working on the class action commenced in this district, not by litigating a transferred individual case to a successful conclusion. The use of an hourly rate prevailing in this district, however, would overlook the inability of local attorneys to continue with the case in 1983 and the concomitant need for replacement counsel, who came for the most part from other areas of the country. Use of a nationally prevailing rate strikes the best balance between competing considerations in this case.

The hourly rates generally applied to fee applications in this case were $100 and $150 per hour. Law professors were compensated at $125 per hour. In general, only rough distinctions were made between partner time and associate time, because the administrative burden involved in making a more detailed analysis would have been far too onerous for the court's limited resources and much of the underlying detailed data was unavailable or unreliable. Such an inquiry would have required, for each of the 121 petitions, separating out partner time from associate time and accounting for the changes in seniority and partnership status of each individual attorney over a number of years. Fee applications reflecting time incurred primarily by partners were compensated at $150 per hour. Fee applications reflecting time incurred primarily by associates were compensated at $100 per hour. Finer distinctions might possibly have been drawn, but

these rough categories adequately reflect such factors as the work done, lawyer status and delays in receiving payment. *See supra* Part II.B.1.b and *infra* Part IV.C.4.

Such hourly rates may seem very high even to a skilled worker earning as much as $30.00 an hour with fringe benefits. But the figure includes very substantial amounts (on the order of 50%) for overhead. Moreover, billable hours are only a percentage of a lawyer's time spent on his or her law business. Administration of the law office, reading advance sheets, attending educational conferences and doing *pro bono* work, for example, cannot be billed to a client.

A national rate approach was adopted by the district court in *In re Fine Paper Antitrust Litigation*, 98 F.R.D. 48, 83 (E.D.Pa. 1983), *rev'd*, 751 F.2d 562, 590–91 (3d Cir. 1984). In reversing, the appellate court objected to the district court's failure to determine prevailing national rates through an examination of available data, rather than to the use of a national rate. 751 F.2d at 590. In contrast, in the instant case a full analysis of the substantial national and local data available was undertaken by the court.

In establishing the applicable hourly rates of $100 and $150 per hour, the court drew on a number of sources of objective information. The billing rate information provided by the lawyers seeking fees could not be accorded significant weight. Many of these attorneys customarily charge contingent fees and so do not have a "normal" billing rate. Six of the nine PMC members, for example, usually bill on a contingent fee basis; the remaining three appear to do so as well. Four members of Yannacone and Associates usually bill on a contingent fee basis; two provided no information and one did not state whether he normally charged on a contingent fee or an hourly rate basis. Little documentation in support of the claimed hourly rates was provided in any case; some appeared excessive in light of other available information. *See Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541,

1547 n. 11, 79 L.Ed.2d 891 (1984) (stating in statutory fee context that, to assist the court's determination of a reasonable hourly rate, a fee applicant must produce "satisfactory evidence" in addition to the attorney's own affidavits that the requested rate is in line with prevailing rates).

The court has studied and placed limited reliance on several sources of nationwide hourly rate data. *See* Fed.R.Evid. 803(18); *supra* Part II.B.1.b; *cf.* Fed.R.Evid. 201. One such data compilation is the National Law Journal Directory of the Legal Profession (B. Gerson, M. Liss & P. Cunningham eds. 1984). It gives hourly rate information as of March 1983 for firms across the country, generally of 50 lawyers or more in size, and includes data on every city and region from which management committee members come. Court personnel assembled this data into a list by state, city and firm, which has been filed and docketed in this case as Document No. 4731. This source of information supports a conclusion that $100 and $150 are fair, reasonable and adequate hourly rates. In addition, the Defendants' Memorandum Concerning Plaintiffs' Lawyers' Applications for Attorneys' Fees and for Reimbursement of Expenses, Ex. D, contains data on nationwide rates. The defendants' brief sets forth data collected from "How Firms Bill," Nat'l L.J., Feb. 27, 1984, at 25–36 and from the 1980 through 1984 surveys of law firm economics by Altman & Weil, Inc., a management consultant organization. Reference to established national rates was also made by plaintiffs' counsel in their fee submissions and in their oral arguments at the fee hearings. This information supports the hourly rates used in this case. The court has relied on its own experience with the rates prevailing in the New York metropolitan area gained from reviewing many applications for fee and sanction awards. *See, e.g., Society for Good Will to Retarded Children, Inc. v. Cuomo,* 574 F.Supp. 994, 1000–01 (E.D.N.Y.1983), *remanded on other grounds,* 737 F.2d 1253, 1254 (2d Cir.1984), *on remand* 103 F.R.D. 169, 171 (E.D.N.Y.). Rates used in recent fee award decisions were also considered.

*See, e.g., In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 590 n. 22 (3d Cir.1984) (citing various cases that support a rate of $150 an hour when time-lapse factors are considered); *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 955–56 (1st Cir.1984).

A single hourly rate has been applied regardless of when during the case an attorney expended the time claimed. The *"Agent Orange"* litigation took about five years to reach settlement; this judgment is rendered nearly six years after the first cases were filed. Under the Second Circuit's guidelines a current rate calculation would be proper for at least the last three years of that period; the Court of Appeals recently permitted the use of a single rate for a seven-year period. *See United States v. Bosurgi,* 750 F.2d 216, 218–20 (2d Cir. 1984) (district court used $125 partner rate and $75 associate rate for period from 1965 to 1971).

In addition, use of current rates for the first three years of this case does not overcompensate counsel for the opportunity costs of delay, given the trend in interest rates and inflation over the last several years. At the end of 1981, class counsel were primarily local attorneys; under the general rule, an hourly rate corresponding to that prevailing in the local community would be appropriate. *See supra* Part II. B.1.b. Based on the court's experience with fee and sanction awards in this district, a partner's normal hourly rate in 1981 would have been about $110. *See, e.g., Society for Good Will to Retarded Children, Inc. v. Cuomo,* 574 F.Supp. 994, 1000–01 (E.D.N.Y.1983), *remanded on other grounds,* 737 F.2d 1253, 1254 (2d Cir. 1984), *on remand* 103 F.R.D. 169, 171 (E.D.N.Y.); *cf.* Defendants' Memorandum Concerning Plaintiffs' Lawyers Applications for Attorneys' Fees and for Reimbursement of Expenses, Ex. D. Interest rates during the last three years generally have exceeded 10%. Fed.R.Evid. 201. $110 invested at 10% interest for three years would have grown to about $146. This analysis if anything underestimates the time value of money; in addition it does

not consider other arguably relevant factors such as indirect hardships suffered because of delay in payment. A historical rate plus delay multiplier would equal or exceed a current rate.

■■■ Since no danger of overcompensation exists, use of a current rate is justified as a simpler, more practical alternative to use of a multiplier to account for delay in payment. A court in accounting for delay in payment is not required to make "a mechanical calculation of the delay factor on the basis of interest rates" and award a sum "equivalent to the prevailing or legal rate of interest for the relevant period of time"; rather, the amount of a delay multiplier is subject to the court's discretion. *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 601–02 (3d Cir.1984) (Becker, J., concurring). In the instant case, the difference between a current rate and a historical rate represents a fair and reasonable allowance for delay in payment that additionally is far easier to administer.

Two categories of lawyers were awarded time at less than the $150 hourly rate. Two PMC members, and three law firms not members of the PMC or of Yannacone and Associates that did some work in furtherance of the class action, received $100 per hour for each hour allowed. *See infra* Part V. This lowered rate reflects the fact that virtually all of the hours submitted by them were attributable to work done by an associate. The second category—law professors—were compensated at the rate of $125 per hour. Unlike practicing attorneys, law professors are guaranteed a salary and do not have appreciable overhead expenses. *See EEOC v. Strasburger, Price, Kelton, Martin and Unis*, 626 F.2d 1272, 1275–76 (5th Cir.1980). The participation of the law professors in this litigation is discussed in greater detail *infra* Part V.

### 3. *Multiplier*

For the reasons stated in Part II.B.1.c.i. of this opinion, the facts in this case do not warrant application of a risk multiplier. In recognition of the quality of the work done in furtherance of the class action, however, a multiplier of 1.5 has been applied to the fee awards of certain attorneys. In one exceptional case, a multiplier of 1.75 was awarded because of the attorney's excellent work in his central role managing the litigation.

■■■ A quality multiplier is warranted only for exceptional or extraordinary skill. *See Lindy I*, 487 F.2d at 168. The court has awarded a quality multiplier where appropriate in recognition of the fact that the single hourly rate adopted here does not wholly reflect the unique skills that certain attorneys have exhibited. Some attorneys have demonstrated an unusual degree of skill in presenting complex and often novel issues to the court; others have shown a level of organization and efficiency that goes beyond what is usually expected. The reasons for giving or not giving a multiplier in an individual case are explained in the next Part. For each attorney who received a fee award, a brief summary is provided that sets forth the number of hours and types of activities and expenses that were allowed. A full detailed explication of the computations is available in the file cabinets deemed attached to this opinion.

### 4. *Interest*

■■■ Much of the time and money expended by the attorneys was spent a year or more before the date of this judgment, although a very large portion was spent in the critical months prior to May 1984. Interest rates were generally high during this period. It would be reasonable to allow interest for the cost of this investment. In the instant case, however, this interest factor has been taken into account by using a flat per hour rate that reflects the cost of money. *See* discussion *supra* Part II.B.1.b and IV.B.2.

The hourly rate takes account of the cost of money only up to the time of judgment. Appeals may be taken from the judgment so that the attorneys will be unable to collect for some time. They are entitled to interest during the period from the time

the final judgment as amended is entered to the time of payment. The fairest way of computing rate of interest is to use the rate being earned by the settlement fund during this period since the attorneys have an interest in the fund for the amount owed them. *In re Fine Paper Antitrust Litigation,* 751 F.2d 562, 589, 601–02 (3d Cir. 1984). "Evenhandedness demands that each party having an interest in that fund receive its share of fund earnings, pending distribution, in proportion to its interest." *Id.* at 589. Since all of the fund is invested in United States Treasury bills and equivalent government securities, interest earned pursuant to this formula will not be substantially different from that provided for by statute. *See* 28 U.S.C. § 1961 ("coupon issue yield equivalent ... of the average accepted auction price for the last auction of fifty-two week United States Treasury bills"). The Clerk shall compute interest at time of payment pursuant to the formula now adopted. He may apply to the court for further clarification at time of payment.

## V. FEE AWARDS

This Part sets forth and explains specific fee awards to those whose work benefited the class.

### A. *Professors Twerski, Henderson, Jr., Gillette, Arnolds, Kamp and Monaghan*

Six professors of law dedicated a total of 1872.35 hours to the *"Agent Orange"* litigation. Three of these distinguished attorneys, Professors Aaron D. Twerski, James A. Henderson, Jr. and Clayton P. Gillette, were part of the Plaintiffs' Law Committee, which advised class counsel concerning the numerous difficult legal issues that arose during the course of this litigation. Professor Twerski first became involved in the litigation in 1980; since 1982 he and Professors Henderson and Gillette have comprised the academic team of the Plaintiffs' Law Committee. These professors were responsible for much of the formulation and development of the legal theories underlying plaintiffs' claims. As the court

has noted on other occasions, this case has presented many novel and complex legal issues. Professors Twerski, Henderson and Gillette each contributed their exceptional knowledge of tort and product liability law. Over the course of the litigation, the Law Committee of which they were a part produced some 36 helpful legal briefs and memoranda.

Three other professors were consulted by the plaintiffs' management committee on specific issues over the course of this litigation. Professors Edward B. Arnolds and Allen R. Kamp of the John Marshall School of Law did legal research for the Plaintiffs' Law Committee on conflict of laws issues and on the government contractor defense. Professor Henry Paul Monaghan of Columbia University Law School advised the Law Committee on numerous issues periodically between 1982 and 1984.

All the professors who devoted time to *"Agent Orange"* are recognized experts in their fields. A $125 hourly rate has been used to calculate their fee awards. *Cf. Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 955 (1st Cir.1984) ($125 rate for eminent Harvard law professor found to be reasonable). Each brought great skill, inventiveness and legal ability to this case. In recognition of the high quality of their work, a multiplier of 1.5 was applied to all their compensable time.

It might be argued that a professor should receive a rate at least equal to that of a practitioner. *Cf. Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) (§ 1988 fees are "to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel"). There are at least three answers to this objection.

First, if it is claimed that professors are entitled to a higher rate than are the practicing lawyers because of the superior legal abilities for which they were retained, then the level of skill exercised presumably was that which would have been expected, and so no quality multiplier would be warranted. A reasonable market rate as compared

to the practicing lawyers' $150 rate would be about the same as the $187.50 effective hourly rate in fact granted by the court ($125 × 1.5). Thus, even if the court were to award fees on these grounds, the same amounts would be allowed.

Second, the *Blum* Court's decision was based on legislative intent, a ground that is absent in common fund cases. The $125 hourly rate reflects the practical differences between the situations of the professors and those of private attorneys. Involvement in this case from the law professors' point of view presented relatively little risk. Professors do not depend on practicing law for their livelihood. The professors who worked on *"Agent Orange"* did not have to give up any clients. Nor did their participation take away time from other cases. Professors do not need the kind of bread and butter work that a practicing lawyer requires. One professor alluded to this fact when he noted in his fee petition that "the factors that led to the withdrawal of the original Yannacone group as lead counsel did not diminish or affect the work of Petitioner or the Law Committee." The professors were able to work for both management committees with no disruption resulting from the change in lead counsel because they did not suffer the extreme financial pressures that led, in part, to the resignation of Yannacone and Associates. Time spent on *"Agent Orange"* did not hurt their practices—in fact it may have enhanced their skills as teachers. Arguably, for just those reasons professors are in a better position than practicing attorneys to devote time to a case like *"Agent Orange."*

Finally, the $125 hourly rate takes into account the fact that the professors, unlike the other attorneys, did not have substantial overhead costs during the five-year period of this litigation. Even though most of the expenses requested by attorneys were granted, certain costs of running a law office cannot be separated out as expenses. These must be absorbed into the lawyer's hourly rate. The $25 difference between the hourly rates of the professors and that of the practicing lawyers reflects

this reality. *See, e.g., EEOC v. Strasburger, Price, Kelton, Martin and Unis,* 626 F.2d 1272, 1275–76 (5th Cir.1980); *Gurule v. Wilson,* 525 F.Supp. 996, 997 (D.Colo. 1981), *rev'd in part on other grounds,* 635 F.2d 782 (10th Cir.1981).

Each professor's fee award and the number of hours allowed is listed in the table *infra* Part VI. The court deeply appreciates their participation.

### B. *Agent Orange Plaintiffs' Management Committee*

#### 1. *Committee Expenses*

The PMC's joint fee petition contained a four volume entry for PMC expenses pertaining to expenditures made from three checking accounts that were funded by contributions from members of the PMC. Six of the nine committee members together contributed almost $1.5 million after they joined the committee. These funds were used to finance the litigation. Most of the expenses for which the PMC seeks reimbursement reflect the costs of discovery and preparation of a large class action for trial. Receipts indicating the costs of depositions and court transcripts and cancelled checks to expert witnesses and consultants have been submitted.

■ A portion of the expenses reflect the costs of running a separate Brooklyn office—rent paid for office space, rental of furniture and office equipment, as well as payments made to office staff and telephone and photocopying expenses. A substantial amount of discovery was undertaken under a very tight schedule during the four months preceding the May 7, 1984 settlement. The parties were frequently before the court and the Magistrate during this time. The Brooklyn office functioned as the plaintiffs' nerve center. Papers were served on that office; if the court needed to contact a particular PMC member, the Brooklyn office personnel were able to locate him. The proximity of the office to the courthouse enabled plaintiffs' counsel to get to court quickly when neces-

sary. In short, the Brooklyn office served as the home litigation office for the geographically scattered PMC members and brought a level of efficiency to the litigation that was not present before and that was badly needed. All reasonable, verifiable expenses for running the Brooklyn office therefore have been allowed.

Almost all of the other expense allowances requested by the PMC have been allowed if supported by adequate documentation. One type of expense that was not allowed was the cost of computer services that did not directly benefit the class. Thus, the costs of giving class notice for which the use of a computer was indispensable were allowed, whereas the $10,000 per month costs of general ongoing "data management" services were disallowed. The court recognizes that computers and other advanced business machinery are necessary for the successful practice of law; in this instance, this special expense was not allowed because it was included in the overhead component of the hourly rates.

### 2. *Individual Awards to Committee Members*

#### (a) *Stanley Chesley, Esq., et al.*

Stanley Chesley of the firm of Waite, Schneider, Bayless and Chesley of Cincinnati, Ohio submitted his fee petition on behalf of himself and 10 other attorneys at his firm. Mr. Chesley joined the PMC in September 1983.

Mr. Chesley submitted computerized time records that were difficult to read and not particularly descriptive of his firm's activities. Many hours were submitted for microfilm reading by an associate. Nonetheless, since the bulk of the work for which Mr. Chesley submitted hours was by lawyers at a partner level, the $150 hourly rate has been applied. The total number of hours allowed is 1737.75.

The quality of the work done by Mr. Chesley's firm was uniformly exceptionally high. Mr. Allen handled discovery matters most expeditiously and Mr. Chesley's efforts relating to the settlement were espe-cially noteworthy. Accordingly, a multiplier of 1.5 is warranted. The total fee award is $390,993.75.

Expenses are granted in the amount of $37,104.67, of which $4,275.00 is attributable to the costs of a law clerk, a paralegal and an administrative assistant. Mr. Chesley was one of the PMC members who contributed $250,000 to the committee for financing the litigation. Since the committee has sought reimbursement of expenditures made out of these contributions, reimbursement of this $250,000 to Mr. Chesley would charge the fund twice for the same expense. This contribution therefore has been treated as an intra-committee advance and Mr. Chesley must look to the committee for any reimbursement due him.

#### (b) *Phillip E. Brown, Esq., et al.*

Phillip E. Brown of San Francisco, California submitted a fee petition on behalf of himself and five other attorneys at his firm. Mr. Brown joined the PMC in September 1983.

Many of the hours requested for September and October 1983 relate to internal PMC organization such as drafting PMC agreements regarding fee and costs and discussing financing of the litigation. As discussed *supra* Part III.A.2, III.A.4 and IV.B.1, such activities may possibly have been helpful to the committee, but they were not sufficiently connected to the class action and did not demonstrably benefit the class as a whole. The total number of hours allowed is 1317.75. Mr. Brown's firm had primary responsibility for discovery relating to defendant Hercules. In light of the exceptionally high quality of this firm's work, a multiplier of 1.5 was applied to the hours allowed; the total fee award is $296,493.75.

Expenses were granted in the amount $35,280.19, which includes reimbursement for all paralegal and law clerk time requested. Mr. Brown's $250,000 contribution to the PMC is not an expense but an intra-committee advance.

(c) *Benton Musslewhite, Esq., et al.*

Benton Musslewhite of Houston, Texas submitted a fee petition on behalf of himself and eight associated counsel. He became involved in the *"Agent Orange"* litigation in 1979. Much of his early time was devoted to internal committee management and was not productive on behalf of the class. In addition, his work was often duplicative of that done by other attorneys. His attendance at many of the court hearings at which he was present was unnecessary.

The quality of the work performed fell short of the standard for a quality multiplier. For these reasons, no multiplier is warranted. The total number of hours awarded to this firm is 2,031.05. Because Mr. Musslewhite performed the majority of the work, the $150 rate has been used for a total fee award of $304,657.50.

Many of the expenses requested by Mr. Musslewhite were unnecessarily high in relation to their utility to the class. Substantiation was inadequate. The court has awarded Mr. Musslewhite expenses in the amount of $50,614.97 which includes reimbursement for 94.87 hours in paralegal time at the rate of $20 per hour. Mr. Musslewhite requested 4,956.25 hours in paralegal and law clerk time. In view of the extensive overstaffing by his office, this has been reduced to reflect only those hours spent in furtherance of the class action.

(d) *Thomas W. Henderson, Esq., et al.*

Thomas W. Henderson of Pittsburgh, Pennsylvania submitted a petition for fees and expenses on behalf of himself, another attorney and four paralegals from his firm, Henderson & Goldberg.

When Mr. Henderson first became involved in the *"Agent Orange"* litigation in July 1983, he was a member of the firm of Baskin & Sears. He separated from this firm, now known as Baskin & Steingut, on January 31, 1984. Mr. Henderson has submitted time records for his work on this case from February 1, 1984 onward. He submitted no records for time spent on this case prior to February 1, 1984. Baskin & Steingut has submitted a petition for an award of fees for Mr. Henderson's work while he was a member of that firm.

For the post-February 1984 period, 1966.90 hours were awarded to Mr. Henderson. Since most of these hours represent partner work, the $150 hourly rate was applied.

Mr. Henderson was responsible for taking numerous depositions and for preparing the plaintiffs' case on medical causation. In view of the consistently outstanding quality of his work, a multiplier of 1.5 is warranted. His fee award is $442,552.50.

Mr. Henderson was allowed those expenses incurred after January 31, 1984 and also those predating February 1, 1984 that he actually paid as evidenced by credit card receipts. The total expense award to Mr. Henderson is $57,216.65 which includes the time submitted for paralegal hours requested at the $20 per hour reimbursement rate.

The portion of Mr. Henderson's hours allocable to Baskin & Steingut amounts to 732.90. With the 1.5 multiplier, the total fee award attributable to Mr. Henderson's work prior to February 1, 1984 totals $164,902.50. Expenses allowed for this period total $42,068.87. Mr. Henderson's contribution of $200,000 was an intra-committee advance not separately reimbursable as a class expense.

(e) *Newton B. Schwartz, Esq., et al.*

Newton B. Schwartz of Houston, Texas submitted a fee petition on behalf of himself and two associated counsel. He began working with the PMC in July 1984. His involvement with the litigation was never particularly active. Much of his firm's work did not aid the class. Mr. Schwartz's firm has been allowed 291.45 hours. At least 75% of that time is attributable to associate work. For this reason, the $100 hourly rate was applied, resulting in a fee award of $29,145.00. The quality of the work performed was not sufficiently high to justify application of a multiplier.

The expenses allowed to Mr. Schwartz total $13,698.18. Mr. Schwartz's contribution of $250,000 was an intra-committee advance and is not separately reimbursable.

(f) *John O'Quinn, Esq., et al.*

The firm of O'Quinn and Hagans of Houston, Texas submitted a fee petition on behalf of John O'Quinn and two associates. This firm became involved in the *"Agent Orange"* litigation in September 1983, but was never an active participant. 883.05 hours have been allowed. The bulk of this time consisted of work done by associates; accordingly, the award has been calculated at the $100 hourly rate, resulting in a total of $88,305.00. The work of this firm was not so exceptional that it warrants a quality multiplier.

Allowed expenses for Mr. O'Quinn total $26,559.43. The $250,000 contribution made by Mr. O'Quinn is an intra-committee advance and is not separately reimbursable.

(g) *Gene Locks, Esq., et al.*

Gene Locks of Philadelphia, Pennsylvania submitted a fee petition for his firm Greitzer & Locks for work done by himself, and Neil Peterson, Esq. Mr. Locks and Mr. Peterson joined the PMC in late December 1983.

Mr. Locks and Mr. Peterson were both responsible for preparing the medical causation part of plaintiffs' case. All time spent in preparing for and taking depositions and review of medical records was allowed.

Two entries on Mr. Peterson's time records were not allowed. Hours for "Lit. Reading" were not compensated. Beginning in late April 1984, this former United States Attorney sometimes charged as many as nine hours per day for "Federal Rules of Evidence Review." Since he was not lead trial counsel and the accumulated Federal Rules of Evidence review time did not benefit the class, this time was not allowed. An additional reason for not compensating time reading the rules of evi-

dence is that Mr. Locks himself is an accomplished student of the law of evidence, having distinguished himself in this subject at law school and in practice. The Greitzer & Locks firm was allowed 1476.75 hours. The $150 hourly rate was used because all the time requested was for partner work. The work of this firm was of exceptional quality and is entitled to a 1.5 multiplier. The resulting fee award totals $332,268.75.

The expenses allowed amount to $32,702.08. Mr. Locks contributed $250,000 to the PMC, an intra-committee advance that is not separately reimbursable.

(h) *Dean, Falanga and Rose*

The firm of Dean, Falanga and Rose of Carle Place, New York has submitted a fee petition on behalf of David J. Dean, Esq., an associate and a paralegal. Participation of this firm in the *"Agent Orange"* litigation began in September 1979, when it joined Yannacone and Associates, and continued after the PMC took over the case. Mr. Dean was designated lead trial counsel for the PMC.

The court has allowed 5,957.50 hours to this firm at the rate of $150 per hour. The work performed demonstrated an extraordinary level of skill and excellence meriting a quality multiplier of 1.5. The resulting fee award amounts to $1,340,437.50. The majority of this work was performed by Mr. Dean, who was particularly diligent in preparing this complex case for the trial that had been scheduled for May 7, 1984.

Expenses to be reimbursed to this firm total $128,893.74. This figure includes 240.25 hours of paralegal hours, compensated at $20 per hour. Of the total expense reimbursement, $54,212.00 represents contributions made to Yannacone and Associates.

(i) *Schlegel & Trafelet, Ltd.*

The firm of Schlegel & Trafelet, Ltd. of Chicago, Illinois submitted a fee petition on behalf of Stephen J. Schlegel, Esq., five other attorneys and three paralegals. The firm entered the litigation in early 1979, partici-

pating first as "regional counsel" for Yannacone and Associates and later becoming a member of the PMC.

The court allowed 2909.25 of the hours requested by Schlegel & Trafelet. Most of these hours represent time expended by Mr. Schlegel, a partner in the firm. Accordingly, the firm was compensated at the $150 hourly rate. Mr. Schlegel was the PMC's primary manager. He was always available to the court and the Magistrate, and he took responsibility in the last months of the litigation for meeting the deadlines of a very demanding discovery schedule. The legal, organizational and managerial skills that he brought to the PMC significantly expedited the litigation and were so extraordinary in nature that a 1.75 multiplier is justified. The total fee award is $763,678.12.

Expenses in the amount of $132,008.01 were allowed. This figure includes 1405.46 paralegal hours at $20 per hour.

### C. *Yannacone and Associates*

#### 1. *Burke, Curry, Hammill & O'Brien*

The firm of Burke, Curry, Hammill & O'Brien of Smithtown, New York submitted a fee petition on behalf of Eugene O'Brien, Esq. Mr. O'Brien became involved in the *"Agent Orange"* litigation in 1979 and was chairman of the Litigation Committee of Yannacone and Associates.

Many of the hours requested by Mr. O'Brien were of limited help to the class; his suggestion that the case be litigated in a series of trials was ultimately rejected by the court. Nonetheless, 960.40 hours were determined to have been in furtherance of the class action. These have been compensated at the rate of $150 per hour for a total fee award of $144,060.00. No multiplier is warranted.

The expenses to which Burke, Curry, Hammill & O'Brien are entitled amount to $54,014.88, of which $49,277.00 represent contributions made to Yannacone and Associates. Unlike the PMC, Yannacone and Associates did not submit joint expenses. Thus, reimbursement of contributions will not result in double recovery.

#### 2. *Albert J. Fiorella, Esq.*

Albert J. Fiorella of Mineola, New York submitted a fee petition for his participation in the *"Agent Orange"* litigation. He joined Yannacone and Associates in 1979 and became chairman of the consortium in September 1980.

The court has awarded Mr. Fiorella fees for 1,329.07 hours at the rate of $150 per hour, for a total of $199,360.50. His work, although diligent, was not so exceptional that it warrants a quality multiplier.

Mr. Fiorella is entitled to reimbursement of $51,032.31 in expenses. This figure includes 88.25 hours of clerk time, reimbursed at the rate of $20 per hour, and $47,982.00 in contributions made to Yannacone and Associates.

#### 3. *O'Hagan, Reilly & Gorman, P.C.*

The Islip, New York firm of O'Hagan, Reilly & Gorman, P.C., submitted a fee petition on behalf of Edward J. Gorman, Esq., one of its partners. His participation in the *"Agent Orange"* litigation dates from January 1980.

The court has awarded fees to O'Hagan, Reilly & Gorman for 703.50 hours of work in furtherance of the class action. Mr. Gorman worked actively on the trial committee, primarily on depositions and discovery, in conjunction with Victor Russo. This work was not of such exceptional skill that it merits a quality multiplier. The fee award totals $105,525.00.

Expenses are reimbursed to this firm in the amount of $52,613.11. $48,523.40 represents contributions made to Yannacone and Associates.

#### 4. *Levine & Grossman*

The Mineola, New York firm of Levine & Grossman has submitted a fee petition on behalf of William F. Levine, Esq. and Michael B. Grossman, Esq. Their participation in Yannacone and Associates began in the fall of 1979.

The court has awarded fees for 1,022.25 hours to this firm at the rate of $150 per hour, for a total of $153,337.50. No quality multiplier was earned.

Expenses reimbursable to the firm amount to $53,208.00. This sum is its contributions to Yannacone and Associates.

### 5. *Victor D. Russo, Jr., Esq.*

Victor D. Russo, Jr. of Northport, New York has submitted a fee petition for his participation in the *"Agent Orange"* litigation. He joined Yannacone and Associates in September 1979. He was primarily responsible for discovery and depositions, particularly of the Diamond Shamrock Company.

The court has allowed fees for 1457.30 hours at a rate of $150 per hour for this attorney, for a total award of $218,595.00. The quality of this work was not so exceptional that it warrants a quality multiplier.

Mr. Russo is entitled to a reimbursement of $52,518.50 in expenses. $52,277.00 of this amount represents assessments paid to Yannacone and Associates.

### 6. *Victor J. Yannacone, Jr., Esq.*

Victor J. Yannacone, Jr. of Patchogue, New York has submitted a fee petition on behalf of himself, his wife, Carol Yannacone, and his late partner, W. Keith Kavenagh, Esq. Mr. Yannacone has been involved in the *"Agent Orange"* litigation from the day the first case was filed.

In his petition, Mr. Yannacone gave no breakdown of his hours and no precise descriptions of his activities. The greater part of his time appears to have been spent organizing veterans. Since 1977 Mr. Yannacone has travelled all over the country and spoken with thousands of Vietnam veterans and their families. He has appeared on television and radio often to speak about "Agent Orange," the Vietnam veterans and this litigation. Perhaps no other person has done as much as Mr. Yannacone to publicize the needs of the veterans. While this *pro bono publico* work was in the highest tradition of the bar, most of it did not directly further the class action. *See Society for Good Will to Retarded Children v. Cuomo,* 574 F.Supp. 994, 998–99 (E.D.N.Y.1983) (no fee allowance for relations with media), *remanded on other grounds,* 737 F.2d 1253 (2d Cir.1984).

Of the hours that Mr. Yannacone requested, 2000 have been allowed for work done by him or his late partner, Mr. Kavanagh. This estimate is based upon the court's knowledge of the files and its observation of Mr. Yannacone in court. He is a skillful litigator and orator. Unfortunately his organizational skills have not proved sufficient to support an award based on any type of acceptable records in excess of the hours awarded. His hours have been compensated at the $150 hourly rate. The legal work done in furtherance of the class action by Mr. Yannacone and Mr. Kavanagh was not of such exceptional quality that a multiplier is warranted. The fee award totals $300,000.00.

Although Mr. Yannacone requested compensation for hours his wife Carol spent on the case, none of these could be granted. Mrs. Yannacone, who is not an attorney, spent many hours answering questions and taking information from veterans who called the office of Yannacone and Associates. The court is certain that the veterans appreciated her help and moral support and commends her for her efforts on their behalf. Nonetheless, her work was not so directly connected to the class action litigation that payment of a fee award out of the settlement fund is justified.

The documentation for expenditures by Mr. Yannacone range from nonexistent to grossly inadequate. It appears from the documents supplied to the court that he was reimbursed by his former associates in sums that have been allowed to them as expenses totaling $380,682.40. Under these circumstances it is impossible to allow any expenses to Mr. Yannacone at this time. While the court regrets the necessity for this ruling, Mr. Yannacone is free to move to set aside or modify the judgment. A hearing will be granted at which he may produce evidence in the form of testimony and documents.

### 7. *Irving Like, Esq.*

Irving Like of the firm of Reilly, Like & Schneider of Babylon, New York first became involved in the *"Agent Orange"* litigation in 1979 as a member of Yannacone and Associates. Over the course of this

litigation, he contributed much to the class. He took a principal role on the Plaintiffs' Law Committee and in the research of legal issues. In view of Mr. Like's long involvement in the litigation and the extensive and detailed contemporaneous time records that he has submitted, 2,932.84 hours have been allowed. Mr. Like is a well-known specialist in the field of environmental law, and his research work was of extraordinarily high quality. Consequently, the court has determined that in addition to his being reimbursed at a rate of $150 per hour, Mr. Like's efforts warrant application of a 1.5 multiplier. The total fee award is $659,889.00.

The court also has allowed $49,703.00 in expenses, representing assessments paid by Mr. Like to Yannacone and Associates. Other costs, which were mentioned in Mr. Like's application, have not been granted because no specific amounts have been provided, nor has any substantiation been supplied.

### 8. *Edward F. Hayes, III, Esq.*

Edward F. Hayes, III of Huntington, New York has submitted a fee petition on his own behalf. Mr. Hayes worked with Yannacone and Associates and with the Plaintiffs' Law Committee. 432.7 hours have been allowed for that work that benefited the class. The $150 hourly rate was used to calculate this practitioner's fee award. No multiplier is warranted. The fee award totals $64,905.00. No expenses were claimed.

### D. *Independent Counsel*

1. *Kelly & Luglio; Mokotoff, Mondshine & Aliano; Greenwald & Thompson; Mayerson, Shniper & Gerasimowicz; Marlene Manes and Richard Ellison, Esqs.; Ann Meroney, Esq.; Woll, Crowley, Berman & Olsman; Sullivan & Associates.*

Kelly & Luglio worked from July 1979 to May 1982 at the request of Yannacone and Associates. The firm was an original member of Yannacone and Associates until May 1982. After reviewing Kelly & Luglio's application for attorney fees, the court has determined that 41 hours were spent in furtherance of the class action. Most of this time was spent in meetings with other members of Yannacone and Associates. Because these 41 hours represent work done by a partner in the firm, Kelly & Luglio has been compensated at a rate of $150 per hour, for a total fee award of $6,150.00. This work was not so exceptional that a multiplier is justified. The firm has also been awarded $18,500.00 in expenses, all of which represents contributions made to Yannacone and Associates.

Mokotoff, Mondshine & Aliano advanced $7,000 to Yannacone and Associates. No support for hours or other expenses was submitted. $7,000 is awarded for expenses.

Most of the hours submitted by Greenwald & Thompson were spent on behalf of individual clients. A total of 397.5 hours, beginning in November 1979 and ending in June 1984, were spent furthering the interests of the class. Most of this work was done at the request of Yannacone and Associates, though some work was done for the PMC. The work largely consisted of reading documents and researching legal issues. The majority of the hours awarded were incurred by Dorothy Thompson, a partner in the firm. Compensation is at the rate of $150 per hour, for a total fee award of $59,625.00. The work was not so exceptional that a multiplier is justified. In addition, this firm was awarded $12,296.79 in expenses. Paralegal time was decreased because of excessiveness.

Mayerson, Shniper & Gerasimowicz was reimbursed for 455.75 hours of work, covering a period from January 1980 to May 1984. The bulk of these hours were expended in 1983 and 1984 at the request of the PMC. The firm was reimbursed at the rate of $150 per hour, for a total fee award of $68,362.50. No multiplier is warranted. The firm was also awarded $20,615.00 in expenses.

Marlene Manes and Richard Ellison submitted a petition for attorney fees only.

After reviewing the application, the court determined that 141 hours were spent in furtherance of the class action, covering a period from January 1983 to August 1984. They were compensated at a rate of $150 per hour, for a total fee award of $21,150.00. No multiplier is warranted. No expenses were allowed.

Anne Meroney was credited with 84.65 hours, at a rate of $150 per hour, for a total fee award of $12,697.50. These hours spanned a period from October 1980 to August 1984, and were expended primarily at the request of the PMC. The hours awarded reflect time spent in furtherance of the class action. The work was not so exceptional that a multiplier is warranted. The court also has granted $10,147.74 in expenses.

Woll, Crowley, Berman & Olsman did a considerable amount of work for the PMC. Jules Olsman, Esq. actively participated in the late stages of discovery and frequently appeared for plaintiffs at hearings before the court and the Magistrate. The 642 hours spent in furtherance of the class action date from February 1980 to August 1984. The court has determined that the firm should be reimbursed at a rate of $150 per hour, for a total fee award of $96,300.00. Although the quality of the work done by this firm was good, it was not so exceptional that a multiplier is justified. In addition, $14,422.40 in expenses has been awarded.

Most of the work by Sullivan & Associates did not further the interests of the class. Work for the class occurred in the early days of the litigation. It was based upon the theory of government agency failures. After reviewing the application for attorney fees, the court has determined that the amount of hours requested is excessive, and that 348.74 hours is a fair estimate of time that benefited the class. Because a large amount of time was attributable to Gregory Stayart, Esq., a member of the firm since 1974, Sullivan & Associates has been compensated at a rate of $150 per hour, for a total fee of $52,311.00. The work was not so exceptional that a multiplier is justified. The court has also granted $20,573.08 in expenses.

### 2. *Allen H. Kline, Jr., Esq.; William J. Risner, Esq.; Ashcraft & Gerel*

Allen H. Kline, Jr. of Cripp & Barker, Houston, Texas, submitted a petition for fees. Mr. Kline worked closely with Mr. Benton Musslewhite. Some of his hours were included in Mr. Musslewhite's petition. The court has reviewed both petitions and compensation for 60.5 hours has been allowed for work done in furtherance of the class action. Because most of his hours reflect associate work, the hourly rate of $100 has been applied for an award of $6050.00. His work was not so exceptional that a multiplier is warranted. No expenses were requested.

William J. Risner of Tucson, Arizona submitted a petition for expenses and fees. He became involved in *"Agent Orange"* litigation in 1980. Four hours were determined to have been expended in furtherance of the class action. Because the majority of those hours represent associate work, the $100 hourly rate was applied for an award of $400.00. No multiplier is warranted. Expenses in the amount of $6,640.97 were allowed, much of which consists of reimbursement for paralegal time.

The firm of Ashcraft & Gerel has submitted a petition requesting fees and expenses on behalf of five attorneys, five law clerks and three paralegals. Ashcraft & Gerel first became involved in the *"Agent Orange"* litigation in 1980.

Despite the length of time that Ashcraft & Gerel has been involved in this litigation, little of its work can fairly be said to have been in furtherance of the class action. Its refusal to participate in the management committee except on its own terms actually hindered the prosecution of the class action. Nevertheless, the court has granted fees to Ashcraft & Gerel for time spent between March 9, 1983 and October 14, 1983 where that work arguably constituted a benefit to the class. It was only during this period that Ashcraft & Gerel actively participated in the class action. A total of 789.35 hours have been allowed.

Because Robert A. Taylor, Esq. contributed virtually all of the firm's hours while an associate with the firm, the rate of

compensation is $100 per hour. Although Mr. Taylor is a talented lawyer, his work was not so exceptional that a multiplier is warranted. Other Ashcraft & Gerel attorneys received little or no compensation because their work was duplicative of other attorneys' work or not in furtherance of the class action. The fee award for time allowed to Ashcraft & Gerel is $78,935.00.

A substantial amount of time spent by Ashcraft & Gerel over the four years of its involvement in this case was in behalf of its individual clients, many of whom opted-out of the class action. Ashcraft & Gerel represents at least 360 opt-out clients who may benefit from the work done by class counsel in the class case. The firm may recover additional fees pursuant to its contingent fee arrangements with its individual clients should it prevail in these pending opt-out cases. As indicated *supra* Part II.C.1, any use of MDL discovery materials in these cases will be subject to a payback to the class fund.

Ashcraft & Gerel's request for expenses has been treated in a manner similar to its fee request. Reimbursement is limited to expenditures between March 9, 1983 and October 14, 1983. Paralegal expenses have been allowed for 483.2 hours at a rate of $20 per hour. The total expenses that have been granted amount to $46,233.18.

### E. *Independent Counsel Who Did Not Directly Benefit the Class*

Many independent attorneys were granted reimbursements for expenses, but awarded little or no fees. They are included in the table that follows. Their individual and collective contribution to the class was not substantial, thus warranting no fees for time expended. *See supra* Part III.A.

The petitions submitted by the attorneys representing Australian and New Zealand veterans presented a special problem because their claims for expense reimbursement were unsubstantiated. The court was not in a position to assess these claims based on its knowledge of law practice in this locality and elsewhere in this country. Although the claimed expenses seemed somewhat high, the court allowed the requested amounts on the assumption that travel and telephone costs were particularly high for these lawyers. The activities of these attorneys included communications with the court and Special Master, submitting memoranda on Australian law and distributing claim forms to foreign veterans.

## VI. TABLE OF ORIGINALLY ALLOWED FEES AND EXPENSES

The following table summarizes the fee and expense awards described above.

Table of Allowed
Fees and Expenses

| Name | Rate/ Multiplier | Hours Allowed | Fee Award | Expense Award | Total |
|---|---|---|---|---|---|
| Arnolds, Edward | $125/1.5 | 28.75 | $ 5,390.62 | | $ 5,390.62 |
| Ashcraft & Gerel | 100/1 | 789.35 | 78,935.00 | $ 46,233.18 | 125,168.18 |
| Barber, James C. | | | | 5,065.87 | 5,065.87 |
| Barnard, Hilleren & Spates, P.A. | | | | 1,575.11 | 1,575.11 |
| Baskin & Steingut, P.C. | 150/1.5 | 732.90 | 164,902.50 | 42,068.87 | 206,971.37 |
| Beezley & Beezeley | | | | 362.95 | 362.95 |
| Bigg, Michael Sidney | | | | 17,480.00 | 17,480.00 |
| Burke, Curry, Hammill & O'Brien, P.C. | 150/1 | 960.40 | 144,060.00 | 54,014.88 | 198,074.88 |
| Chelf, Cox and Apperson | | | | 156.96 | 156.96 |
| Cherry, Owens, Callihan | | | | 55.26 | 55.26 |

| Name | Rate/ Multiplier | Hours Allowed | Fee Award | Expense Award | Total |
|---|---|---|---|---|---|
| Chesley, Stanley, M., et al. of Waite, Schneider, Bayless & Chesley Co. | $ 150/1.5 | 1737.75 | $ 390,993.75 | $ 37,104.67 | $ 428,098.42 |
| Cromartie, E.W., II | | | | 746.55 | 746.55 |
| Darmopray, Walter T. | | | | 99.31 | 99.31 |
| Davison, Paul Joseph | | | | 2,042.08 | 2,042.08 |
| Dean, David, et al. of Dean, Falanga & Rose | 150/1.5 | 5957.50 | 1,340,437.50 | 128,893.74 | 1,469,331.24 |
| Epstein & Kesselman | | | | 11,138.00 | 11,138.00 |
| Finkelstein, Kaplan, Levine, Gittelsohn and Tetenbaum | | | | 107.96 | 107.96 |
| Fiorella, Albert, et al. | 150/1 | 1329.07 | 199,360.50 | 51,032.31 | 250,392.81 |
| Fox, Byron Neal | | | | 216.94 | 216.94 |
| Gage & Tucker | | | | 2,724.97 | 2,724.97 |
| Garvey, Magner & Love, P.C. | | | | 1,560.26 | 1,560.26 |
| Gillette, Clayton, P. | 125/1.5 | 366.95 | 68,803.12 | | 68,803.12 |
| Gilreath, Sidney | | | | 867.29 | 867.29 |
| Gorman, Edward J., et al. of O'Hagan, Reilly & Gorman, P.C. | 150/1 | 703.50 | 105,525.00 | 52,613.11 | 158,138.11 |
| Grant and Artesani | | | | 2,314.64 | 2,314.64 |
| Greenwald, Alvin G., of Greenwald & Thompson | 150/1 | 397.50 | 59,625.00 | 12,296.79 | 71,921.79 |
| Greitzer & Locks | 150/1.5 | 1476.75 | 332,268.75 | 32,702.08 | 364,970.83 |
| Grincewicz, Donald E. | | | | 1,662.00 | 1,662.00 |
| Hall, John B., of Kraft & Hughes | | | | 3,305.48 | 3,305.48 |
| Harper & Anderson | | | | 200.00 | 200.00 |
| Hayes, Edward F., III | 150/1.0 | 432.70 | 64,905.00 | | 64,905.00 |
| Henderson, James A., Jr. | 125/1.5 | 435.91 | 81,733.12 | | 81,733.12 |
| Henderson, Thomas W., et al. | 150/1.5 | 1966.90 | 442,552.50 | 57,216.65 | 499,769.15 |
| Higgins, John J. | | | | 10.82 | 10.82 |
| Hill, Boren and Associates, P.C. | | | | 190.27 | 190.27 |
| Hoberg, Finger, Brown, Cox & Molligan | 150/1.5 | 1317.75 | 296,493.75 | 35,280.19 | 331,773.94 |
| Hollow, Reginald Frederick Monty | | | | 7,410.30 | 7,410.30 |
| Kamp, Allen R. | 125/1.5 | 39.90 | 7,481.25 | | 7,481.25 |
| Kaufman, Robert K. | | | | 377.66 | 377.66 |

| Name | Rate/ Multiplier | Hours Allowed | Fee Award | Expense Award | Total |
|---|---|---|---|---|---|
| Kauza, Thomas F. | | | | $ 421.24 | $ 421.24 |
| Kelly & Luglio | $ 150/1 | 41.00 | $ 6,150.00 | 18,500.00 | 24,650.00 |
| Kline, Allen H., Jr. | 100/1 | 60.50 | 6,050.00 | | 6,050.00 |
| Knee, Kenneth M. | | | | 85.00 | 85.00 |
| Levine & Grossman | 150/1 | 1,022.25 | 153,337.50 | 53,208.00 | 206,545.50 |
| Like, Irving, et al. | 150/1.5 | 2,932.84 | 659,889.00 | 49,703.00 | 709,592.00 |
| London, Jack E. | | | | 3,000.00 | 3,000.00 |
| Ross V. Lonnie & Co. | | | | 3,055.93 | 3,055.93 |
| MacLaren, Roger L. | | | | 3,683.39 | 3,683.39 |
| McClelland, Arden C. | | | | 5,368.90 | 5,368.90 |
| McConnell, Steven M. | | | | 17.44 | 17.44 |
| McDermott, McDermott, Zollinger & Box | | | | 615.76 | 615.76 |
| McMillan, William T. | | | | 25,497.00 | 25,497.00 |
| Marlene P. Manes and Richard Ellison | 150/1 | 141.00 | 21,150.00 | | 21,150.00 |
| Marcello, Victor L., of Talbot, Sotile, Carmouche, Marchand & Marcello | | | | 3,222.56 | 3,222.56 |
| Mayerson, Shniper & Gerasimowicz | 150/1 | 455.75 | 68,362.50 | 20,615.00 | 88,977.50 |
| William L. Meritz Associates | | | | 182.00 | 182.00 |
| Meroney, Anne L. | 150/1 | 84.65 | 12,697.50 | 10,147.74 | 22,845.24 |
| Miller & Pitt, P.C. | | | | 1,221.71 | 1,221.71 |
| Mokotoff, Mondshine & Aliano | | | | 7,000.00 | 7,000.00 |
| Monaghan, Henry Paul | 125/1.5 | 40.75 | 7,640.62 | | 7,640.62 |
| Musslewhite, Benton | 150/1 | 2031.05 | 304,657.50 | 50,614.97 | 355,272.47 |
| Myers, Mary Wade | | | | 1,695.00 | 1,695.00 |
| O'Lochlayne, D. Sean, of Frisch, Dudek & Slattery, Ltd. | | | | 651.45 | 651.45 |
| O'Quinn & Hagans | 100/1 | 883.05 | 88,305.00 | 26,559.43 | 114,864.43 |
| Owens, Danny L. | | | | 450.55 | 450.55 |
| Robert I. P. Pasternak and Jane R. Kaplan | | | | 1,680.00 | 1,680.00 |
| Petriello, John, of Levy & Ehrlich, P.C. | | | | 231.39 | 231.39 |
| Richardson & Murphy | | | | 25.00 | 25.00 |
| Richter, Wimberly, Ericson, Woods & Brown | | | | 6,411.96 | 6,411.96 |
| Risner, William J. | 100/1 | 4.00 | 400.00 | 6,640.97 | 7,040.97 |

| Name | Rate/ Multiplier | Hours Allowed | Fee Award | Expense Award | Total |
|---|---|---|---|---|---|
| Lewis A. Royal, Samuel S. Zelden, Frank G. Wieslander, P.C. | | | | $ 4,581.42 | $ 4,581.42 |
| Russo, Victor D., et al. | $ 150/1 | 1457.30 | $ 218,595.00 | 52,518.50 | 271,113.50 |
| Schlegel & Trafelet, Ltd. | 150/1.75 | 2909.25 | 763,678.12 | 132,008.01 | 895,686.13 |
| Schroeter, Goldmark & Bender, P.S. | | | | 12,958.03 | 12,958.03 |
| Newton B. Schwartz, P.C. | 100/1 | 291.45 | 29,145.00 | 13,698.18 | 42,843.18 |
| Shapiro, I. B. | | | | 9,428.73 | 9,428.73 |
| Slater & Tenaglia | | | | 210.00 | 210.00 |
| Smith, James D. | | | | 974.37 | 974.37 |
| Steiner, Del | | | | 635.38 | 635.38 |
| Sullivan & Associates | 150/1 | 348.74 | 52,311.00 | 20,573.08 | 72,884.08 |
| Charles R. Terry and William L. Jenkins | | | | 2,287.39 | 2,287.39 |
| Twerski, Aaron D. | 125/1.5 | 961.07 | 180,200.62 | | 180,200.62 |
| Ursini, Frank J. | | | | 483.81 | 483.81 |
| Wade, Charles A. | | | | 114.00 | 114.00 |
| Willner, Don S. | | | | 7,564.40 | 7,564.40 |
| Woll, Crowley, Berman & Olsman | 150/1 | 642.00 | 96,300.00 | 14,422.40 | 110,722.40 |
| Yannacone, Victor | 150/1 | 2,000.00 | 300,000.00 | | 300,000.00 |
| Agent Orange Plaintiffs' Management Committee | | | | 1,390,686.18 | 1,390,686.18 |
| | | | | GRAND TOTAL: | $9,325,113.14 |

## VII. ADOPTION OF MAGISTRATE'S REPORT ON MODIFICATION AND SUPPLEMENTATION OF FEE AWARDS

Following announcement of the awards set forth in the above table, many attorneys moved under Rule 59(e) of the Federal Rules of Civil Procedure for reconsideration and a hearing to provide further justification for their applications for fees and expenses. In addition, a number of them sought to supplement their requests by applications for work done for the period subsequent to that covered by their initial applications.

The court referred these petitions to Magistrate Shira A. Scheindlin to take evidence by documents and testimony and to report. She was particularly qualified for this task since she had supervised discovery on a daily basis for many months and is fully cognizant of the work and professional skills of the lawyers involved.

Magistrate Scheindlin has now furnished a report and recommendations on the attorneys' fee petitions recommending changes in the original awards and supplemental awards. In most instances, the proposed modifications and additions result from further documentation or concern work done after the period covered by the court's orig-

inal award. In the main, while somewhat more generous than the court, the Magistrate's determinations are fully consistent with those of the court. Cross-checks were made to ensure that no duplicate allowances were made. The combined judgment adequately protects the class fund, and provides appropriate rather than extravagant compensation to the attorneys involved.

The court held a public hearing on June 11, 1985 to permit any objections to the Magistrate's recommendations to be heard. Except as indicated below, none of the objections was persuasive; accordingly, the Magistrate's report dated May 30, 1985 is adopted by the court with the following modifications made for the reasons indicated here and orally on the record.

The allowed expenses for the services of Liquori Associates, Ltd. will be reimbursed to the attorneys who incurred them. No awards will be made directly to a supplier of services; the attorney who incurred the expense is responsible for payment, not the court. Accordingly, the PMC's expense award will be increased by a total of $212,214.10 for expense incurred by class counsel in retaining the services of Liquori Associates, Ltd. This award satisfies all claims for services by Mr. Liquori personally or through the corporation bearing his name for services rendered to Victor J. Yannacone, Jr. or any group Mr. Yannacone was associated with.

The law firm of Greitzer and Locks will receive an additional 100 hours at $150 per hour, or $15,000.00, for post-settlement work including work on formulation of a distribution plan. The firm of Henderson & Goldberg will receive an additional 100 hours at $150 per hour, or $15,000.00, for post-settlement work including work on formulation of a distribution plan. The firm of Hoberg, Finger, Brown, Cox & Molligan will receive an additional $5,000.00 in expenses and 30 hours at $150 per hour, or $4,500.00 in fees.

The firm of O'Quinn and Hagans will receive an additional 115 hours for the work of Alison Pettiette on the causation portion of the PMC's brief on the fairness of the settlement. No quality multiplier will be given for the work of this associate, which in the court's view was not so extraordinary in quality that a multiplier is warranted. In addition, provision of a multiplier here would not redound to the benefit of the attorney who did the work. Instead, it simply would increase the already substantial profit that the O'Quinn firm will receive for Ms. Pettiette's work, for which she was paid $25 per hour, and which represents most of the compensable time submitted by O'Quinn and Hagans. The firm accordingly will be compensated at the $100 per hour rate. An additional $2,000.00 in expenses will be awarded.

The firm of Schlegel & Trafelet will receive an additional 300 hours at $150 per hour, or $45,000.00, for post-settlement work. An additional $10,000.00 in expense for paralegal time will be allowed. The firm of Waite, Schneider, Bayless & Chesley will receive an additional 50 hours at $150 per hour, or $7,500.00, for post-settlement work.

The law firm of Ashcraft & Gerel appealed the Magistrate's report as it concerns their motion to alter or amend the January 7, 1985 judgment on attorney fees. The Magistrate's recommendations on what fees and expenses should be awarded to the Ashcraft firm are reasonable and justified in all respects, including imposition of a negative quality multiplier. Ashcraft & Gerel's refusal to participate in the case except on its own terms and withdrawal from an active role adversely affected the interests of the class, as pointed out by both the Magistrate and Special Master Sol Schreiber. *See* Magistrate's Report, 611 F.Supp. at 1367; Transcript of September 20, 1983 Hearing Before Special Master Sol Schreiber, pp. 6575–76. Special Master Schreiber in fact recommended that no fees be paid at all. *Id.* The court's January 7, 1985 fee opinion limited the time period for which compensation was awarded to this firm precisely for these reasons. Imposition of a negative quality multiplier addresses the same issue and is amply justified on the record before the court. *See, e.g., In re*

*Fine Paper Antitrust Litigation,* 98 F.R.D. 48, 214–15 (E.D.Pa.1983), *aff'd in pertinent part,* 751 F.2d 562, 600–01 (3d Cir.1984); *Arizona v. Maricopa County Medical Society,* 578 F.Supp. 1262, 1278 (D.Ariz.1984) (disallowing time in lodestar calculation in lieu of "a substantial negative multiplier"); *cf. Sun Publishing Co., Inc. v. Mecklenburg News, Inc.,* 594 F.Supp. 1512, 1517–18 (E.D.Va.1984) (no fees for duplicative work caused by midstream change in counsel; time expended by previous counsel disallowed).

The Magistrate's report on Ashcraft & Gerel's fee petition is confirmed. The fee otherwise payable, however, will be offset against the benefit obtained by the firm's individual clients through the use of discovery materials assembled through the multidistrict discovery process and paid for by the class. Extensive use of these materials was made by Ashcraft & Gerel on motions, particularly those involving the issues of summary judgment. The value of the class's materials it used far exceeds the value of the services rendered by this firm to the class. Therefore, no fee award will be made to the firm of Ashcraft & Gerel. Arguably, no expense award should be made either, given the extensive use this firm made of MDL discovery. Nevertheless, in light of the court's award of expenses to other independent counsel, Ashcraft & Gerel will be permitted to receive the expense award recommended by the Magistrate.

Victor J. Yannacone, Jr., Esq. will receive an additional $100,000.00 for expenses, despite his failure to submit organized documentation in a form permitting effective review by the court. This is the minimum sum that must have been expended to benefit the class. Undoubtedly he expended far more on this litigation, but it cannot be determined on this record if these expenditures aided the class. Mr. Yannacone is an honorable lawyer and officer of the court. Nevertheless, the court cannot discharge its responsibility to the class by simply awarding Mr. Yannacone fees and expenses based on his blanket assertions that all the time and expenses claimed benefited the class. Counsel has the obligation to document in detail and in an organized fashion a claim for attorney fees and related expenses.

E.W. Cromartie, II, Esq. will receive 50 hours at $150 per hour, or $7,500.00, for post-settlement work that benefited the class, including assistance in formulation of a distribution plan. $2,000.00 in additional expenses are awarded as well.

William T. McMillan, Esq., one of the Australian attorneys, submitted on the day of the June 11, 1985 hearing a request for fees for attendance at the San Francisco fairness hearings in August 1984. Although this request is most untimely, and could be denied for that reason alone, the court recognizes that overseas counsel have experienced problems of communication and are not familiar with United States law on attorney fee assessment and related matters. Therefore, in the interests of fairness the court will award the $3,650.00 in fees requested, 11 hours at $150 per hour and 40 hours of travel time at $50 per hour. The hours requested are reasonable and the requested travel time hourly rate in fact is less than the effective rate payable under the court's guidelines.

A supplemental fee application was received by the court on May 29, 1985 from Michael S. Bigg, Hawthorn, Cuppaidge & Badgery, Brisbane, Australia. Mr. Bigg's supplemental petition, like that of Mr. McMillan, was received long after the deadline by which it was to have been filed. In the interests of fairness, it too has been considered. A total of 38 hours has been allowed at $150 per hour, totalling $5,700.00, for attendance at the San Francisco fairness hearing. No consideration was given to a supplemental expense request received by the court on January 24, 1985, in part because the expenses were not detailed or explained. One entry, however, captioned "travelling expenses to USA etc." may relate to Mr. Bigg's travel to the United States for the fairness hearing. A cost of $5,081.76, the amount

claimed, is not unreasonable for round-trip air fare and associated travel costs. Accordingly, it is allowed as an additional expense.

Marlene Manes and Richard Ellison appealed the Magistrate's report as it concerned their fee petition. The Magistrate's report is confirmed in all respects. Contrary to counsel's belief, their original fee award did include payment for work through August 31, 1984 that benefited the class, although generally the court observed a June 15, 1984 cut-off date on the initial fee petitions.

The Magistrate's report will be deemed a part of this memorandum. It is printed as an appendix.

## VIII. FINAL AWARDS AFTER MODIFICATION AND SUPPLEMENTATION

The final awards are set forth in the table below. The figures include those originally allowed by the court, the additional allowances recommended by the Magistrate, the supplemental allowances recommended by the Magistrate and the modifications ordered by the court at the June 11, 1985 hearing on fees.

TABLE OF ALLOWED FEES AND EXPENSES

| NAME | HOURS ALLOWED | FEE AWARD | EXPENSE AWARD | TOTAL |
|---|---|---|---|---|
| Arnolds, Edward | 28.75 | $ 5,390.62 | $ — | $ 5,390.62 |
| Ashcraft & Gerel | — | — | 54,897.39 | 54,897.39 |
| Barber, James C. | — | — | 5,065.87 | 5,065.87 |
| Barnard, Hilleren & Spates, P.A. | — | — | 1,575.11 | 1,575.11 |
| Baskin & Steingut, P.C. | 846.60 | 190,485.00 | 42,068.87 | 232,553.87 |
| Beezley & Beezley | — | — | 362.95 | 362.95 |
| Bigg, Michael Sidney | — | 5,700.00 | 22,561.76 | 28,261.76 |
| Burke, Curry, Hammill & O'Brien, P.C. | 960.40 | 144,060.00 | 54,014.88 | 198,074.88 |
| Chelf, Cox and Apperson | — | — | 156.96 | 156.96 |
| Cherry, Owens, Callihan | — | — | 55.26 | 55.26 |
| Chesley, Stanley M., et al. of Waite, Schneider, Bayless & Chesley Co. | 2223.25 | 475,080.00 | 48,923.60 | 524,003.60 |
| Cromartie, E.W., II | 50.00 | 7,500.00 | 2,746.55 | 10,246.55 |
| Darmopray, Walter T. | — | — | 99.31 | 99.31 |
| Davison, Paul Joseph | — | — | 2,042.08 | 2,042.08 |
| Dean, David, et al. of Dean, Falanga & Rose | 6330.15 | 1,424,283.75 | 133,673.19 | 1,557,956.94 |
| Epstein & Kesselman | 108.80 | 16,320.00 | 11,138.00 | 27,458.00 |
| Finkelstein, Kaplan, Levine, Gittelsohn and Tetenbaum | — | — | 107.96 | 107.96 |
| Fiorella, Albert, et al. | 1329.07 | 199,360.50 | 51,032.31 | 250,392.81 |
| Fox, Byron Neal | — | — | 216.94 | 216.94 |
| Gage & Tucker | — | — | 2,724.97 | 2,724.97 |
| Garvey, Magner & Love, P.C. | — | — | 1,560.26 | 1,560.26 |
| Gillette, Clayton P. | 366.95 | 68,803.12 | — | 68,803.12 |
| Gilreath, Sidney | — | — | 867.29 | 867.29 |
| Gorman, Edward J., et al. of O'Hagan, Reilly & Gorman, P.C. | 703.50 | 105,525.00 | 52,613.11 | 158,138.11 |
| Grant and Artesani | — | — | 2,314.64 | 2,314.64 |
| Greenwald, Alvin G., of Greenwald & Thompson | 397.50 | 59,625.00 | 12,296.79 | 71,921.79 |

TABLE OF ALLOWED FEES AND EXPENSES

| NAME | HOURS ALLOWED | FEE AWARD | EXPENSE AWARD | TOTAL |
|---|---|---|---|---|
| Greitzer & Locks | 2316.62 | $487,208.25 | $52,945.32 | $540,153.57 |
| Grincewicz, Donald E. | — | — | 1,662.00 | 1,662.00 |
| Hall, John B., of Kraft & Hughes | 25.40 | 2,425.00 | 3,935.48 | 6,360.48 |
| Harper & Anderson | — | — | 200.00 | 200.00 |
| Hayes, Edward F., III | 432.70 | 64,905.00 | — | 64,905.00 |
| Henderson, James A., Jr. | 435.91 | 81,733.12 | — | 81,733.12 |
| Henderson, Thomas W., *et al.* | 2386.90 | 515,163.75 | 71,739.44 | 586,903.19 |
| Higgins, John J. | — | — | 10.82 | 10.82 |
| Hill, Boren and Associates, P.C. | — | — | 190.27 | 190.27 |
| Hoberg, Finger, Brown, Cox & Molligan | 1585.14 | 348,331.50 | 68,136.53 | 416,468.03 |
| Hollow, Reginald Frederick Monty | 215.50 | 32,325.00 | 8,684.74 | 41,009.74 |
| Kamp, Allen R. | 39.90 | 7,481.25 | — | 7,481.25 |
| Kaufman, Robert K. | — | — | 377.66 | 377.66 |
| Kauza, Thomas F. | — | — | 421.24 | 421.24 |
| Kelly & Luglio | 41.00 | 6,150.00 | 18,500.00 | 24,650.00 |
| Kline, Allen H., Jr. | 60.50 | 6,050.00 | — | 6,050.00 |
| Knee, Kenneth M. | — | — | 85.00 | 85.00 |
| Levine & Grossman | 1022.25 | 153,337.50 | 53,208.00 | 206,545.50 |
| Like, Irving, *et al.* | 2966.69 | 664,966.50 | 49,703.00 | 714,669.50 |
| London, Jack E. | — | — | 3,000.00 | 3,000.00 |
| Ross V. Lonnie & Co. | — | — | 3,055.93 | 3,055.93 |
| MacLaren, Roger L. | — | — | 3,683.39 | 3,683.39 |
| McClelland, Arden C. | — | — | 5,368.90 | 5,368.90 |
| McConnell, Steven M. | — | — | 17.44 | 17.44 |
| McDermott, McDermott, Zollinger & Box | — | — | 615.76 | 615.76 |
| McMillan, William T. | — | 3,650.00 | 27,178.34 | 30,828.34 |
| Marlene P. Manes and Richard Ellison | 141.00 | 21,150.00 | — | 21,150.00 |
| Marcello, Victor L., of Talbot, Sotile, Carmouche, Marchand & Marcello | — | — | 3,222.56 | 3,222.56 |
| Mayerson, Shniper & Gerasimowicz | 455.75 | 68,362.50 | 20,615.00 | 88,977.50 |
| William L. Meritz Associates | — | — | 182.00 | 182.00 |
| Meroney, Anne L. | 84.65 | 12,697.50 | 10,147.74 | 22,845.24 |
| Miller & Pitt, P.C. | — | — | 1,221.71 | 1,221.71 |
| Mokotoff, Mondshine & Aliano | — | — | 7,000.00 | 7,000.00 |
| Monaghan, Henry Paul | 40.75 | 7,640.62 | — | 7,640.62 |
| Musslewhite, Benton | 2431.05 | 344,657.50 | 59,614.97 | 404,272.47 |
| Myers, Mary Wade | — | — | 1,695.00 | 1,695.00 |
| O'Lochlayne, D. Sean of Frisch, Dudek & Slattery, Ltd. | — | — | 651.45 | 651.45 |
| O'Quinn & Hagans | 1325.76 | 132,576.00 | 32,316.00 | 164,892.00 |

1346

## TABLE OF ALLOWED FEES AND EXPENSES

| NAME | HOURS ALLOWED | FEE AWARD | EXPENSE AWARD | TOTAL |
|---|---|---|---|---|
| Owens, Danny L. | — | $ — | $ 450.55 | $ 450.55 |
| Robert I.P. Pasternak and Jane R. Kaplan | — | — | 1,680.00 | 1,680.00 |
| Petriello, John, of Levy & Ehrlich, P.C. | — | — | 231.39 | 231.39 |
| Racine, Olson, Nye, Cooper & Budge | — | — | 1,253.37 | 1,253.37 |
| Richardson & Murphy | — | — | 25.00 | 25.00 |
| Richter, Wimberly, Ericson, Woods & Brown | — | — | 6,411.96 | 6,411.96 |
| Risner, William J. | 4.00 | 400.00 | 6,640.97 | 7,040.97 |
| Lewis A. Royal, Samuel S. Zelden, Frank G. Wieslander, P.C. | — | — | 4,581.42 | 4,581.42 |
| Russo, Victor D., et al. | 1457.30 | 218,595.00 | 52,518.50 | 271,113.50 |
| Schlegel & Trafelet, Ltd. | 3867.15 | 944,448.75 | 166,898.74 | 1,111,347.49 |
| Schroeter, Goldmark & Bender, P.S. | 72.45 | 7,245.00 | 12,958.03 | 20,203.03 |
| Newton B. Schwartz, P.C. | 418.86 | 41,886.00 | 16,109.18 | 57,995.18 |
| Searcy & Smith, P.C. | 165.50 | 24,825.00 | 974.37 | 25,799.37 |
| Shapiro, I.B. | — | — | 9,428.73 | 9,428.73 |
| Slater & Tenaglia | — | — | 210.00 | 210.00 |
| Steiner, Del | — | — | 635.38 | 635.38 |
| Sullivan & Associates | 348.74 | 52,311.00 | 20,573.08 | 72,884.08 |
| Charles R. Terry and William L. Jenkins | — | — | 2,287.39 | 2,287.39 |
| Twerski, Aaron D. | 961.07 | 180,200.62 | — | 180,200.62 |
| Ursini, Frank J. | — | — | 483.81 | 483.81 |
| Wade, Charles A. | — | — | 114.00 | 114.00 |
| Willner, Don S. | — | — | 11,146.40 | 11,146.40 |
| Woll, Crowley, Berman & Olsman | 642.00 | 96,300.00 | 14,422.40 | 110,722.40 |
| Yannacone, Victor | 2036.00 | 381,750.00 | 102,846.00 | 484,596.00 |
| Agent Orange Plaintiffs' Management Committee | — | — | 1,711,155.87 | 1,711,155.87 |

GRAND TOTAL: $10,767,443.63

## IX. CONCLUSION

The fee awards shall be payable by the Clerk of the Court as directed in this memorandum and judgment. No payment shall be made except upon written demand of the attorney receiving the fee. That demand shall certify that all *"Agent Orange"* litigation discovery material in his or her possession has been filed with the Clerk. It must also certify that the attorney has retained no fees or advance for expenses from any member of the class. Payment shall be stayed until completion of appeals from this judgment.

Interest will accrue at a rate determined pursuant to this opinion. Since the final judgment is now being issued, interest shall be computed from today's date, June 18, 1985, and not from the date of the original order fixing fees, January 7, 1985. *See* discussion *supra* Part IV.C.4.

If an appeal from the January 7, 1985 fee-fixing order is presently pending, permission of the Court of Appeals to amend that order may be required. The parties may wish to seek a remand from the Court of Appeals to permit today's judgment to become effective.

The settlement was approved on January 7, 1985 for the reasons stated in the Preliminary Memorandum and Order on Settlement. *See In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740 (E.D. N.Y.1984). The approval is now reaffirmed.

All prior orders, opinions, memoranda, briefs, transcripts and documents on file in the court under M.D.L. No. 381 have been considered by the court in making this order and judgment. This judgment is final.

SO ORDERED.

APPENDIX

REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE RE: ATTORNEY FEE PETITIONS

May 30, 1985

SHIRA A. SCHEINDLIN, United States Magistrate.

### TABLE OF CONTENTS

I. INTRODUCTION ........................................................... 1348
 A. Fee Guidelines ...................................................... 1348
 1. Guidelines As To Which No Change Is Recommended ................... 1348
 2. Guidelines As To Which This Court Recommends Amendment ........... 1350
 B. Expense Guidelines .................................................. 1351
 C. Post-Settlement Compensation Guidelines ............................ 1351
II. RECONSIDERATION OF FEE PETITIONS ...................................... 1352
 A. PMC MEMBERS ........................................................ 1352
 1. Dean, Falanga & Rose .............................................. 1352
 2. Greitzer and Locks ................................................ 1355
 3. Henderson & Goldberg .............................................. 1357
 4. Hoberg, Finger, Brown, Cox & Molligan ............................. 1360
 5. Benton Musslewhite ................................................ 1360
 6. O'Quinn & Hagans .................................................. 1362
 7. Stephen J. Schlegel ............................................... 1363
 8. Newton B. Schwartz ................................................ 1364
 9. Waite, Schneider, Bayless & Chesley ............................... 1365
 B. NON–PMC MEMBERS .................................................... 1366
 1. Ashcraft & Gerel .................................................. 1366
 2. Baskin & Steingut ................................................. 1368
 3. Epstein & Kesselman ............................................... 1369
 4. Thomas Grasso ..................................................... 1370
 5. John J. Higgins ................................................... 1370
 6. Reginald Frederick Monty Hollow ................................... 1370
 7. Kraft & Hughes .................................................... 1372
 8. Litvin, Blumberg, Matusow & Young ................................. 1372
 9. Racine, Olson, Nye, Cooper & Budge ................................ 1372
 10. Searcy & Smith .................................................... 1373
 11. Charles A. Wade ................................................... 1373
 12. Don S. Willner .................................................... 1374
 13. Victor J. Yannacone ............................................... 1374
 C. LIQUORI ASSOCIATES LTD. ............................................ 1378
 * * *
III. SUPPLEMENTAL FEE PETITIONS ............................................ 1380
 A. PMC MEMBERS ........................................................ 1380
 1. Greitzer & Locks .................................................. 1380
 2. Henderson & Goldberg .............................................. 1381
 3. Hoberg, Finger, Brown, Cox & Molligan ............................. 1382
 4. Benton Musslewhite ................................................ 1383
 5. O'Quinn & Hagans .................................................. 1383
 6. Stephen J. Schlegel ............................................... 1384

7. Waite, Schneider, Bayless & Chesley ................................... 1386
8. The PMC ........................................................ 1387
B. NON–PMC MEMBERS ............................................... 1389
 1. E. W. Cromartie, II ............................................. 1389
 2. Ellison & Manes .............................................. 1389
 3. Mayerson, Shniper & Gerasimowicz ............................. 1390
 4. William T. McMillan .......................................... 1390
 5. Reilly, Like & Schneider ...................................... 1390
 6. Schroeter, Goldmark & Bender ................................. 1391
 7. Searcy & Smith .............................................. 1392
 8. Sullivan & Associates ........................................ 1392
 9. Charles A. Wade ............................................. 1392
 10. Don S. Willner .............................................. 1392
 11. Woll, Crowley, Berman & Olsman, P.C. .......................... 1392

IV. CONCLUSION ...................................................... 1393
 A. Reconsideration Petitions ..................................... 1393
 B. Supplemental Petitions ....................................... 1394
 C. Total Award ................................................. 1395

## I. INTRODUCTION

Twenty-three petitioners have moved for reconsideration of the fees and expenses awarded to their firms by the District Court. Separate hearings were held, on request, on the majority of these motions. This court has also reviewed the memoranda submitted by petitioners. All petitions were reviewed pursuant to the Second Circuit's rule that attorneys must submit contemporaneous time records for all work performed after June 15, 1983 in order to receive fees. *See New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147–48 (2d Cir.1983); *Birmingham v. Sogen-Swiss International Corp. Retirement Plan*, 718 F.2d 515, 523–24 (2d Cir.1983).

The petitioners have severally challenged each of the guidelines originally promulgated by the court. Upon reconsideration, I am recommending the amendment of several of the original guidelines used to review the fee and expense applications.

I have also received nineteen supplemental fee petitions. Each of these petitions has been reviewed pursuant to the recommended guidelines set forth below.

### A. FEE GUIDELINES

#### 1. Guidelines As To Which No Change is Recommended

##### a. Telephone Time

Several firms have objected to the reduction in time spent in telephone conversation. Generally, the guidelines allow compensation for this activity if the purpose of the telephone time is ascertainable. Exceptionally vague entries were not credited. *See* Memorandum and Order on Attorney Fees As Modified and Final Judgment (E.D.N.Y.1985), 611 F.Supp. 1296, 1322 (hereinafter "Memorandum and Order on Attorney Fees"). In order to secure compensation, the attorney must show that the telephone conversation was beneficial to the class. *Id.* at 1305; *see City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977). Telephone time therefore should only be compensable if accompanied by adequately detailed time records and descriptions. I recommend that this guideline stand because it is fair and reasonable.

##### b. Correspondence Review

Many firms also objected to the limited compensation allowed for time spent reviewing mail. As with telephone time records, correspondence review entries must reveal the nature of the correspondence reviewed and the time spent on this activity to be compensable. The court must then determine whether the time spent on review of correspondence benefited the class. Memorandum and Order on Attorney Fees, 611 F.Supp. at 1305, 1321. Consequently, I recommend that the original guidelines for compensation of correspondence review time be continued.

#### c. Document Review

The court allowed all hours claimed for document review as long as the documents concerned substantive legal issues. *Id.* at 1321. It is my recommendation that this guideline stand because it is fair and reasonable.

#### d. Travel Time

Several firms have objected to the guideline that hours claimed as travel time be compensated at 50% of the normal hourly rate. *See id.* at 1321–22. By definition, travel time cannot be as productive as office time. There are simply too many interruptions. Many lawyers argued that they worked at all times while traveling. I cannot credit this argument. They may have worked 100% of the time during some of their travel, but not at all at other times. Moreover, travel time cannot be used as effectively as office time. I find therefore that 50% compensation is fair and reasonable. *See also Society for Goodwill to Retarded Children v. Cuomo,* 574 F.Supp. 994, 998 (E.D.N.Y.1983), remanded on other grounds, 737 F.2d 1253 (2d Cir.1984).

#### e. Management Meetings

Many attorneys sought compensation for a large number of hours devoted to "management" or "business" meetings. These meetings primarily dealt with organizational and financial matters among the lead plaintiffs' attorneys. The court found that time spent on such matters was not compensable. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1320. Many PMC attorneys took issue with this ruling. They reasoned that business, financial and organizational meetings were essential to the successful prosecution of the class action. Thus, they argued, such time should be compensable because it was beneficial to the class.

I disagree. Attorneys bill clients for most of their activities. But they do not bill them for the cost of setting up their practice, drafting their partnership agreement, or for meetings in which they determine the size of each partner's share of the pie. These are accepted costs of doing business that cannot be transferred to the client, except to the extent that these costs are reflected in the billing rate. As the Supreme Court stated recently with regard to a fee award in a civil rights action, "[i]n the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* are also not properly billed to one's *adversary* pursuant to statutory authority." *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) (quoting *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (*en banc* )) (emphasis in original).

The same is true in this class action litigation. Lawyers should not bill the *class* for items that they would not bill to clients. These lawyers are in practice to make money. Each of the lawyers who submitted a fee application chose to work on the Agent Orange case instead of on other matters. Each expected a fee in return for his services. In order to earn this fee, each lawyer or group of lawyers was required to make certain financial arrangements. How to fund the litigation was a question that had to be addressed. However, a successful resolution to that question was a condition precedent to the receipt of a fee. Therefore, the attorneys should be required to absorb the time spent in making financial arrangements, not the members of the class.

#### f. Hourly Rate

Many firms objected to the court's imposition of a uniform $150 per hour partner compensation rate. The court determined that the application of a single national rate is appropriate for purposes of administrative simplicity, fairness to all attorneys participating in a multidistrict litigation, and fairness to the class members. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1307–08.

I have reviewed the briefs and taken testimony concerning the challenge to both the $150 hourly rate for partners and $100 per hour rate for associates. Nothing in the record has persuaded me that these

rates are inappropriate. In fact, the record before me lends support to the rates adopted by the court. *See infra,* 611 F.Supp. at 1358–59. I therefore recommend no change in the rate. The question of the permissibility of a national rate from the legal standpoint is open in this Circuit and must be decided there. *See* Transcript of Hearing before District Court on February 6, 1985 at 60.

### g. *Risk Multiplier and Quality Multiplier*

Many firms have also challenged the lack of a risk multiplier and the adequacy of the quality multiplier. Both issues involve the court's discretion. Any further instructions must come from the Court of Appeals, not this court. *Id.* at 14–15.

### 2. *Guidelines As To Which This Court Recommends Amendment*

### a. *Educational Reading*

The original guidelines did not compensate an attorney for the time spent on medical or scientific reading. The plaintiffs' attorneys spent considerable time researching and reviewing medical and scientific documents in order to prepare the case, and to prepare for depositions of expert witnesses.

It is my recommendation that such reading be compensated at 50% of the normal hourly rate. It is well established that a court may award different hourly rates for different tasks. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1306–07 (citing *In re Equity Funding Corp. of America Securities Litigation,* 438 F.Supp. 1303, 1330 (C.D.Cal.1977)); *see also* 2. M. Derfner & A. Wolf, *Court Awarded Attorney Fees* ¶ 16.03(11) (1983) ("appellate courts have, with an uncommon degree of consistency, held that it is permissible to award different rates for different tasks"). I recommend the 50% rate here in view of the highly technical and specialized nature of the scientific material that plaintiffs' attorneys reviewed. This review obviously benefited the class. In fact, if the available scientific material had not been thor-

oughly digested, the class would not have been adequately represented. Nonetheless, a products liability lawyer will always benefit in the future from his increased scientific knowledge, thus a 50% reduction is justified.

### b. *Conference Time*

Many firms also protested the disallowance of their intra-office conference time. I recommend that an attorney be compensated for 50% of the time spent conferring with other lawyers in his office on substantive matters. Such time was well spent if it was the least expensive method of facilitating necessary communications between attorneys.

Several firms also hired law clerks and law students to work exclusively on Agent Orange matters. To the extent that the attorneys discussed substantive matters with these individuals, the attorneys should be compensated at the same 50% rate. This lower rate solves the problem of double compensation, which would arise if two attorneys requested time for the same conversation.

### c. *Deposition Time*

Most of the fee modifications that I am recommending arise from time spent on depositions. The original guidelines allowed only 50% of the time claimed preparing or summarizing a deposition. I recommend that such time be fully credited. Given the scientific and technical nature of the bulk of the depositions, there is no doubt that the examining or defending attorney required extensive preparation.

Summarizing depositions should also be fully compensated. The deposition summaries were beneficial to the class if only because this court required that such summaries be submitted as a part of the final pretrial order. *See* Magistrate's Pretrial Order 17 (March 26, 1984). In addition, I recommend the elimination of the original guidelines' 9-hour limit on time spent taking depositions. Having been closely involved in the discovery process from Janu-

ary to May, 1984, I have no doubt that the time spent preparing for and taking depositions often exceeded nine hours per day.

#### d. *Reading Transcripts*

Reading transcripts of depositions and of court hearings should receive 50% compensation. Such activity was often necessary but did not benefit the class sufficiently to warrant full compensation. *See infra,* 611 F.Supp. at 1353.

### B. EXPENSE GUIDELINES

Generally, the court's expense guidelines are fair and reasonable. Expenditures for hotels were reimbursed at a rate of $90 per night. Meals were reimbursed at a per diem rate of $50, $20 if they were in the attorney's home city. Law clerk and paralegal expenses were reimbursed at a rate of $20 per hour. Any out-of-pocket expenditures such as postage, telephone bills, duplication costs, and messenger services were fully reimbursed if adequately documented. All disbursements were compensated at either the maximum allowable guideline rate or the amount requested, whichever figure was lower. I see no need to recommend any change in the court's guidelines in these areas.

I do, however, make two recommendations with regard to the expense guidelines. First, where attorneys submitted sufficient documentation of their Agent Orange-related expenses, but were unable to establish that those expenses were related to compensable activities, I recommend that the attorney or firm be awarded the same percentage of requested expenses that they received in attorneys' fees. For example, if an attorney requested compensation for 1,000 hours of time and it is determined that only 200 hours, or 20% of his time, was spent on compensable activities, then he should receive 20% of his documented expenses. It would be unfair to deny the attorney any compensation for well-documented expenses simply because he is unable to identify the activity to which it relates. Assigning a percentage to these expenses would appear to be the appropriate solution. *See In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357, 1388–

89 (N.D.Ga.1979) (travel expenses reduced in proportion to reduction of allowable attorney time) *modified and remanded on other grounds,* 645 F.2d 488 (5th Cir.1981).

The second recommendation relating to expense guidelines is to place a cap on the expert fees awarded to non-causation experts. As stated in the Memorandum and Order on Attorney Fees, "[e]xpenses must be both reasonable in amount and reasonably related to the interests of the class." 611 F.Supp. at 1364 (citing *Armored Car,* 472 F.Supp. at 1388–89; *Fine Paper,* 98 F.R.D. at 85).

The PMC retained approximately nine non-causation experts at a total cost of approximately $83,000. These experts were only marginally useful to the class. Their reports were submitted late and were uniformly inadequate. Because the reports were late, no time remained in which to conduct their depositions. I therefore respectfully recommend that non-causation experts receive a maximum reimbursement of $5,000 each.

### C. POST–SETTLEMENT COMPENSATION GUIDELINES

The District Court originally considered compensation only for those fees and expenses requested through June 15, 1984. The court granted leave to file supplemental petitions by April 1, 1985 for post-settlement fees and expenses. Nineteen attorneys and/or law firms, including PMC and non-PMC members, filed supplemental petitions. I confined my review of these petitions to the period from June 15, 1984 through April 1, 1985, with an exception for reimbursable expenses incurred prior to June 15, 1984 that were not previously compensated.

I recommend that members of the PMC be compensated fully for the following activities: preparing for and participating in the Fairness Hearings; meeting with the Special Masters; drafting settlement papers; researching or drafting a distribution plan; consulting with medical or financial experts; opposing Ashcraft & Gerel's or Benton Musslewhite's motions to overturn the settlement; and any related expenses.

However, only one attorney for each firm should be compensated for attending Fairness Hearings.

For non-PMC attorneys the same guidelines apply with the exception that no compensation should be given for their attendance at Fairness Hearings because their arguments were on behalf of individual clients. To the extent legal arguments were made in support of the settlement, they could only have been duplicative of those made by the PMC.

I further recommend that no compensation be awarded for the following post-settlement activities: attorneys' fees work; any work on the suit against the government; time spent on civilian and opt-out cases; any media contact; meetings with veterans and other clients; and any related expenses.

Finally, it is my recommendation that no discretionary quality multiplier be awarded for post-settlement hours. In its Memorandum and Order on Attorney Fees, the court stated that "a quality multiplier need not be granted for all counsel or all tasks." 611 F.Supp. at 1314. It is my view that although the attorneys continued to work on behalf of the class during this period, their work was not of a sufficiently high quality to warrant a quality multiplier. For example, much of their energy was focused on non-productive tasks such as the plaintiffs' suit against the government. Therefore, I recommend a straight hourly rate of $150 for partners and $100 for associates.

## II. RECONSIDERATION OF FEE PETITIONS

### A. PMC MEMBERS
#### 1. DEAN, FALANGA & ROSE

The law firm of Dean, Falanga & Rose submitted a motion for reconsideration of

its fee award. Hearings were held on March 28 and April 3, 8, and 9, at which both Mr. Dean and Mr. Covello testified. In further support of his petition, Mr. Dean provided the court with exhibits listing by category those areas in which he believes his firm was inadequately compensated. After reviewing the petition, I recommend an increase in the fee award to the Dean, Falanga & Rose firm.

### A. Objections to Award of Fees

### 1. David Dean

### a. Depositions

Mr. Dean took issue with the fees awarded that relate to depositions. He first asserted that his compensation was insufficient for the time he spent preparing, traveling to and conducting depositions. I am recommending an additional award of 58.50 hours in this category in accordance with two recommended modifications discussed in the Introduction, 611 F.Supp. at 1350–51: the elimination of the 9-hour rule, and full credit for time spent preparing for depositions.[1] Almost all the additional deposition time that Mr. Dean requested relates to travel time. For the reasons stated in the Introduction, 611 F.Supp. at 1349, I am not persuaded that such time merits more than 50% compensation.[2]

Mr. Dean next challenged the award for time spent reading and reviewing deposition transcripts. The initial guidelines provided for 50% compensation for this task. See Memorandum and Order on Attorney Fees, 611 F.Supp. at 1321. I recommend no change in this rule. Mr. Dean reviewed over 300 deposition transcripts in his capacity as

---

1. Full compensation should be given for depositions conducted on February 25, 1983 and November 30, 1983. Although his contemporaneous time records indicate that he "attended" depositions on these dates, Mr. Dean testified that he actually conducted these depositions.

2. The court is mindful of Mr. Dean's frequent objections to the reduction in travel time hours. I have increased compensation wherever time

spent traveling, as distinct from other activities, was overestimated. Travel time was never specified in Mr. Dean's original petition. Nonetheless, Mr. Dean has overestimated the amount of time the court attributed to travel. On most occasions, where an entry included a reduction for travel, the lion's share of the decrease was actually attributable to other non-compensable activities.

lead counsel. He argues that he should receive full compensation for this work whether or not he attended the deposition because he was required to be familiar with all the evidence in the case. While it is true that Mr. Dean needed to read the transcripts, a question arises as to the appropriate compensation for this work. As noted above, it is appropriate for a court to award different rates of compensation for different tasks. *See* Introduction, 611 F.Supp. at 1350.

From the perspective of preserving the integrity of the settlement fund, charging the fund once for taking a deposition and again for reviewing it is duplicative. The transcript review only incrementally benefits the class. Thus 50% compensation for the time spent in such review is fair to the attorney and the members of the class. As a result, I recommend no change in the hours awarded for reviewing deposition transcripts.

### b. *Court Hearings*

Mr. Dean contested the award for time spent reviewing transcripts of court hearings and for what he considers the court's overestimation of travel time associated with court hearings. As with depositions, full time should be awarded for preparation for and attendance at court hearings. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1319. With regard to transcript review, it is my recommendation that Mr. Dean be awarded full compensation for review of transcripts of those hearings he did not attend because of his position as lead trial counsel. In addition, travel time has been adjusted where appropriate. Reconsideration of each entry in this category yields an additional 30.25 hours.

### c. *Management Meetings*

Mr. Dean next challenged the court's decision not to award fees for time spent in management meetings of the PMC, the Lead Counsel Committee, and Yannacone & Associates. Many of these meetings involved matters that Mr. Dean variously described as "business," "payment of liti-

gation costs," "financing," "steering committee," "monthly expenses," "reorganization of the committee," "review of the PMC agreement," and "budget problems." *See* Dean Fee Petition. The court found that time spent on such matters was not compensable. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1320. As I stated in the Introduction, *id.* at 1349, attorneys who organize to prosecute a class action should bear the costs of that initial organization and the ongoing business transactions that inevitably occur. Time spent making intracommittee financial arrangements, for example, is not compensable.

In sum, I recommend no additional compensation for management meetings. My review of the hours requested in this category, however, results in an additional award of 34.25 hours. Most of this increase is attributable either to a better understanding of a particular meeting or to reduced travel time, based upon Mr. Dean's testimony.

### d. *Conferences with Co-Counsel*

As with the meetings discussed above, many of these entries concerned business matters. A review of the entries in this category resulted in a net decrease of 15 hours.

### e. *Telephone Conferences and Correspondence*

A review of the entries in these categories revealed that Mr. Dean has challenged the court's failure to award fees for calls or correspondence of a non-substantive nature. I do not believe such activity should be compensated. However, my review of these entries resulted in a net recommended increase of 35.75 hours based on evidence submitted by Mr. Dean.

### f. *Miscellaneous*

In the remaining categories questioned by Mr. Dean, I recommend a total increase of 89.50 hours. This increase results from conferences with associates in the same firms, scientific reading, and the correction of errors in various categories. *See* Introduction, 611 F.Supp. at 1350–1351.

## 2. *Joseph Covello*

Mr. Joseph Covello, who is associated with Mr. Dean, has objected to the fees awarded him by the court. I have heard argument from Mr. Covello and reviewed his submission. Based on my review, I make the following recommendations.

### a. *Deposition Scheduling*

Mr. Covello was not compensated for the hours he spent in deposition scheduling. From June, 1983 through March, 1984, the task of deposition scheduling was assumed by the firm of Dean, Falanga & Rose, pursuant to the directive of Special Master Sol Schreiber. Transcript of March 28, 1985 at 21, 59–62; Covello Affirmation of April 3, 1985. It is my recommendation that this time be fully compensated as it was court ordered and directly beneficial to the class. I have reviewed Mr. Covello's time in light of this recommendation and find that he is entitled to an additional 74.50 hours.

### b. *Attendance at Management Committee and Consortium Meetings*

Mr. Covello has not persuaded me to amend the guideline that disallows compensation for an associate's attendance with a partner at consortium and management committee meetings. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1320. It is reasonable to impute a partner's knowledge of a meeting to his firm. Throughout the Agent Orange litigation, Mr. Covello has been an associate with Dean, Falanga & Rose. Thus, there is no reason to award him a fee for attending any consortium or management committee meeting at which Mr. Dean was present.

### c. *Discussion with Law Clerks*

Mr. Covello requested compensation for time spent instructing student law clerks who were hired to summarize depositions. The court denied compensation for this task. Upon reconsideration it is my recommendation that half of the time spent supervising student clerks be compensated as analogous to discussions among associates of the same law firm. Compensation should only be awarded if the student work was beneficial to the class. Because the court required deposition summaries for the Pretrial Order, this work must be so considered. I have reviewed these entries, and have determined that the firm is entitled to an additional 6.37 hours.

### d. *Intra-Office Conferences*

As stated in the Introduction, 611 F.Supp. at 1350, I am recommending that 50% of the time spent in conferences between attorneys in the same firm be compensated. In Mr. Covello's case, an additional 6.41 hours should be awarded.

### e. *Depositions and Travel Time*

As set forth in the Introduction, 611 F.Supp. at 1350, I am recommending the elimination of the 9-hour rule regarding depositions. This recommendation results in an additional award of 21.50 hours. I do not feel that any adjustment is required with respect to compensation for travel time. However, in reviewing the petition, errors as to the amount of time spent in travel were corrected, resulting in an increase of 9.75 hours.

### f. *Regional Counsel Meetings*

Mr. Covello has asked that he be compensated for time spent at regional counsel meetings. I do not believe that these meetings were sufficiently beneficial to the class to warrant compensation. It is therefore my recommendations that no additional hours be added for this activity.

### g. *Miscellaneous*

In the "Miscellaneous" category as denominated by Mr. Covello, I recommend a total increase of 7 hours. This category includes meetings and telephone conferences with co-counsel and review of legal memoranda. Other miscellaneous activities which should be reimbursed pursuant to this reconsideration amount to 13.87 hours.

### B. Objections to Award of Expenses

At the March 28, 1985 hearing, Mr. Dean testified that with regard to expenses, "I felt with some minor exceptions I was treated fairly by the Court." Tr. at 53. Indeed, Mr. Dean has contested only four items on behalf of himself and Mr. Covello, all of which involve travel expenses. Having examined these entries, I recommend that an additional $4,779.45 be awarded to reimburse Mr. Dean for expenses incurred on four business trips in 1982. Mr. Dean's testimony made clear that each trip was taken in connection with class related activities.

### C. Conclusion

It is my recommendation that the Dean, Falanga & Rose firm be compensated for an additional 372.65 hours. Applying the $150 hourly rate with a 1.50 multiplier, I recommend an increase of $83,846.25 for a new total award of $1,424,283.75. I also recommend an additional $4,779.45 in expenses for a new expense award of $133,-673.19. I therefore respectfully recommend that the total award for the firm be increased by $88,625.70 to $1,557,956.94.

### 2. GREITZER & LOCKS

Gene Locks and Neil Peterson, of Greitzer & Locks, have sought reconsideration of the fees and expenses awarded to their firm. A hearing was held on March 1, 1985. After considering their testimony, as well as their previously submitted memorandum, I recommend a modification of the award made to the firm.

### A. Objections to Award of Fees

### 1. Gene Locks

Gene Locks requested review of three categories of time. First, he asked that the 9-hour limit on preparing and taking depositions be eliminated. I have discussed this matter in the Introduction, 611 F.Supp. at 1350, and recommend the elimination of this cap. As a result, I recommend that the firm be compensated for an additional 92 hours.

Mr. Locks requested review of a second category of time which he labeled "Miscellaneous." It contains seven specific entries, the total or partial disallowance of which he now contests. I have reexamined each of these entries, and recommend that Mr. Locks be reimbursed for an additional 14.5 hours.[3]

In addition, the time requested for a number of entries was disallowed or reduced because the descriptions were vague. These entries comprise the third category of time for which Mr. Locks requested reconsideration. I have examined each of these entries together with their corresponding notations on Mr. Locks' contemporaneous time records, and recommend that the firm be reimbursed for an additional 32.75 hours of work.[4]

The initial computation of Mr. Locks' compensable hours also contained a mathematical error. He was inadvertently deprived of 12.5 hours, for which the firm should be compensated.

### 2. Neil Peterson

Neil Peterson, in his testimony and by his memorandum, objected to the partial or total reduction of time in six categories. The first area, travel time, was uniformly compensated at 50% of the time claimed. As set forth in the Introduction, 611 F.Supp. at 1349, it is my recommendation that 50% compensation for travel time is appropriate.[5]

Mr. Peterson's original application contained numerous entries for "literature reading," totaling 327.5 hours. I am recommending that 50% of the time requested for background reading be compensated,

---

3. The 14.5 hours break down as follows: 4.5 hours for reading medical literature, 5 hours for deposition preparation, and 5 hours for certain post-settlement activities.

4. The additional time is for activities such as attending management committee meetings, reading medical literature, and preparing for depositions.

5. In effect, 50% compensation for travel is the equivalent of compensation at an hourly rate of $112.50 for travel time.

an additional award to Mr. Peterson of 163.75 hours. However, these entries originally were not accompanied by any description other than the mere words "Lit Reading." Further, Mr. Peterson's time records were of little help in explaining what literature he read on each day. As a result, none of the 327.5 hours were allowed in the initial examination. In the memorandum subsequently received by this court, Mr. Peterson provided more detail as to how such time was spent. Further, he has testified that all of this time was spent preparing for depositions either directly or indirectly. Tr. at 35. In light of this additional information, it would be unduly harsh to deny reimbursement for all of these hours. Nonetheless, Mr. Peterson's records fails to state in detail the items read or their relationship to deposition preparation. Therefore, I recommend payment for 50% (81.87 hours) of the 163.-75 hours that would otherwise have been granted.

Mr. Peterson requests reimbursement for 95.5 hours under the category "Mail." [6] As with the literature reading entries, none of this time was originally compensated because of the vague descriptions. Again, further information has been provided, but not with sufficient specificity to warrant compensation. While the court can presume that at least a portion of the time spent on literature reading benefited the class, it cannot make the same presumption for a category as general as "Mail." Although this category may include compensable items, there is no way to determine, because of the poor time records, how much time was spent on such tasks.

The fourth category of disallowed hours concerns telephone calls. During discovery, I ordered Mr. Peterson to call all treating physicians. Because Mr. Peterson has provided more detail as to the content of his telephone conversations and because he was performing a court ordered task, it

is my recommendation that the firm be reimbursed for all of the 67 hours previously disallowed.

The fifth contested category concerns 41.5 hours spent reading the Federal Rules of Evidence. As the court noted, Mr. Peterson has an extensive background in the Federal Rules of Evidence, and his re-reading did not benefit the class, particularly because he was not lead trial counsel. Memorandum and Order on Attorney Fees, 611 F.Supp. at 109. Therefore, none of this time should be credited to the firm.

Finally, Mr. Peterson's sixth category contains detailed explanations of many disallowed hours. Upon initial review, much of each day's time was not compensated by the court because the fee petition lacked specificity. The detail since provided by Mr. Peterson's petition allows for a more informed examination of particular hours. Consequently, I recommend that the firm be reimbursed for 85.5 hours previously disallowed.

#### B. *Objections to Award of Expenses*

Mr. Locks testified that $15,120.43 in expenses claimed by his firm were disallowed. Of that amount, $10,800.00 was spent as a security deposit for the Remsen Street, Brooklyn apartment rented by the PMC. The court initially determined that the security deposit should not be reimbursed because it would be refunded upon termination of the lease. In fact, the deposit has not and will not be returned because, although the PMC signed a one-year lease that expired in March, 1985, no rent has been paid since the first of the year. The landlord therefore applied the security deposit to the last three months' rent, which, at $3,600.00 per month, totaled $10,800.00. *See* Transcript of Schlegel, March 18, 1985, at 72 (testimony of Stephen J. Schlegel).

I recommend that the firm's expense award be amended to include this amount. Without the apartment, which housed many PMC members, the cost of the litigation would have been greater. The rental

---

**6.** Mr. Peterson's memorandum states that this category includes the following: review of pretrial orders, review and analysis of government

contract defense materials, review of treating physician reports, and review of liability-related pleadings and documents.

avoided many hotel and restaurant bills, and was clearly a prudent expenditure. Although most of the lease period extended past the settlement date, all rent paid should be reimbursed. Had the action gone to trial, it is likely that the apartment would still be occupied. Moreover, the PMC members attempted to reach a settlement with the lessor but were unable to do so. *Id.* Payment of the $10,800.00 is therefore justified.

Virtually all of the remaining $4,320.43 in disallowed expenses represents cuts made in hotel and meal costs. *See* Transcript of March 1, 1985 at 7. Pursuant to the court's original guidelines, ceilings of $90 per day for hotels and $50 per day for meals were imposed. Mr. Locks testified that, because he often paid the hotel and restaurant bills of others, this restriction worked a particular hardship upon him. Tr. at 8. While the court is sympathetic to his position, these ceilings are reasonable and should not be changed. Though Mr. Locks may have indeed paid the expenses of others, such instances are not sufficiently documented to allow for additional compensation.

### C. *Conclusion*

As detailed above, it is respectfully recommended that the firm be compensated for an additional 386.12 hours of work. Compensated at a rate of $150 per hour, with a 1.50 quality multiplier, the attorneys' fees award should increase by $86,877.00 to a total of $419,145.75. It is also recommended that the expense award be increased by $10,800.00, to a total of $43,502.08. Therefore, it is recommended that Greitzer & Locks receive a total award of $462,650.08—an increase of $97,677.00.

### 3. HENDERSON & GOLDBERG

Thomas W. Henderson and Antonio D. Pyle have moved for reconsideration of the fees and expenses awarded to the firm of Henderson & Goldberg. A hearing was held on March 20, 1985 at which both Mr. Henderson and Mr. Pyle testified.

### A. *Objections to Award of Fees*

#### 1. *Telephone Time*

Mr. Henderson objected to the "inartful" cutting of his telephone time. Tr. of March 20, 1985 at 6. In support of this claim he has submitted a list of the disallowed time. See Appendix 7 to Memorandum of Henderson & Goldberg in Support of Motion to Alter and Amend Judgment (hereinafter "Henderson Memorandum"). This list is helpful only insofar as it states Mr. Henderson's specific objections. However, it still does not explain the purpose of the various telephone calls. In order to satisfy the guidelines, the attorney must show that a particular telephone conversation concerned substantive legal issues. Therefore, no compensation can be awarded for telephone calls that lack a specific description. Mr. Henderson's telephone time entries generally read: "t/c (several)." This description is insufficient.

I therefore recommend that Mr. Henderson receive time only for those entries which clearly describe the purpose or content of the telephone conversation.

#### 2. *Correspondence Review*

Mr. Henderson also objected to the disallowance of certain time spent reviewing correspondence. *See* Henderson Memorandum at 17. I have reviewed all entries that indicate such a review. I first note that there were very few entries in that category. Where I could determine the nature of the correspondence review, I have recommended an award of attorneys' fees.

#### 3. *Scientific Reading*

Mr. Henderson testified that he spent considerable time researching and reviewing medical and scientific literature to prepare for depositions of expert witnesses and for the causation case in general. Tr. at 7, 8. As previously stated in the Introduction, it is my recommendation that such reading be compensated at 50% credit. I make this recommendation in view of the highly technical and specialized nature of the scientific material that was reviewed by members of the causation team. None-

theless, a products liability lawyer will always benefit in the future from his increased scientific knowledge, thus the 50% reduction is justified.

### 4. Conferences Between Counsel

Mr. Henderson also protested the disallowance of his conference time. Tr. at 9. I recommend that an attorney be compensated for 50% of the time spent conferring with other lawyers in his firm on substantive matters. This guideline has been applied upon review of Mr. Henderson's and Mr. Pyle's fee petitions. Conferences among members of the PMC were fully compensated.

### 5. Depositions

Mr. Henderson and Mr. Pyle noted that substantial cuts were made in the deposition time allowed. Again, I recommend the elimination of the 9-hour rule. In addition, I have allowed full compensation for deposition preparation and deposition summaries required by the Pretrial Order. *See* Introduction, 611 F.Supp. at 1350–51.

### 6. Travel

Mr. Henderson and Mr. Pyle further objected to the award of 50% of requested travel time. *See* Henderson Memorandum at 16; Tr. at 53; Memorandum and Order on Attorney Fees, 611 F.Supp. at 1321–22. Travel time cannot be fully compensated because it cannot be used as efficiently as office time. It is my recommendation that no change be made in the 50% compensation rate established by the court.

### 7. Post-Settlement Hours

Mr. Henderson testified at the hearing that he was not adequately compensated for his post-settlement work. *See* Appendix 7 to Affidavit of Thomas W. Henderson; Tr. at 11–19.

As I recommended in the Introduction, 611 F.Supp. at 1351–52, certain post-settlement activities should be fully compensated, but not others. Both Mr. Henderson's and Mr. Pyle's fee petitions have been reviewed and adjusted accordingly.

### 8. Hourly Rate

Mr. Henderson objected at the hearing to the court's imposition of a uniform $150 per hour partner compensation rate. Mr. Henderson seeks compensation at his "retail rate" of $370 per hour. Tr. at 34. See also Affidavit of Thomas W. Henderson, Feb. 5, 1985 at 16.

Mr. Henderson's challenge to the hourly rate on the grounds that it does not equal his own does not withstand analysis. Mr. Henderson testified at the hearing that in 1983 he worked the equivalent of 2,000 to 2,150 billable hours. After subtracting overhead, which in this case was substantially compensated in the expense award, Mr. Henderson estimated that his take-home pay in 1983 was between $400,000.00 and $500,000.00. Tr. at 37. A simple calculation reveals an effective hourly rate of $200 for Mr. Henderson personally. Mr. Henderson's effective rate of compensation for his participation in this litigation is $225 per hour, based upon a fee of $150 per hour with a 1.50 multiplier.[7]

Furthermore, the court awarded Mr. Henderson $242,527.50 in fees for his work over a 4½ month period.[8] If compensated at this rate for an entire year, Mr. Henderson would have earned $647,548.42, well over the $400,000.00-plus he claimed to have netted in 1983.

I recommend no change in the hourly rate awarded by the court.

---

**7.** In fact, according to one member of the PMC, once the PMC internal agreement is implemented, Mr. Henderson's effective rate of compensation will rise to approximately $300 per hour. *See* Affidavit of David Dean, May 16, 1985 at 13.

**8.** Mr. Henderson testified that although he personally reported approximately $400,000 in earnings, he actually generated $800,000 worth of business for the firm each year. The difference is attributable to overhead. Here, overhead costs such as PMC expenses, personal and hourly fee awards to law clerks and paralegals were separately awarded.

### 9. *Multipliers*

Finally, Mr. Henderson challenges the lack of a risk multiplier and the adequacy of the quality multiplier. As previously stated, both issues are addressed to the court's discretion which has been exercised. Any further direction must come from the Court of Appeals. *See* Transcript of District Court Hearing on February 6, 1985 at 14–15.

### B. *Objections to Award of Expenses*

Mr. Henderson and Mr. Pyle have requested a review of their expenses that relate to hotel and meal disbursements. *See* Appendix 8 to Affidavit of Thomas W. Henderson; Henderson Memorandum at 18–20; Tr. at 27–30; Hearing Exhibit No. 11.

Mr. Henderson attacked the $90 per night allowance for hotels. Henderson Memorandum at 20. As previously stated in the Introduction, 611 F.Supp. at 1350–51, I recommend no change in that rate. However, a review of his records reveals that on a number of occasions Mr. Henderson paid the hotel bill for other attorneys, plaintiffs, and experts. Consequently, Mr. Henderson is entitled to an additional reimbursement of $1,330.39, increasing his total hotel expense award to $5,954.74.

Mr. Henderson also asked for a review of his and Mr. Pyle's meal expense allowances. *See* Henderson Memorandum at 19. Upon review of his meal vouchers, I find that Mr. Henderson's meal expenses were excessive. Unlike most other plaintiffs' attorneys, Mr. Henderson and Mr. Pyle consistently ate at the finest restaurants available. While in New York, they patronized such establishments as The Plaza, Smith & Wollensky, Le Cheval Blanc, Sardi's, Mortimer's, The Parker Meridien, and The Park Ten. Attorneys are entitled to reimbursement of reasonable expenses, but not excessive ones. For this reason, I must interpret the guideline to afford each person three meals per day at $50, not $50 for one meal. I therefore recommend that a reasonable reimbursement structure of $35 for dinners, $10 for lunches, and $5 for breakfasts be imposed upon Henderson & Goldberg, P.C. Any other interpretation would be inequitable and would needlessly drain the settlement fund.

Mr. Henderson further objected to the $20 per day limitation on reimbursement for "hometown" meals. *See* Henderson Memorandum at 19. Hometown meals are not normally a reimbursable expense because they are personal to the attorney. The court recognized, however, that it may be necessary to incur additional expenses during the course of business at home. Thus, a $20 per day limit was established. Any greater award would encourage people to dine out at greater expense to the class. This guideline is reasonable and should not be changed solely because an attorney chooses to eat expensive meals.

Consequently, my review of Henderson & Goldberg's disbursements, applying the above guidelines, has resulted in an increased meal allowance of $1,244.44. This increase resulted from a review of the further documentation submitted by Henderson & Goldberg, P.C. Previously, a meal expense was limited to one person where insufficient information was supplied. Appendix 8 established the number of people attending each meal, and proper credit was then given under the recommended guidelines for each expenditure. The total reimbursement for this expense should be $4,509.53.

### C. *Conclusion*

In accordance with the proposed amended guidelines, I respectfully recommend that Henderson & Goldberg, P.C. be compensated for an additional 128.15 hours, as detailed in the annexed records. At a rate of $150 per hour with a 1.50 multiplier applied, the firm's fee award should increase by $28,833.75 to $471,386.25. In addition, I recommend that the firm's expense award be increased by $2,574.83. The new recommended award to Henderson & Goldberg, P.C. is, therefore, $531,164.03—an increase of $31,408.58.

## 4. HOBERG, FINGER, BROWN, COX & MOLLIGAN

Hoberg, Finger, Brown, Cox & Molligan has moved for reconsideration of the fees awarded by the court. David Moyer, a partner in the firm, testified in support of the petition at a hearing held on February 26, 1985. I have also considered memoranda submitted in support of the petition.[9] Based on the amended guidelines set forth in the Introduction, I am recommending an increase in the original fee award.

### A. Objections to the Award of Fees

The Hoberg firm has requested additional fees for time spent preparing for and summarizing depositions. I am recommending that full time be awarded for these activities as set forth in the Introduction. I also recommend that the 9–hour deposition rule be eliminated, another modification sought by the Hoberg firm. The firm additionally requested a fee award for time spent on intra-office conferences. It is my recommendation that 50% credit be awarded for these conferences as long as they concerned substantive matters.

Finally, I am recommending partial reimbursement for time spent on "background" or "educational" reading. Such time was primarily expended during the early days of the litigation, and allowed the attorneys to acquaint themselves with the issues and the case history. Extensive scientific reading was also necessary to prepare for depositions. As set forth in the Introduction, 611 F.Supp. at 1350, I recommend a fee equal to 50% of the time requested for such reading.

### B. Objections to Award of Expenses

The firm submitted a request for expenses incurred on behalf of individual clients. I recommend that the following sum be reimbursed. Proof of payment of these expenses has been supplied to and reviewed by this court: (1) $180 for court filing fees; (2) $269.03 for costs of service;

9. On April 3, 1985, Mr. Brown submitted, with the permission of the court, a "Supplementary Declaration of Phillip E. Brown in Support of Application of Hoberg Law Firm for Fees."

(3) $3,414.25 for medical records; and (4) $489.36 for telephone costs and miscellaneous expenses. Claimed travel expenses of $4,925.13 were not credited to the firm because they involved trips made to PMC meetings before the Hoberg firm was a member of the committee. Such trips do not constitute a sufficiently direct service either to the class as a whole or to the firm's individual clients. Because these travel expenses do not fit into either category, I recommend that they not be reimbursed.

The firm also requested payment for 973.5 hours spent on individual cases by law clerks and paralegals. It should be noted that the firm has already been granted paralegal hours for individual cases. The time previously compensated, however, was spent after the firm joined the PMC, whereas the hours presently requested are pre-PMC hours. Thus the 973.5 hours are not duplicative, and it is recommended that they be reimbursed. Applying the established rate of $20 per hour, the award totals $19,470. It is my recommendation that these additional expenses, totaling $23,822.64, be awarded to the Hoberg firm.

### C. Conclusion

I respectfully recommend that Hoberg, Finger, Brown, Cox & Molligan be compensated for an additional 156.39 hours at a rate of $150 per hour with a 1.50 multiplier applied. As a result, an additional $35,187.75 should be awarded for attorneys' fees. Together with the additional expense award of $23,822.64, the firm's total award should increase by $59,010.39 to $390,784.33.

## 5. BENTON MUSSLEWHITE

Benton Musslewhite, a member of the PMC, has moved for a reconsideration of the fee awarded his firm. The court has considered his motion, as well as the testimony given by Mr. Musslewhite in a hearing held on February 28, 1985.

This declaration supplemented his original petition for reconsideration. Mr. Brown's declaration has been reviewed and is reflected in the reconsidered fee award.

### A. Objections to Award of Fees

The court has compensated the Musslewhite firm for 2,031.05 hours of work. At the hearing, Mr. Musslewhite stated that he does not object to the total of 1,723.48 hours attributed to his own work. Tr. of February 28, 1985 at 4. He did, however, request that the time records of two of his associates—Allen Kline and Frances Farenthold—be reexamined.

### 1. Associated Attorneys

In its initial examination of the firm's time records, this court had particular difficulty in assessing those entries attributable to Allen Kline. From March 22, 1980 to December 31, 1982, most of Mr. Kline's weekly entries read: "review documents; briefing; handling mail and clients; telephone calls; scheduling and organization on Agent Orange." Until February 1982, Mr. Kline claimed that he spent 25 hours each week performing these tasks; thereafter, 10 hours were claimed each week. These entries total 2,900 hours. Thus, the work performed for almost 25% of the 12,234 hours requested by the firm is described by the same vague statement, repeated verbatim week after week. Because of this ambiguity, none of Mr. Kline's time was credited. It should be noted that even if the descriptions were more specific, Mr. Kline would not have received full credit for these hours because of the non-compensable nature of some of the tasks described.

At the February 28 hearing, Mr. Musslewhite testified that at least 33% of the time Mr. Kline spent on the Agent Orange case, approximately 800 hours, directly benefited the class. The remainder was devoted to the many individual cases with which the firm was involved. Tr. at 7. The court does not doubt that Mr. Kline performed a substantial amount of work on behalf of the class. However, because the records provided are inadequate, I recommend granting only 50% of the time requested. In accordance with Mr. Musslewhite's statements at the hearing, Tr. at 10, it is respectfully recommended that this work be compensated at an hourly rate of $100, which results in additional fees of $40,000.00.[10] Mr. Kline should be compensated at the lower hourly rate because his work was routine and because the court has authority to compensate attorneys at varying rates for different tasks. *See* Introduction, 611 F.Supp. at 1350.

Frances Farenthold was credited with 170 of the 292 hours requested for her services. The court, in response to Mr. Musslewhite's request, has reexamined her time records and finds that no change should be made in the number of compensable hours.

### 2. Quality Multiplier

The court has also considered whether the firm's attorneys' fee award should be subject to a quality multiplier. Initially, no such multiplier was awarded. The court recognizes that Mr. Musslewhite has represented the Vietnam veterans, both individually and as a class, for many years. He remained as class counsel throughout the litigation, including the difficult period when the management team was in transition. Nevertheless, I am not persuaded that his work was of such superior quality as to warrant a quality multiplier.

### B. Objections to Award of Expenses

In its original application, the firm claimed $93,000.00 in paralegal and law clerk time. This figure dwarfs those submitted by the other firms. No paralegal time was granted unless the time records specifically indicated what tasks were performed. Consequently, the court allowed only $1,897.40 for the firm's paralegal expenses.

At the hearing, Mr. Musslewhite testified that his firm had a high number of paralegal hours because he was responsible for preparing the deposition summaries required by the Pretrial Order. Tr. at 34.

---

**10.** Because this routine weekly entry is described only in generalities and is not supported by time records, the court must assume that the work performed was of the most routine nature. Therefore, the compensation is only awarded at an associate rate without any multiplier.

He asked to be compensated for a minimum of 450 hours spent on the summaries. Tr. at 36. Because the court required this work, see Magistrate's Pretrial Order 17, March 26, 1984, it is my recommendation that the firm be awarded an additional $9,000.00 in paralegal and law clerk expenses. This represents 450 hours, reimbursed at the regular paralegal and law clerk rate of $20 per hour.

The firm's original submission also included expenses claimed for non-causation experts. None of these expenses were reimbursed to Mr. Musslewhite because they were, in large part, reimbursed to the PMC pursuant to its original omnibus expense submission. I recommend that all expenses attributable to non-causation experts, whether submitted by Mr. Musslewhite, the PMC, or both, be awarded to the PMC. The PMC was charged with the overall management of the litigation, and is ultimately responsible for payment of these bills.

### C. Conclusion

I respectfully recommend, therefore, that the fee award to the Musslewhite firm be increased by $40,000.00 to $344,657.50, and that the firm be awarded an additional $9,000.00 in expenses for a total expense award of $59,614.97. The firm's total award would thus be increased by $49,000.00 to $404,272.47.

### 6. O'QUINN & HAGANS

John O'Quinn and Alison Pettiette, of O'Quinn & Hagans, have moved for reconsideration of their fee award. Both testified before this court on March 5, 1985. Based upon that testimony, records produced at that time, and a motion previously received by the court, I am recommending that the award to the firm be amended.

**11.** Most of these hours represent time spent in four PMC meetings. Due to the ambiguous descriptions in the original petition, no time was awarded for these meetings. However, at the March 5, 1985 hearing, Mr. O'Quinn testified as to the amount of time spent at each meeting on substantive matters. He also identified the amount of travel time to these meetings. Tr. at 8–11, 26–29. After considering this newly provided information, I have determined that Mr.

### A. Objections to Award of Fees

#### 1. John O'Quinn

Mr. O'Quinn's original petition for attorneys' fees contained vague descriptions of his daily activities. Moreover, he did not provide contemporaneous time records. As a result, Mr. O'Quinn was credited with only a small portion of his requested hours. Although he still has not provided detailed written explanations, he did elaborate on certain daily entries at the March 5, 1985 hearing. Mr. O'Quinn's explanations have enabled the court to meaningfully reexamine his time records. Having done so, it is my recommendation that the firm should be compensated for an additional 68.75 hours for Mr. O'Quinn's work.[11] As with the firm's original award, these hours should be compensated at a rate of $100 per hour, with no multiplier.[12]

#### 2. Alison Pettiette

In her original petition, Ms. Pettiette provided more detail than Mr. O'Quinn, but she too failed to provide contemporaneous time records. She did, however, provide such records at the March 5, 1985 hearing. I have reexamined her fee request in light of this additional information and recommend that the firm be compensated for an additional 180.96 hours for her work.

Ms. Pettiette spent many hours performing a variety of tasks for the PMC. She therefore benefited from many of the amended guidelines discussed in the Introduction including, e.g., the increased allowances for deposition work and for educational and scientific reading. But the time allowed for hours Ms. Pettiette spent in discussion with PMC members was decreased upon reexamination.

O'Quinn should be compensated for 61.25 hours for these four meetings.

**12.** Because the large majority of hours credited to the firm are attributable to Ms. Pettiette, it is her status that determines the hourly rate applied to all members of the firm. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1325. As explained below, Ms. Pettiette is an associate, thus the firm's hours are compensated at the $100 hourly rate.

Because of her unique position within the PMC and within the O'Quinn & Hagans firm, Ms. Pettiette, rather than being an associate of the O'Quinn firm, was in effect an associate of the PMC. I have therefore concluded that only 50% of the time she spent in conferences with the members of the PMC should be compensated, just as only 50% of any other attorney's time would be compensated for discussions with members of his or her own firm.

Ms. Pettiette testified that she had been a partner in a firm for which she worked before her association with O'Quinn & Hagans, and that her agreement with Mr. O'Quinn provided for a bonus contingent upon the amount of attorneys' fees eventually awarded. Nonetheless, Ms. Pettiette should be considered an associate for the purposes of this case for several reasons. First, the firm itself describes her as an associate. Second, she was paid at a rate of $25 per hour. Tr. at 67. Finally, she was not admitted to the practice of law until 1979.

Having seen the additional material that Ms. Pettiette provided, as well as a letter from Stephen Schlegel, a member of the PMC, attesting to her value to that committee, I have concluded that her work was of the highest quality. She clearly worked long hours during the hectic final four months of pretrial preparation which resulted in great benefit to the class. I therefore recommend that the attorneys' fees attributable to Ms. Pettiette be subject to a 1.50 quality multiplier.

### B. *Objections to Award of Expenses*

The O'Quinn firm has requested a reexamination of that portion of its expenses not originally allowed. Mr. O'Quinn's and Ms. Pettiette's testimony at the March 5, 1985 hearing permitted a more informed analysis of their expense records. In addition, the proposed amended fee guidelines have affected certain expense items. I therefore respectfully recommend that the award of expenses be amended.

Mr. O'Quinn requested that the court reconsider all 42 entries that were not previously reimbursed in their entirety. Having done so, I have determined that the amount awarded for eleven items be increased. I also recommend that the total granted for two entries be decreased. In all, I have determined that the firm should be reimbursed for an additional $1,567.99 in expenses.

Even after this re-computation, approximately 50% of the firm's claimed expenses will remain unreimbursed. These expenses consist mainly of advances made by the firm to Benton Musslewhite, another PMC member, primarily for his travel expenses. None of these expenses were accompanied by records detailing how the money was spent. While I have no doubt that the money was advanced to Mr. Musslewhite, I cannot be certain how these funds were spent without the submission of supporting documents. Further, any award to the O'Quinn firm for these expenses might be duplicative because the Musslewhite firm may already have received compensation for them. This matter need not be resolved by the court. It involves a business arrangement between Mr. O'Quinn and Mr. Musslewhite, who should settle their own accounts.

### C. *Conclusion*

As detailed above, I respectfully recommend that the O'Quinn firm be compensated for an additional $75,069.00 in fees, increasing that award to $163,374.00. I also recommend that the firm be reimbursed an additional $1,567.99 in expenses, raising that total to $28,127.42. The total award would thus be increased by $76,636.99, for a new award of $191,501.42.

### 7. STEPHEN J. SCHLEGEL

Stephen J. Schlegel has moved for reconsideration of the fees and expenses awarded to his firm. On March 18, 1985, a hearing was held on his petition at which he testified.

### A. *Objections to Award of Fees*

Mr. Schlegel testified at the hearing that the court's fee awards were arbitrary. Tr. of March 18, 1985 at 5. He further stated that the hours listed on his fee petition were all spent in furtherance of the class action. Tr. at 12. Consequently, Mr. Schlegel

asked that all of the time excluded by the court be allowed on this reconsideration. Tr. at 7, 11.

The only specific guideline attacked by Mr. Schlegel was that relating to travel. Mr. Schlegel requested reimbursement for all of his travel time because he claimed that he charged only for travel during which he actually worked. The guidelines established by this court call for an award of 50% for all travel time. Some lawyers may have worked 60% of the time while traveling, others only 40%. Common sense, however, convinces me that no lawyer can work 100% of the time during travel. A 50% award for travel time seems to be the most appropriate measure. Therefore, I recommend no adjustment in Mr. Schlegel's travel time award.

Mr. Schlegel also joined his colleagues in attacking other guidelines, including the 9-hour deposition rule; partial compensation for preparing and summarizing depositions; no compensation for conferences between attorneys in the same firm; no compensation for scientific reading; and a failure to award a risk multiplier. I have made recommendations with respect to all of these areas and have applied them in examining Mr. Schlegel's fee petition.

The review of Mr. Schlegel's fee petition, applying the recommended revised guidelines, has resulted in an increase of 329.65 hours. Applying the 1.75 multiplier awarded by the court, I recommend that the fee award to the Schlegel firm be increased by $86,533.13. The total fee award would thus increase from $763,678.12 to $850,211.25.

### B. Objections to Award of Expenses

Mr. Schlegel challenged the guideline that governs the reimbursement rate for paralegals and law clerks. He argued at the hearing that compensation for these expenses should depend upon the nature of the law firm's personnel and its geographic location. Tr. at 20. This argument is not persuasive. The guideline established by the court is fair and reasonable, and should not be altered solely because an attorney retained expensive help. I therefore respectfully recommend that Mr. Schlegel's existing reimbursement for this expense stand.

No other expenses were challenged by Mr. Schlegel. I therefore recommend that his firm's total expense reimbursement remain at $132,008.01.

### C. Conclusion

I respectfully recommend an increase of $86,533.13 in the fees awarded to the Schlegel firm for a total award of $982,219.26.

### 8. NEWTON B. SCHWARTZ

Newton B. Schwartz, a member of the PMC, testified before this court on March 7, 1985. At that time he asked that his petition for attorneys' fees and expenses be reconsidered. Based upon both Mr. Schwartz's testimony and a motion he submitted earlier to the court, I am recommending that the award to his firm be amended.

### A. Objections to Award of Fees

The firm's original petition for attorneys' fees requested reimbursement of hours for Harold Sosebee and Barry Berger as well as for Mr. Schwartz. The time entries contained in each of their submissions were ambiguous, and their contemporaneous time records did not clarify the entries. In his testimony, Mr. Schwartz elaborated on some of these entries, thereby enabling the court to make a more accurate assessment of the firm's fee petition. In addition to reexamining ambiguous entries, this court also reconsidered the petition in light of the amended guidelines set forth in the Introduction.

As a result of this two-pronged reexamination of each attorney's submission, I recommend that the firm be compensated for an additional 127.41 hours. This time should be reimbursed at a $100 hourly rate.[13] No quality multiplier should be

---

13. This is the same rate of compensation that the court applied in its initial examination. Because the large majority of hours credited to the firm are attributable to Mr. Sosebee, it is his status that determines the hourly rate applied to all members of the firm. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1325. Mr. Schwartz conceded that Mr. Sosebee

awarded because Mr. Schwartz did not contribute the vast majority of his time and efforts to the PMC during the final six months of hectic pretrial preparation.

### B. *Objections to Award of Expenses*

The court initially declined to reimburse the firm for $861 advanced to Mr. Sosebee and Mr. Allen Kline. These two attorneys incurred this expense while on trips to Kansas City and New York, where they were taking depositions and attending what was described in the original petition as a "seminar." Mr. Schwartz testified that the seminar was in fact a conference, attended only by PMC attorneys, designed to prepare the junior attorneys for taking depositions. Tr. at 14. Having been persuaded by Mr. Schwartz's testimony as to the value of this conference, I recommend that the firm be reimbursed for these expenses.

The Schwartz firm also paid the rent and purchased furniture for Frances Farenthold's additional office space. According to Mr. Schwartz, the space was devoted exclusively to Agent Orange matters. Tr. at 19. The firm paid $450.00 for three months' rent, and I recommend that it be reimbursed for that expense. The furniture costs should not be compensated because the furniture is in Mr. Schwartz's possession and can be resold.

Similarly, Mr. Schwartz himself rented an apartment on Livingston Street, in Brooklyn, at $800 per month for two months. He cancelled the lease before the two months had passed, and settled with the lessor for $1,100.00. Tr. at 20. Because a hotel stay during this period would have resulted in a much higher cost, the $1,100.00 expenditure seems reasonable and it is my recommendation that it be reimbursed.[14]

Finally, Mr. Schwartz requested payment for $300.00 spent attending a post-settlement conference in Houston. By his own admission, this conference was "PR work

and not necessary." Tr. at 22. Although the court recognizes that such conferences were useful in informing the Houston area veterans of the terms of the settlement, it cannot be said that it was of a sufficiently direct benefit to the class as a whole to warrant reimbursement.

### C. *Conclusion*

As detailed above, I respectfully recommend that the firm be compensated for an additional 127.41 hours of work, at $100 per hour, for an increased fee award of $12,741.00. In addition, I recommend that the firm be reimbursed an additional $2,411.00 in expenses. The firm's total award thus would increase by $15,152.00 to $57,995.18.

### 9. WAITE, SCHNEIDER, BAYLESS & CHESLEY

Waite, Schneider, Bayless & Chesley has requested reconsideration of its fee award. At a hearing held on March 21, 1985, Phillip B. Allen testified in support of the firm's petition. Memoranda submitted by the firm were also considered. No review of the firm's expense award was requested.

### A. *Objections to Fee Award*

This firm, like so many others, objected to the court's original guideline denying compensation for conferences among lawyers in the same firm. I have previously recommended that this rule be amended to allow compensation for 50% of the time spent on substantive discussions. As a result, it is my recommendation that the Chesley firm be compensated for an additional 34.15 hours.

The firm also requested additional reimbursement for telephone conferences. These calls are still inadequately documented and described. I therefore do not recommend an additional fee award for these calls.

In addition, the firm has requested a review of certain time Mr. Allen spent in

---

is an associate in the firm. Tr. at 10. Consequently, Mr. Schwartz and Mr. Berger, as well as Mr. Sosebee, are reimbursed at the $100 hourly rate.

**14.** This expense is not duplicative of the expense reimbursed for the PMC house on Remsen Street which could not accommodate all members of the PMC.

 the Brooklyn office of the PMC. This time was originally disallowed because the activities were inadequately described. A typical entry would read: "Work in Brooklyn office." Petition at 30, entry of 4/20/84. Testimony and submissions to this court have satisfied me that Mr. Allen performed substantive work that benefited the class on eleven specified occasions that total 88.75 hours. For example, Mr. Allen testified that during the 11.5 hours claimed for February 23, 1984, he was coordinating discovery and other pretrial matters; preparing for appearances related to discovery before this court; and drafting pleadings and correspondence that concerned discovery. Tr. at 8–9. I therefore recommend that the firm's fee award be amended to include these 88.75 hours of substantive work.

Finally, this firm has requested fees for certain post-settlement time that was originally denied. The post-settlement hours spent answering telephone calls from veterans who requested information was not of direct benefit to the class action and merits no compensation on review. I do recommend, however, that the time spent preparing documents essential to finalizing the settlement agreement be compensated. Such activities, including initial and final drafting of the class notice; negotiations on the form of the settlement agreement and investment of the fund; and mailing of the notice to members of the class, Tr. at 10–19, unmistakably benefited the class even though a settlement had been reached. Consequently, compensation has been awarded for time spent on these activities during the weeks of June 1–15, subtracting any time spent on telephone calls with veterans. I therefore recommend that the firm be compensated for an additional 26.75 hours.

### B. *Conclusion*

I respectfully recommend that this firm be awarded a total of 150.15 additional hours. Calculated at $150 per hour with a 1.50 multiplier, I recommend that the firm award be increased by $33,783.75 for a new total of $461,882.17.

### B. NON–PMC MEMBERS
#### 1. ASHCRAFT & GEREL

Robert A. Taylor, Jr. has moved for reconsideration of the fees and expenses awarded to the firm of Ashcraft & Gerel. A hearing was held on March 19, 1985 at which Mr. Taylor testified.

### A. *Objections to Award of Fees*

Mr. Taylor alleged that half of his requested hours were routinely disallowed. Tr. of March 19, 1985 at 7, 15. The court applied uniform guidelines to the review of all fee petitions; Ashcraft & Gerel was treated no differently. As with all other attorneys, if and only if Mr. Taylor's work benefited the class did his firm receive compensation. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1304. Thus, allegations that the court's decision making process was arbitrary or peculiarly unfair to Mr. Taylor are groundless.

In its initial review, the court limited its consideration of Ashcraft & Gerel's fee and expense award to the period between March 9, 1983 and October 14, 1983. Mr. Taylor objected to this limitation and requested that the court expand its review. The original period of review represents the only time in which the firm actively participated in the management of the litigation. At the hearing, however, Mr. Taylor testified that he personally engaged in activities that benefited the class both before March 9, 1983 and after October 14, 1983. Other attorneys who testified agreed that Mr. Taylor had worked for the class during the periods in question. I therefore reviewed Mr. Taylor's petition for the full period between 1980 and 1984.

#### 1. *Travel Time*

Mr. Taylor objected to the consistent disallowance of 50% of his travel time. For reasons previously stated, I recommend that no change be made in the 50% compensation rate established by the court.

#### 2. *Deposition Time*

Mr. Taylor stated that the time he spent preparing and attending depositions was

also halved. Tr. at 8, 12, 34. In support of this contention, he submitted a list of depositions at which he claimed to have been the sole defending attorney. As stated in the Introduction, 611 F.Supp. at 1350–51. I am recommending that the deposition guidelines be amended. I thus recommend that Mr. Taylor receive full compensation for preparing and taking depositions.

### 3. *Quality Multiplier*

Mr. Taylor further complained that his firm did not receive a quality multiplier. Tr. at 11. The court awarded quality multipliers to those firms that worked intensively on trial preparation between January and May, 1984. Tr. at 11–12. Because Ashcraft & Gerel declined to participate in this phase of the litigation, no quality multiplier is warranted.

Ashcraft & Gerel began working on this litigation in 1980, although it never joined the consortium known as Yannacone and Associates. Between June and August, 1983 it briefly participated in an interim management committee. However, when the remaining members of the management team declined to give the firm exclusive case control, Ashcraft & Gerel refused to join the newly formed PMC and left the litigation.

In my view, far from benefiting the class, Ashcraft's decision to quit the management team worked to the detriment of the class. Those attorneys who remained to manage the class action and those who later joined them were forced to duplicate much of Ashcraft & Gerel's previous work, a critical and time consuming use of the attorneys' resources made necessary only by Ashcraft & Gerel's actions. Ashcraft had spent many productive hours reviewing documents produced by defendants and the government and accumulating detailed scientific knowledge. When Ashcraft left the class action, its attorneys took their knowledge with them and forced new members of the management team to relearn that knowledge. Those hours were billed for and compensated. The bulk of defendants' depositions and those on causation issues were taken from October, 1983

through April, 1984 without Ashcraft's help.

In similar situations, where a firm's management decisions have worked to the disadvantage of class interests, courts have applied a negative quality multiplier. *See In re Fine Paper Antitrust Litigation,* 98 F.R.D. 48, 214–15 (E.D.Pa.1983), *rev'd on other grounds,* 751 F.2d 562, 600–01 (3d Cir.1984). In *Fine Paper,* the Third Circuit affirmed the district court's finding that one of the plaintiffs' firms had managed the class action "in a manner that involved too many attorneys spending too many hours...." *Fine Paper,* 751 F.2d at 601. After subtracting all hours deemed not beneficial to the class, the court applied a 50% negative quality multiplier to the remaining compensable hours as a penalty. On appeal, the Third Circuit stated that the test for applying the quality multiplier is whether "the lawyer discharged the professional burden undertaken with a degree of skill above or below that expected for lawyers of the caliber reflected in the hourly rates." *Id.* at 600 (quoting *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 118 (3d Cir.1976)). *See also New York Ass'n For Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1140 (2d Cir.1983) (court has discretion to adjust fee award in light of subjective factors) (citing *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093 (2d Cir.1977)).

Here I find that Ashcraft & Gerel undertook a great professional burden when it joined with other plaintiffs' firms in the Agent Orange class action and spent many hours reviewing documents and preparing for depositions. It failed to discharge that burden when it decided to cease work on the case, thereby requiring other attorneys to duplicate its work. I respectfully recommend, therefore, that a .25 negative quality multiplier be applied to Ashcraft & Gerel's total recommended fee award.

### 4. *Hourly Rate*

Finally, Mr. Taylor challenged his $100 per hour compensation rate, which is ap-

plied to all associates. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1326–28. Because Mr. Taylor performed the majority of his firm's work and was an associate during that period, application of the $100 rate is fair and reasonable.

### 5. *Recommended Fee Award*

Ashcraft & Gerel's original fee award was $78,900 based on 789 hours compensated at a rate of $100 per hour. I respectfully recommend that the firm's compensable time be increased to 1,850.50 hours (an increase of 1,061.50) and, applying the .25 negative quality multiplier, that the firm be compensated at a rate of $75 per hour. The new total that I recommend for the firm's award is thus $138,788.00, an increase of $59,853.00.

### B. *Objections to Award of Expenses*

As mentioned, Mr. Taylor has requested that the time period limitation on fees and expenses be eliminated. In response to this request, I respectfully recommend that the firm be reimbursed for all expenses that relate to Mr. Taylor's appearances before the Special Masters, Magistrates, and Judges in this action. With regard to depositions, however, I recommend that Ashcraft & Gerel only be compensated for expenses incurred while Mr. Taylor was taking depositions 1) by himself, and 2) outside of Washington, D.C. I therefore recommend that Ashcraft & Gerel be awarded an additional $8,664.21 for these expenses.

Mr. Taylor also testified on behalf of law clerk Marie Thompson. The court declined to compensate her time for several reasons: the time records she submitted were insufficient; a typographical error misrepresented her hours; and the hours she worked were prior to March 9, 1983. Accepting Mr. Taylor's affirmation that Ms. Thompson actually worked the claimed hours, I still cannot recommend compensation. The sole description of the approximately 1200 hours sought on behalf of Ms. Thompson reads "Researching, writing, proofing, filing, and serving (no longer with the firm and unable to reconstruct time records) Estimated 1200." This estimate is insufficient for a reviewing court to make an informed determination as to whether these hours were beneficial to the class rather than to the firm's individual clients. I therefore recommend no compensation for this paralegal time.

Other than Mr. Taylor's request that the court eliminate the time limitation on expenses, there is no further request to amend the court's expense award. Ashcraft & Gerel's original expense award was $46,233.18. With the recommended increase of $8,664.21 for deposition and court appearance expenses, the firm's new expense award would total $54,897.39.

### C. *Conclusion*

I respectfully recommend a total fee and expense award of $192,672.39 to Ashcraft & Gerel—an increase of $68,517.21.

### 2. BASKIN & STEINGUT

Mark J. Morgenstern, Esq. has moved on behalf of Baskin & Steingut, P.C. for reconsideration of the fees and expenses awarded to his firm. A hearing was held on April 2, 1985 at which Mr. Morgenstern and Robert E. Fiorito, comptroller of Baskin & Steingut, testified. A Memorandum in Support of Motion to Alter or Amend Judgment was also filed on April 2, 1985 by the firm. In addition, a Supplemental Memorandum in Support of Motion to Alter or Amend Judgment was filed on May 16, 1985.

### A. *Objections to Award of Fees*

Mr. Fiorito testified that Baskin & Steingut was not compensated for 54.55 hours of telephone conference time. Tr. of April 5, 1985 at 5. As previously stated, such time is compensable if properly documented. Reinspection of Baskin & Steingut's computer time sheets and the Supplemental Memorandum reveals that most of the telephone time entries are insufficiently detailed to warrant further compensation. I therefore recommend that no change be made in the firm's award for telephone conference time.

Mr. Fiorito testified that 30.05 hours of review of scientific literature was not compensated. Tr. at 4–5, Memorandum at 5. Pursuant to my recommendation in the In-

troduction at 1350, 50% of the time spent on scientific reading should be compensated.

Mr. Fiorito next claimed that no compensation was awarded for 50.60 hours of document review time. Document review time is fully compensable, provided it concerned substantive legal issues. The firm's petition was reviewed according to this standard and additional compensation is recommended as indicated in the petition.

Mr. Fiorito also protested the court's failure to compensate the firm for 61.35 hours of conference and meeting time. Tr. at 5; Memorandum at 5. Such time is not compensable absent full documentation explaining the substantive legal nature of the conference. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1320. Compensation has been awarded, upon review, in accordance with that guideline.

With regard to other court guidelines, Baskin & Steingut asked the court to restore 3.5 hours of deposition time lost as a result of the 9-hour deposition rule. I recommend that the firm be compensated for these additional hours. The firm also objected to the 50% reimbursement for travel time. It is my recommendation that no adjustment be made regarding travel time.

In addition, a request was made for an additional 55 hours previously disallowed because of vague descriptions. Sikor & Love, P.A., attorneys for Baskin & Steingut, P.C., submitted a Supplemental Memorandum further detailing many of these entries. I recommend fees for additional hours as indicated in the petition.

Finally, Baskin & Steingut sought compensation for 37.05 hours of time expended by attorneys other than Mr. Henderson and Mr. Pyle. *See* Memorandum at 5. Additional documentation for these hours was submitted in the Supplemental Memorandum in Support of Motion to Alter or Amend Judgment. The recommended total amount of additional compensation for this entry is 32.10 hours.

I therefore recommend that the hours allowed to Baskin & Steingut, P.C. be increased from 732.9 hours to 846.60 hours. With compensation at the $150 per hour rate, and with a 1.50 multiplier awarded by the court, the new fee award totals $190,-485.00, an increase of $25,582.50.

**B.** *Objections to Award of Expenses*

Baskin & Steingut, P.C. has requested reimbursement for $37,500.00 advanced to the PMC. Tr. at 7–11; Memorandum at 7–8; Supplemental Memorandum at 12. The PMC has been reimbursed directly for its expenses to avoid the problem of compensating both the PMC and the contributing attorneys for the same expenditures. Consequently, firms that have contributed to the PMC should seek reimbursement from them. I thus do not recommend that an award be made to Baskin & Steingut for the $37,500.00 paid to the PMC.

The firm made no other specific objection to the court's award of expenses. I therefore recommend that the expense award to Baskin & Steingut, P.C. remain unchanged at $42,068.87.

**C.** *Conclusion*

I respectfully recommend that Baskin & Steingut, P.C. receive a total fee and expense award of $232,553.87, an increase of $25,582.50.

3. EPSTEIN & KESSELMAN

The firm of Epstein & Kesselman is seeking reconsideration of its request for fees. The firm's original award included a partial reimbursement for expenses and no compensation for fees. A hearing was held on March 1, 1985. Having considered both the testimony and the petition, I recommend an increase in the firm's award.

Epstein & Kesselman served as one of three firms in the Midwest Consortium early in the litigation. Its involvement preceded any class certification. Only those hours that directly benefited the class may be compensated.

Epstein & Kesselman has supplemented its original petition and offered further support of its claim for fees. First, the firm submitted an "Affidavit of Steven J. Schlegel in Support of Petition by Epstein & Kesselman for Attorneys Fees." Mr. Schlegel, lead trial counsel of the PMC, described the nature of the work per-

formed by the firm. He also noted that these responsibilities were assigned by the Midwest Consortium, which, in turn, "was requested by, and supportive of, lead New York counsel." Schlegel Affidavit at 2–3. Further, Mr. Schlegel pointed out that none of the work was duplicative of PMC work. *Id.* at 2.

Specifically, Mr. Schlegel stated that the firm was "assigned and undertook" the following responsibilities:

 (a) development of facts to support theories of causation, in particular, with regard to symptomology information;

 (b) review and analysis of scientific reports;

 (c) coordination of specific experts' findings and studies;

 (d) development and briefing of contributing experts;

 (e) reporting on non-governmental screening efforts;

 (f) standardization of medical forms for the class;

 (g) streamlining of procedures for communication interchange between veterans and lead counsel;

 (h) development of computer and clinical resources from Midwest law schools to aid causation analysis;

 (i) contributions to the third amended complaint.

Schlegel Affidavit at 2.

Further, at his own hearing, Mr. Schlegel testified that Epstein & Kesselman's fee petition correctly reflected items that "they did at my behest or at Victor Yannacone's behest." Tr. at 75. Mr. Schlegel added, "I do support [their application]." *Id.*

I have reviewed the application of Epstein & Kesselman and respectfully recommend that the firm be compensated for those hours that benefited the class. Most notably, Epstein & Kesselman made a substantial contribution in the area of causation. They interviewed experts, developed symptomology questionnaires and reviewed scientific materials. Further, the firm enlisted the support of law schools to aid in the causation analysis. All these efforts benefited the class.

I have reviewed Epstein & Kesselman's request for 468.8 hours, and recommend that the firm be compensated for the 108.8 hours shown to have benefited the class. I recommend that the firm be reimbursed at the rate of $150 per hour for a total fee award of $16,320.00. Epstein & Kesselman requested no reconsideration of their original · expense award which totaled $11,138.00. Therefore, it is respectfully recommended that the firm's total award, including expenses and fees, be increased to $27,458.00.

### 4. THOMAS GRASSO

This court has considered the "Petition for Fee and Affidavit" of Thomas A. Grasso which requested fifteen hours on reconsideration of his fee and expense award. I recommend that the petition be denied.

The court has repeatedly stated that "[f]ees [will be] awarded only for that work in furtherance of the class action." Memorandum and Order on Attorney Fees, 611 F.Supp. at 1320. Although Mr. Grasso's work may have been invaluable to the five Rhode Island plaintiffs whom he names in his petition, he has not shown that any of this work was of any benefit to the class. Moreover, he did not claim any out-of-pocket expenses.

Therefore, I respectfully recommend that no award of fees or expenses be made.

### 5. JOHN J. HIGGINS

John J. Higgins, an attorney from Oregon, has submitted a motion for reconsideration of his request for fees. The court originally did not award Mr. Higgins any fees, but awarded him $10.82 for expenses. He does not seek reconsideration of the expense award.

All of Mr. Higgins' hours were expended on one individual client. In his motion for reconsideration, Mr. Higgins simply reiterates his commitment to the estate of this one client. Fees can only be awarded for work that benefited the class. I therefore respectfully recommend that Mr. Higgins' request for attorney's fees be denied.

### 6. REGINALD FREDERICK MONTY HOLLOW

Reginald Frederick Monty Hollow, an Australian attorney, requested reconsidera-

tion of his fee award. None of the Australian attorneys received any court award of fees. Mr. Hollow originally requested compensation for 2,000 hours at an hourly rate of $100. A hearing at which Mr. Hollow testified in support of his petition was held on March 18, 1985.

### A. Objections to Award of Fees

In his motion for reconsideration, Mr. Hollow provided a breakdown of his fee charges but did not submit contemporaneous time records or supporting information. Although this court has applied the Second Circuit's rule requiring contemporaneous time records for hours claimed after June 15, 1983, Mr. Hollow should be exempted from a strict application of this rule. Mr. Hollow is an Australian attorney who has, it appears, followed every Australian law applicable to attorney fees. In his petition, Mr. Hollow submitted a lengthy appendix explaining the Australian method of computing fees, which, incidentally, does not allow fees to be awarded on a contingent basis. For these reasons, I do not recommend disallowing all of Mr. Hollow's hours because of a lack of contemporaneous time records.

In the first section of Mr. Hollow's petition, "Correspondence," he has billed $1.90 for each folio read (pursuant to Australian rules). His total request in this category is $585.20 Australian dollars, none of which should be compensated because this work did not directly benefit the class. The second section, "Attendances,"[15] amounted to 57.46 hours. Again, none of this time benefited the class. The third section, "Interlocutory Proceedings and Documentation," involves "examination" of specific documents. The request in this category is for $5,970.40 Australian dollars. This time should not be compensated because it involved only the *reading* of court papers.

Section four, "Preparation for Trial—Instructions for Briefs," involves "perusing publications." Again, the 53.25 hours requested for this activity should not be awarded because Mr. Hollow did not put his scientific knowledge to use for the benefit of the class. For example, he did not select representative plaintiffs or expert witnesses, or help examine or defend the expert witnesses at deposition. Likewise, Section six involves a request of $3,743.33 Australian dollars for reading scientific articles. For the same reasons, this entry should be disallowed.

Mr. Hollow should receive compensation, however, for certain hours he devoted to legal research. Steven Schlegel, one of the lead trial counsel for the PMC, testified at his own hearing that Mr. Hollow prepared legal memoranda at his request "concerning the difficulties of applying certain Australian laws, including statutes of limitations." Tr. of March 18, 1985 at 77. Mr. Hollow is also entitled to compensation for his appearance at the San Francisco fairness hearing and for the hours he worked on the settlement.

Mr. Hollow has requested compensation for 431 hours in these categories. Nonetheless, I recommend compensation for only 50%, or 215.5 hours, at a rate of $150 U.S. dollars per hour. Although Mr. Hollow's work was of high quality, he submitted no contemporaneous time records or supporting information that would have enabled the court to conduct a detailed examination of his fee request. The recommendation is supported solely by Mr. Hollow's and Mr. Schlegel's testimony. Although it would be unfair to deny Mr. Hollow's entire fee request for his failure to submit time records, it would also be unfair to the class to allow him full compensation without a more accurate review.

### B. Objections to Award of Expenses

Mr. Hollow was awarded $7,410.30 (U.S.) in expenses.[16] He now requests reimburse-

---

**15.** The court has not been given a precise definition for the term "attendance." It appears from its context and from the submitted list of activities which are considered "attendances" that the term refers to substantive conversations, wheth-

er in person or by telephone, with witnesses or parties.

**16.** Mr. Hollow's expense award of $7,410.30 was arrived at by first determining the allowable expenses in Australian dollars and then convert-

ment for five additional items. Because the first three of these expenses were incurred after the settlement, but not in conjunction with a compensable post-settlement activity, no reimbursement should be paid. Mr. Hollow inadvertently failed to include the last two entries, for airfreight charges to the United States and photocopying charges since 1979, in his original application. These expenses amount to $1,274.44 (U.S.) and should be reimbursed.

### C. *Conclusion*

I therefore respectfully recommend that Mr. Hollow be awarded $32,325.00 (U.S.) in fees for 215.5 hours, and an additional $1,274.44 (U.S.) in expenses, for a total expense award of $8,684.74. Thus, I recommend that Mr. Hollow be awarded a total of $41,009.74—an increase of $33,-599.44.

### 7. KRAFT & HUGHES

Kraft & Hughes, a New Jersey firm, has submitted a motion for reconsideration of its application for attorneys' fees.

In his motion for reconsideration, Mr. Hall, a member of the firm, made clear for the first time that some of the hours the firm initially requested were beneficial to the class. Early in the litigation, the firm researched the New Jersey laws concerning statutes of limitation at the request of Yannacone & Associates. In 1983, it provided the PMC, at its request, with data regarding Kraft & Hughes' clients. It is my recommendation that these hours be compensated.

Kraft & Hughes requested a billing rate of $90 an hour for work in 1981 and $100 an hour for work in 1983. Therefore, I respectfully recommend that the firm, which originally received no fees, be compensated $1,035.00 for 11.5 hours of work in 1981 and $1,390.00 for 13.90 hours of work in 1983, for a total of $2,425.00.

The firm also requested reimbursement for the services of a law clerk who worked 31.5 hours on the PMC request. At a rate of $20 an hour, this expense totals $630.00.

Added to Kraft & Hughes' original expense award of $3,305.48, its expense award should now total $3,935.48.

I respectfully recommend that Kraft & Hughes now be awarded $2,425.00 in attorneys fees and $3,935.48 in expenses, for a total of $6,360.48—an increase in its total award of $3,055.00.

### 8. LITVIN, BLUMBERG, MATUSOW & YOUNG

On January 24, 1985 the court received a letter from Litvin, Blumberg, Matusow & Young requesting reimbursement for $3,362.02 in expenses that the firm incurred while accumulating information about its individual clients. Although the firm performed no service of direct benefit to the class as a whole, it sought reimbursement under the court's ruling that "reasonable expenses actually paid by independent counsel on behalf of their 'Agent Orange' clients have been awarded where those expenses were substantiated by vouchers and receipts." Memorandum and Order on Attorneys Fees, 611 F.Supp. at 1322.

The court originally denied this request for expenses as "inadequate and untimely." It is my recommendation that the request for reconsideration be denied for the same reasons. To allow such expenses would unduly burden the settlement fund. Moreover, it would be unfair to those attorneys who did not seek expense payments because the deadline had passed, as well as to those unrepresented class members who paid similar expenses themselves.

I respectfully recommend that the firm's request be denied.

### 9. RACINE, OLSON, NYE, COOPER & BUDGE

The Idaho law firm of Racine, Olson, Nye, Cooper & Budge has moved for reconsideration of the fees and expenses awarded by the court.

### A. *Fees*

The court did not originally award fees to the firm because its claims were not

---

ing that figure into U.S. dollars. The exchange rate used for determining the original award

was 1.23 Australian dollars to 1.00 U.S. dollar.

documented. The reconsideration petition has provided the court with sufficient detail to permit a determination of the firm's compensable time. No contemporaneous time records were supplied by this firm as required by the Second Circuit for all fee claims after June 15, 1983. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1305. Therefore, it is my recommendation that no compensation be awarded for time spent after June 15, 1983.

I further recommend that no compensation be awarded for the period between April 23, 1979 and June 14, 1983. Racine, Olson, Nye, Cooper & Budge was not a member of Yannacone & Associates or the PMC. The firm did, however, represent individual clients. These records show that much of the firm's time was spent reviewing papers prepared by other attorneys and do not reveal any work performed on behalf of the entire class. Consequently, I respectfully recommend that no fees be awarded.

B. *Expenses*

The firm has submitted a list of expenditures, primarily filing fees and service costs. These expenses are reimbursable pursuant to the original guidelines. Consequently, I recommend that this firm be reimbursed $1,253.37 for its actual out-of-pocket expenses.

C. *Conclusion*

The recommended total award of fees and expenses to the firm of Racine, Olson, Nye, Cooper & Budge is $1,253.37.

10. SEARCY & SMITH

Margie T. Searcy has submitted two fee petitions to this court. Her first petition, dated August 30, 1984, was for reimbursement of time and expenses spent as local counsel to numerous plaintiffs. The second petition, dated January 16, 1985, concerned work that she claimed benefited the class as a whole, and was not originally considered by the District Court.

A. *Objection to Award of Fees*

A review of Ms. Searcy's second petition together with her testimony before this court at a March 8, 1985 hearing, reveals that her work directly benefited the class. From December, 1983 through March, 1984 she worked under the direction of Thomas Henderson, a member of the PMC, to prepare two trial notebooks. One notebook was a compilation and summary of scientific articles for the PMC members' use during depositions and trial. The other notebook, titled the "Scientific Defenses Notebook," outlined the PMC's counter-arguments to defendants' summary judgment motion. Ms. Searcy also researched a statute of limitations issue and worked on plaintiff's interrogatory answers. It is my recommendation that this work be compensated. Ms. Searcy has requested compensation for 146.5 hours and an additional 38 hours in travel time. Because these hours were spent on compensable work, Ms. Searcy should receive an award of 165.5 hours (146.5 hours of time worked plus 19 hours, 50% of her travel time). As the senior partner of her firm, I recommend that her work be reimbursed at the partner's rate of $150 per hour. Her fee award would thus total $24,825.

B. *Objections to Award of Expenses*

Ms. Searcy's first petition concerns hours and expenses spent while working as local counsel to Agent Orange plaintiffs. The court has not awarded fees for work that did not benefit the class as a whole. However, an attorney's out-of-pocket expenditures such as telephone, postage, and duplicating costs are compensable. Consequently, Ms. Searcy was reimbursed earlier for expenses totaling $311.18. It is recommended that this determination stand.

C. *Conclusion*

Therefore, I respectfully recommend a total fee and expense award to Ms. Searcy of $25,136.18—an increase of $24,825.00.

11. CHARLES A. WADE

Charles A. Wade has petitioned this court for reconsideration of his request for attorneys' fees. His petition was considered by the court in its initial examination of fee and expense requests. He was

awarded $114 in expenses and nothing in attorneys' fees. I have reviewed Mr. Wade's original petition, as well as documents subsequently submitted to the court, and find no grounds for recommending any amendment to that decision.

Mr. Wade does not contend that the time he spent on this case benefited the class as a whole. He was, like many other attorneys, an independent counsel who represented individual clients. While these attorneys no doubt expended considerable efforts, the hours that they spent representing individual clients should not be paid for out of the settlement fund. Attorneys' fees may be awarded only for those activities that can be characterized as having directly benefited the class, so as to preclude an attorney from being paid fees by class members for whom he provided no service. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1323. Therefore, it is respectfully recommended that Mr. Wade's request for reconsideration of his fee award be denied.

### 12. DON S. WILLNER

Don S. Willner submitted a petition for fees. The court originally awarded him $7,564.40 for expenses, nothing for fees. This court subsequently received a motion for reconsideration of that award. Having considered that motion together with the accompanying affidavits of Mr. Willner and Irving Like, a member of Yannacone and Associates and the Law Committee, it is my recommendation that a fee award is warranted.

The original fee petition requested compensation for 156.77 hours that Mr. Willner spent representing approximately 300 veterans who lived in Oregon. The court did not compensate Mr. Willner because he was an independent counsel whose work, for the most part, did not directly benefit the class as a whole. As stated in the Memorandum and Order on Attorney Fees at 1323,

> attorney fees and expenses may be awarded only for those activities that can be characterized as having substantially benefited the class. Unless a petition revealed that an attorney spent time on

an activity that furthered the interests of the class, such as taking a deposition, or writing a brief that was submitted to the court, no fee award could be made.

611 F.Supp. at 1323.

In his motion for reconsideration, Mr. Willner made clear for the first time that some of the 156.77 hours directly benefited the class. Specifically, Mr. Willner devoted 23.88 hours to organizing and supervising a task force of law students at Lewis and Clark Law School in Portland, Oregon. These students wrote legal memoranda that Mr. Willner transmitted to Mr. Like and Dr. Keith Kavenagh, members of Yannacone and Associates. Although Mr. Willner outlined these hours in his original petition, he described them ambiguously and received no compensation. Because Mr. Willner has now sufficiently demonstrated that he spent these hours serving the class as a whole, and because Mr. Like's affidavit confirms that Mr. Willner's time records are correct, I recommend that Mr. Willner be compensated for 23.88 hours of work at a rate of $150 per hour. Therefore, it is respectfully recommended that Mr. Willner's total award, including the $7,564.40 previously granted for expenses, be increased by $3,582.00 to $11,146.40.

### 11. VICTOR J. YANNACONE

### I. INTRODUCTION

Victor J. Yannacone, Jr. has moved for reconsideration of his fee award. In support of his petition Mr. Yannacone submitted memoranda and testified at a hearing held on April 3, 1985. Because Mr. Yannacone's involvement in the first four and a half years of the Agent Orange litigation was unique, this court has conducted a most lenient review of his petition. Moreover, I reviewed this petition despite the grossly inadequate nature of Mr. Yannacone's submissions, a fact which Mr. Yannacone himself has frequently conceded. *See* Tr. of April 3, 1985 at 26.

In his Memorandum and Order on Attorney Fees, Chief Judge Weinstein noted that "[i]n his petition, Mr. Yannacone gave no

breakdown of his hours and no precise descriptions of his activities." 611 F.Supp. at 1335. However, the court chose to compensate Mr. Yannacone and his late partner, Dr. W. Keith Kavenagh for 2000 hours of work, "based upon the court's knowledge of the files and its observation of Mr. Yannacone in court." *Id.* At an hourly rate of $150, the Yannacone firm was awarded $300,000.00 as fees. This estimate of 2,000 hours [17] falls significantly short of the 14,000 hours that Mr. Yannacone testified he deserves. Tr. at 37.

Further, the court allowed no expenses because "[t]he documentation for expenditures by Mr. Yannacone range[d] from nonexistent to grossly inadequate." Memorandum and Order on Attorney Fees, 611 F.Supp. at 1335. Mr. Yannacone had requested $380,682.40 in expenses.

In its Memorandum and Order on Attorney Fees the court stated that Mr. Yannacone was "free to move to set aside or modify the judgment" and, further, that "a hearing will be granted at which time he may produce evidence in the form of testimony and documents." *Id.*

Mr. Yannacone appeared before this court on April 3, 1985 to ask that his award for fees and expenses be reconsidered. He brought no new material with him. Rather, he appealed, repeatedly, to the equity power of the court to hear his testimony and "allow a fair and reasonable fee." Tr. at 127.

This court has closely examined Mr. Yannacone's fee petition and the multitude of papers he has submitted. Most of those papers contain only cryptic inter-office memos. The court is sympathetic to Mr. Yannacone's status as a solo practitioner and is cognizant of the costly time that would be required to reconstruct four and a half years of hours and expenses. This court is also aware of the 1981 fire which, according to Mr. Yannacone, destroyed the computer tapes that stored his billing records. Tr. at 25. Nonetheless, the lack of reviewable documentation frustrated this court's efforts to be understanding in its review of the Yannacone petition.

Victor Yannacone was the prime mover of the Agent Orange litigation in its first four and a half years. His office filed one of the first complaints in this case. Tr. at 22. He took it upon himself to organize veterans groups and inform them of the progress of the litigation. He acted as spokesman for the veterans. He communicated with attorneys from around the country in order to establish a workable network of counselors.

In order to centralize all Agent Orange activities, Mr. Yannacone rented an entire house in Patchogue, New York.[18] Tr. at 14. Mr. Yannacone engaged the services of Robert Liquori, a computer programmer, who developed unique programs for the management of this large multidistrict class action litigation. Tr. at 30.

This court does not doubt Mr. Yannacone's sworn testimony that he devoted a great deal of time and effort to the Agent Orange case. Tr. at 37. It may indeed be true that for several years he spent every working hour on this case. Nonetheless, fees will only be awarded for those activities enumerated in the court's Memorandum and Order on Attorney Fees or in this court's recommended amended guidelines.

At his hearing Mr. Yannacone attacked several of the existing guidelines and urged the adoption of additional guidelines that would allow compensation for heretofore excluded activities.

## II. GUIDELINES

Mr. Yannacone specifically addressed four categories of work for which he received no compensation: time spent with the media; discussions with associated counsel and with veterans; time spent on the case after his involvement with the management of the case ended in Septem-

---

17. Chief Judge Weinstein states in his Order that this figure was merely an estimate. *See* Memorandum and Order on Attorney Fees, 611 F.2d at 1335.

18. This building was owned by a corporation of which Mr. Yannacone was one of the principals. Tr. at 14.

ber 1983; and the $150 hourly rate. Tr. at 94–104.

### A. *Time Spent With the Media*

At his hearing, Mr. Yannacone stated, In the Agent Orange litigation public information and education played a critical part in maintaining unity of the class against the [predators] of that sector which I intend to refer to as the "sleaze" sector of the personal injury trial [bar] which sought to take individual veteran claims, run them through a state court and try to negotiate largely by extortion, a settlement from carriers or defendants. There were no sources of distributing information to the veterans about either health or the progress of the class action. Support of the veterans and information about their health was of critical importance to establishing the data base from which causation had to be determined.

Tr. at 95.

This court has no doubt that Mr. Yannacone did a great deal to publicize the case. However, as Chief Judge Weinstein stated in his Memorandum, "[w]hile this *pro bono publico* work was in the highest tradition of the bar, most of it did not directly further the class action." 611 F.Supp. at 1335 (citing *Society for Good Will to Retarded Children v. Cuomo,* 574 F.Supp. 994, 998–999 (E.D.N.Y.1983), *remanded on other grounds* 737 F.2d 1253 (2d Cir.1984)).

Mr. Yannacone has failed to persuade me that time spent with the media should be compensable. Although such time surely was a necessary precondition to building the base for a successful prosecution of this class action, it is not substantive legal work deserving of an award of attorney's fees. The analysis applied to management meetings is applicable here. *See* Introduction, 611 F.Supp. at 1349. The time spent with the media was not of *sufficient* benefit to the class so as to justify a reduction in the size of the fund.

### B. *Talks with Associated Counsel and with Veterans*

Once again, I have no doubt that Mr. Yannacone spent countless hours with associated counsel and their clients. However, I do not recommend that these hours be compensated.

Mr. Yannacone's role as personal confidant and advisor to associated counsel and the "thousands" of veterans who discussed their problems with him cannot be underwritten by this court and, ultimately, the settlement fund. Although the individual veterans surely appreciated Mr. Yannacone's concern and compassion, it is the benefit to the class which determines compensation, not the benefit to an individual. Memorandum and Order on Attorney Fees at 1306. Moreover, communications to independent counsel are likely to have been of greater benefit to those attorneys and their individual clients than to the class as a whole. Therefore, I recommend no compensation for these activities.

### C. *Time Spent as a Continuing Consultant*

Mr. Yannacone's involvement with the management of the Agent Orange litigation was substantially curtailed upon the creation of the PMC in September 1983. Although Mr. Yannacone took it upon himself to keep abreast of all Agent Orange developments, his involvement did not aid the class, and therefore is not compensable.

Mr. Yannacone, at his hearing, did relate one incident which suggests that his knowledge of the case was sometimes helpful to the PMC. Tr. at 100. This court is aware, however, of a large number of occasions where Mr. Yannacone's refusal to cooperate with the PMC resulted in a great deal of wasted time and effort. Mr. Yannacone provided no documentation of any assistance he gave to the PMC after September, 1983. As mentioned above, no compensation can be given for time spent after June 1983 if no contemporaneous time records are provided as required by law. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1305 (citing *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1140 (2d Cir.1983) ).

### D. Hourly Rate

Mr. Yannacone vigorously objected to the $150 per hour billing rate awarded him, and contends that "[t]he Judge pulled $150.00 an hour out of his hat." Tr. at 104. As set forth in the Introduction, 611 F.Supp. at 1349, it is my view that this hourly rate is appropriate in view of the prevailing national rates. Particularly here, where Mr. Yannacone seeks compensation primarily for hours worked from 1979 to 1983, the rate is more than adequate. I do not recommend any increase in the hourly rate.

### E. Quality Multiplier

I recommend that Mr. Yannacone be awarded a quality multiplier of 1.25. There is no doubt that he was the driving force behind the class action for many years. There is also no doubt that he waged the legal fight for the veterans at great personal sacrifice. The award of fees here cannot compensate Mr. Yannacone for his personal contribution of time and energy. Moreover, he kept the litigation afloat single-handedly when others lost hope. Nonetheless, he does not deserve the 1.50 multiplier awarded to others because of his inability and unwillingness to cooperate with the PMC during the final phase of the litigation.

### III. COMPENSABLE ACTIVITIES

Mr. Yannacone and Dr. Kavenagh should receive compensation for time spent preparing for and attending depositions and hearings. They are also entitled to compensation for those hours spent researching legal issues and preparing court papers. Finally, all documented expenses related to those activities are reimbursable.

Unfortunately, Mr. Yannacone's records are virtually useless for calculating the time spent on these activities. With the aid of the Clerk of the Court, I have determined that Mr. Yannacone attended 26 depositions and 64 court hearings. Dr. Kavenagh attended 10 depositions and 2 hearings.

### A. Fees

#### 1. Depositions and Hearings

Because of Mr. Yannacone's known contributions to this litigation, I recommend that both Mr. Yannacone and Dr. Kavenagh be awarded eight hours for each deposition taken and four hours for each hearing attended.

It is my further recommendation that they be awarded sixteen hours of preparation time for each deposition taken and eight hours of preparation time for each hearing attended. Travel time, as with all attorneys in this case, is awarded at 50% of the actual time spent. Pursuant to this recommendation Mr. Yannacone is entitled to 675 hours for deposition activities and 847 hours for court hearings. Dr. Kavenagh is entitled to 263 hours for deposition activity and 26 hours for hearings.

#### 2. Legal Research and Preparing Court Papers

Unlike depositions and hearings, this court has no independent resources to determine how much time Mr. Yannacone spent on legal research or in preparation of court papers. The only resource available was Mr. Yannacone's submission which generally contained nothing more than intra-office memos. Nevertheless, this court reviewed 72 folders containing roughly 1,500 sheets of paper in an attempt to search for compensable entries. Based on this review I recommend compensation of 150 hours to Mr. Yannacone, 75 to Dr. Kavenagh. It is likely that significantly more time was spent on legal research. Nonetheless, Mr. Yannacone has been given ample opportunity to provide documentation in support of his petition but has failed to do so. The court cannot reward unsubstantiated hours.

#### 3. Total Fee Award

I recommend that the firm of Yannacone & Yannacone be compensated for 2,036 hours of work, which represents 1,672 hours on the part of Mr. Yannacone and 364 hours for Dr. Kavenagh. Compensat-

ed at the rate of $150 an hour with a 1.25 multiplier, the fee award totals $381,750.00—an increase of $81,750.00.

### B. *Expenses*

Mr. Yannacone's records were also reviewed for all documented expenses related to compensable activities. Mr. Yannacone's documented expenses totaled $2,693.00; Dr. Kavenagh's reached only $153.00.

Once again, I suspect that far more was expended. For example, Mr. Yannacone attended a hearing before the MultiDistrict Litigation Panel in California, but submitted absolutely no related expenses. This court cannot conjure up figures. Therefore, it is my recommendation that Mr. Yannacone be reimbursed $2,693.00 and Dr. Kavenagh $153.00. The total expense reimbursement to Victor Yannacone should therefore be $2,846.00.

### IV. CONCLUSION

I respectfully recommend that the firm of Yannacone & Yannacone be awarded $381,750.00 as fees and $2,846.00 as expenses. The recommended total award is $384,596.00—an increase of $84,596.00.

### C. LIQUORI ASSOCIATES LTD.

Liquori Associates Ltd. ("Liquori"), a computer consulting firm, provided services to the plaintiffs during the Agent Orange litigation. The PMC submitted a request for reimbursement of monies paid to Liquori as part of its expense application. In addition, Liquori filed its own application for monies owed by plaintiffs for services rendered. Affidavits and memoranda were submitted on behalf of Liquori by Edward J. Hayes, III and Stephen J. Schlegel. Mr. Hayes testified at a hearing held on March 4, 1985, Mr. Schlegel and Mr. Robert M. Liquori, at a March 18, 1985 hearing. All witnesses asked this court to reconsider its original award by which the PMC received $100,121.55 for computer expenses and Liquori received nothing.

In sum, the PMC requests reimbursement of $70,488.74, the balance of its computer expense. Liquori, in its petition, requests payment of: the PMC's unpaid bills; funds that Yannacone and Associates owe pursuant to a prior computer service agreement; and additional fees for unbilled "time and expenses" spent by Liquori and its personnel on behalf of the PMC.

### A. *Contract Computer Services*

After reviewing the affidavits and testimony of the witnesses, I am persuaded that Liquori's services were directly beneficial to the plaintiff class. In the early years of the litigation, Liquori acted as consultant to Yannacone and Associates, furnishing and providing advice on appropriate computer equipment, training personnel to use it, devising useful programs for this case (e.g., veterans' profiles), and organizing the eventual computer storage and retrieval of deposition material. Tr. of March 4, 1985 at 4–6 (testimony of Mr. Hayes).

After the PMC took over, the computer operation "provided plaintiffs with a litigation support program that allowed for the searching and cross-referencing of thousands of pages of depositions and documents at a cost of but a fraction of commercially available support systems." Hayes Affidavit at 6–7. Mr. Schlegel confirmed that the system was necessary to the litigation, not only as a general support system (useful for the development of medical information received from expert depositions, for example), but especially from October 1983 through May 1984, when an expansion of the computer system was required in order to comply with the court's orders on pretrial discovery and class notice. Schlegel/Liquori Tr. of March 18, 1985 at 26–30 (testimony of Mr. Schlegel).

### B. *PMC Disbursements*

Schlegel testified that Liquori billed the PMC $227,335.65. This amount included $130,000.00 in flat fees and $97,335.65 in "extras." The flat fee agreement between Liquori and the PMC was $15,000.00 for each of the first two months and $10,000.00 for each month thereafter, beginning July 30, 1983 and ending no later than July 30, 1984. Exhibit 8, Original Liquori Petition. The "extras" consisted of charges for spe-

cial projects performed as needed. The supporting invoices and testimony revealed that these projects directly benefited the class and included such items as class notice mailings, and preparation of the plaintiffs' Pretrial Order.

The PMC paid $170,610.29 of the approximately $227,000.00 billed. The court has reimbursed the PMC for $100,121.55 of these expenses. It is my recommendation that the expense award be amended to include the balance of $70,488.74 expended by the PMC on Liquori's services.

### C. Billings to PMC Remaining Due to Liquori

Liquori requests reimbursement from the fund of $56,725.36 due and owing by the PMC for the services provided through July 30, 1984.[19] The court did not award this amount to Liquori originally, but because these services directly benefited the class, I respectfully recommend that Liquori be compensated for these services.

### D. Liquori's Agreement with Yannacone and Associates ("Y & A")

According to Liquori's original fee petition, his firm agreed to provide computer services to Y & A for a flat monthly fee of $2,500.00. Liquori Petition, Section 3, Exhibit 2. Liquori received no payments from October 1, 1980 through July 30, 1983, even though the firm continued to provide litigation support services throughout that period. As noted above, the services consisted of computerizing medical information, deposition testimony and legal material, particularly for the summary judgment motions. In addition to the monthly fee, Liquori requested compensation for many "extras" during that period including software such as the "Web" system (developed to determine the level of knowledge regarding Agent Orange by any party to the action at any point in time); a time and expense data

base system, and sundry statistical analyses. Tr. at 53; Original Liquori Petition, Section 2, Part IV.

Liquori requests a total of $407,740.00 in fees owing for services rendered to Y & A through July, 1983, including claims for both the base monthly fee and Mr. Liquori's contingency fee. Because this work was not sufficiently beneficial to the class as a whole, I recommend that only the base contract fee with Y & A totaling $85,-000.00[20] be paid to Liquori.

### E. Additional Fees for Liquori Time and Expense from 7/30/83 through 7/30/84

In addition to the flat monthly charge, the Liquori firm had a contingency arrangement with the PMC whereby Mr. Liquori would provide his own personal services free of charge pending the outcome of the litigation. In the event of a successful outcome, the PMC agreed to reimburse Mr. Liquori for the retail value of his services at his then usual billing rate of $200.00 per hour. Obviously, Mr. Liquori assumed the risk of no fee in the event of an unsuccessful outcome. Mr. Liquori has requested an additional $281,750.00 for his consulting services. It is my view that the PMC is solely responsible for this profit-sharing arrangement. If Mr. Liquori's personal services were required by the PMC in order to successfully complete the litigation, then the PMC should honor its agreement with Liquori. This additional fee was not a reimbursable expense such as hotels, airfare, or meals. Rather, the additional charges consist of a contingent fee arrangement between the PMC and Mr. Liquori. The court should not intervene in this private arrangement.

### F. Conclusion

I recommend that the PMC's expense award be increased by $70,488.74, for a

---

**19.** Mr. Schlegel testified that the PMC required Liquori's computer services even after the settlement, during May and June 1984, and that payment of the flat fee was therefore still justified for those months. It should be noted that the computers were used to prepare the Supplemental Pretrial Order and to collate voluminous

amounts of medical information related to disabilities claimed by the veterans for the purpose of preparing a distribution plan.

**20.** This sum consists of the monthly fee for the period October 1, 1980 through July 30, 1983. See Liquori Petition, Section 5, Part I, Item 2.

new total of $1,461,174.92. It is my further recommendation that Liquori, which originally received no compensation, should be awarded $141,725.36 ($85,000.00 plus $56,725.36).

## III. SUPPLEMENTAL FEE PETITIONS

### A. PMC MEMBERS

#### 1. GREITZER & LOCKS

Greitzer & Locks, a Philadelphia firm, has submitted a petition requesting supplemental fees and expenses. The firm requests compensation for two attorneys, Gene Locks and Neil Peterson, amounting to $115,987.50, and seeks reimbursement for expenses totaling $24,971.80. Greitzer & Locks is a member of the PMC.

### A. *Fees*

Both Mr. Locks and Mr. Peterson worked a great deal on evaluating the fairness of the settlement and developing a distribution plan. Time spent on these activities is compensable and related expenses are reimbursable. However, only one attorney from a firm should be compensated for attendance at hearings or meetings. As a result, I recommend that no fee be awarded for two trips to New York when both Mr. Peterson and Mr. Locks attended court hearings. Further, it is my recommendation that the time spent by Mr. Peterson reading scientific literature in order to develop a distribution plan is only 50% compensable for the reasons set forth in the Introduction, 611 F.Supp. at 1350. The same is true for intra-office conferences between two attorneys. After applying these guidelines, then, it is my recommendation that Mr. Peterson be compensated for 110.5 hours.

Mr. Locks prepared for and attended the five fairness hearings. As a member of the PMC, he is entitled to compensation for these activities. Further, fees should be awarded for his meetings with experts and the Special Master regarding the distribution plan. In all, I recommend that Mr.

Locks be compensated for 243.25 hours of work.[21]

I therefore respectfully recommend that Greitzer & Locks be compensated for 353.-75 hours of work at a rate of $150 per hour for a total award of $53,062.50.

### B. *Expenses*

The records submitted in support of the Greitzer & Locks supplemental expense request are poor. Mr. Peterson offers no documentation whatsoever for his $787.85 in expenses. Therefore none of these expenses should be reimbursed. Although Mr. Locks did submit many pages of documentation in support of his request, these pages are often exceedingly light photocopies. Further, the firm's documentation has been presented in a manner that hinders the court's review. Mr. Locks submitted three computer print-out sheets with expenses listed generally, such as "travel" and "federal express." Mr. Locks then submitted about 200 photocopied pages of receipts, invoices and checks. Matching the expenses on the computer print-out with the proper documentation proved to be a difficult and frustrating task. Occasionally, Mr. Locks submitted photocopies of the original receipt together with photocopies of the prepared check. Sometimes he only submitted monthly credit card statements that did not provide the date on which the individual expenses were incurred. In addition, documentation for travel expenses was exceptionally poor.

The largest properly documented expense was $7,910.00 paid to Total Data Services for the study conducted by Dr. Ronald Codario. This expense should be fully reimbursed. The remaining expenses were for postage, photocopying and express mail services. I recommend that these expenses totaling $2,222.09 be reimbursed in the same proportion that fees were awarded to the firm because I am unable to determine the reason for these

---

**21.** Certain hours requested by Mr. Locks were not allowed because the descriptions provided in the fee submission were vague. For example, "telephone conference re [method of Distribu-

tion]" should not be compensable because there is no indication as to who participated in the conference.

miscellaneous expenses. Because Greitzer & Locks was awarded 69% of its requested fees, I recommend an award of $1,533.24 for its miscellaneous expenses. I therefore recommend a total supplemental expense award to Greitzer & Locks of $9,443.24.

### C. *Conclusion*

I respectfully recommend that Greitzer & Locks be awarded $53,062.50 in supplemental fees and $9,443.24 in supplemental expenses, for a total of $62,505.74.

### 2. HENDERSON & GOLDBERG

Thomas W. Henderson submitted a petition on behalf of his firm Henderson & Goldberg, P.C., for fees and expenses incurred between June 15, 1984 and April 1, 1985.

### A. *Fees*

Henderson & Goldberg requested compensation for 668.1 hours expended by Thomas W. Henderson. Much of Mr. Henderson's post-settlement time was devoted to work on the case against the government and preparation of his own fee petition. A review of the petition reveals that 191.85 of Mr. Henderson's hours are compensable under the post-settlement guidelines at the rate of $150 per hour. These hours were spent mainly on preparation for and participation in the fairness hearings and work on the distribution plan. Therefore, I recommend a supplemental fee award of $28,777.50 to the firm of Henderson & Goldberg.

### B. *Expenses*

Henderson & Goldberg also requested compensation for 398.5 hours expended by Susan McDougall, a legal assistant. Examination of the petition shows that she spent the majority of this time working on cases for individual clients and on the government case. Her work on the fairness hearings is compensable under the post-settlement guidelines at the rate of $20 per hour. I therefore recommend a supplemental expense award of $1,033.00 for 51.65 hours of paralegal time.

### 1. *Specific Expenses*

Mr. Henderson has also requested reimbursement of $19,443.71 in expenses. Of these expenses, $14,127.33 are specific in nature, including, e.g., expenditures for hotel rooms, airfare and meals attributable to a particular date and purpose. Mr. Henderson has requested reimbursement for $6,823.00 expended for rent and cleaning of the PMC house at 18 Remsen Street, Brooklyn, New York. Claims for rent on this house are compensable. I therefore recommend that Henderson & Goldberg P.C. be reimbursed $6,150.00 for two months rent. I further recommend that an award of $3,223.19 be granted to reimburse Mr. Henderson for other expenses. The remaining $4,000.00 of specific expenses incurred is not reimbursable because they were unrelated to compensable activities. Therefore, I recommend that $9,373.19 be awarded as reimbursement for specific expenses incurred.

### 2. *General Expenses*

The remaining requested expenses totaling $5,316.38 are general, such as postage, photocopying, telephone and courier service costs. Because no documentation exists to determine whether these expenses were related to compensable post-settlement activities, I recommend that Henderson & Goldberg P.C. be awarded general expenses in proportion to its award of fees. Mr. Henderson received 29% of his requested post-settlement hours (668.10 hours requested, 191.85 hours awarded). Twenty-nine percent of the requested general expenses amounts to $1,541.77.

The firm's total expense award, therefore, including paralegal hours, specific and general expenses, and rent on the Remsen Street house is $11,947.96.

### C. *Conclusion*

In conclusion, it is respectfully recommended that Henderson & Goldberg, P.C., receive a total supplemental award of $40,725.46.

### 3. HOBERG, FINGER, BROWN, COX & MOLLIGAN

Hoberg, Finger, Brown, Cox & Molligan has submitted a supplemental petition seeking both fees and expenses for the post-June 15, 1984 period. This petition, submitted on April 3, 1985, is the latest in a series of submissions made by Hoberg, Finger concerning attorneys' fees. Its original submission, made in September of 1984, included fees and expenses from the beginning of the firm's involvement in the litigation through the summer of 1984. In December, 1984, Hoberg, Finger updated its original fee and expense request through November, 1984. In April, 1985, Hoberg, Finger again updated its expenses.

All fees requested and expenses incurred before June 15, 1984, were considered in the court's Memorandum and Order on Attorney Fees, and were subsequently reconsidered by this court. The court originally awarded Hoberg, Finger fees and expenses for its attendance at fairness hearings even though these hearings occurred after the June 15th cut-off date for the initial review of fee petitions. Hours spent on other post-settlement activities were not compensated at that time.

In this review I have examined all the post-June 15th activities of Hoberg, Finger in light of my recommendation that firms be compensated for time spent considering the fairness of the settlement and the distribution of the fund. *See* Introduction at 1351–1352.

#### A. *Fees*

Hoberg, Finger submitted a request for post-June 15th hours for Philip E. Brown and David Moyer, as well as for two paralegals. Much of Mr. Brown's time was spent preparing the case against the government and conferring with the PMC on undisclosed topics, time that is not compensable. His time spent on the fairness hearings has already been compensated. Finally, his time sheets do not indicate any involvement with the distribution plan. Therefore, I respectfully recommend that Mr. Brown receive no supplemental fee.

Although Mr. Moyer also spent time on the case against the government, he devoted many hours to developing a distribution plan for the settlement fund. For example, he consulted with Touche, Ross, the accounting firm, on investment strategy. This time is compensable. Similarly, I have recommended that contributions made to the fairness hearings beyond mere attendance should also be compensable. Mr. Moyer spent many hours researching fairness issues and should be compensated accordingly. Therefore, I recommend that Mr. Moyer be compensated for a total of 81 hours. At a rate of $150 per hour, Mr. Moyer's supplemental fee award totals $12,150.00.

#### B. *Expenses*

The time spent by the two paralegals is neither compensable nor reimbursable as an expense. The time sheets for one paralegal are exceptionally vague, while the time sheets for the other indicate that all her time was spent on the case against the government.

Hoberg, Finger also petitioned this court for $11,763.15 in post-June 15th expenses. First, the firm sought reimbursement of $5,837.90 paid to an investigator, hired to locate Agent Orange plaintiffs who had changed their addresses. This expense was not incurred in conjunction with a compensable activity and therefore cannot be reimbursed. Hoberg, Finger did not provide documentation for three other expenses totaling $663.07. Further, $765.13 in expenses were related to hearings on attorneys' fees and are not reimbursable. Finally, Mr. Moyer seeks reimbursement for an October trip to New York for which no time was requested or compensated. It is not clear that this trip was related to a compensable activity and therefore the firm's request for reimbursement is denied.

Hoberg, Finger should be reimbursed for its payment of one month's rent for the Remsen Street apartment amounting to $3,600.00. All other reimbursable expenses amount to $433.70, thereby bringing

the entire supplemental expense award to $4,033.70.

### C. Conclusion

I therefore respectfully recommend that Hoberg, Finger, Brown, Cox & Molligan be awarded $12,150.00 in supplemental fees for the work performed by Mr. Moyer and $4,033.70 in supplemental expenses—a total of $16,183.70.

### 4. BENTON MUSSLEWHITE

Benton Musslewhite has submitted a supplemental fee and expense petition requesting compensation for 110 hours of attorney's time and $730.00 in expenses.

Mr. Musslewhite stated that he was involved in evaluating the fairness of the settlement as well as developing a distribution plan for the fund. These are compensable activities, and this court has little doubt that Mr. Musslewhite did indeed spend time and money on these tasks. However, this court also has *no doubt* that Mr. Musslewhite is aware that "the Second Circuit *requires* submission of contemporaneous time records for work performed after June 15, 1983." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d at 1147–48 (emphasis supplied). Nevertheless, Mr. Musslewhite submitted neither contemporaneous time records nor documentation for expenses. Although his two-page petition lists time that is compensable, I respectfully recommend no award of fees or expenses because of Mr. Musslewhite's failure to comply with the legal requirements of this Circuit.

Additionally, Mr. Musslewhite's time entries are much too general. He indicates, for example, that he spent 47 hours in August, 1984, preparing for and participating in fairness hearings around the country. Mr. Musslewhite gives no specific times or dates. He denotes no hours as travel time, yet there is also no suggestion that he excluded travel time from this entry. Mr. Musslewhite's conduct prevents this court from reviewing his petition in light of the established guidelines for billable hours.

Mr. Musslewhite's expense entries are also too general. He requests, for example, $540.00 in expenses without indicating when or where these expenses were incurred, or for that matter, what these expenses were. Again, this court is unable to apply its guidelines to Mr. Musslewhite's request for reimbursement.

Therefore, I respectfully recommend that Benton Musslewhite not be awarded supplemental fees or expenses.

### 5. O'QUINN & HAGANS

The Houston law firm of O'Quinn & Hagans, a member of the PMC, has submitted a petition for supplemental fees and expenses. The firm requests compensation for 395.75 hours expended by John O'Quinn and Alison Pettiette. The firm also requests reimbursement for expenses incurred after June 15, 1984.

### A. Fees

Alison Pettiette submitted records requesting compensation for 299.75 hours of work. Much of Ms. Pettiette's time was spent researching the applicable laws on attorneys' fees both for her firm and for Benton Musslewhite. These hours are not compensable. In addition, Ms. Pettiette provided research and drafting assistance on the causation brief, an activity for which compensation is not recommended.

Many of Ms. Pettiette's entries lack specificity, simply stating "Memo to O'Quinn." No compensation should be awarded for such vague entries.

Ms. Pettiette should be compensated for her contributions to the fairness brief and for her participation in the New York and Houston fairness hearings. The time spent on these activities totals 78 hours.

John O'Quinn requests compensation for 96 hours of work. He spent 69 of those hours on attorneys' fees. Fifteen hours were spent traveling to and attending a Chicago PMC meeting concerning internal management of the committee. The remaining hours were spent at the Houston fairness hearing for which time Ms. Pettiette has already been compensated.

Therefore, I recommend no supplemental fee award for Mr. O'Quinn.

In sum, I recommend that O'Quinn & Hagans be compensated for 78 hours of attorney work. Because all the firm's compensable activity is attributable to Ms. Pettiette, the associate rate of $100 an hour should be applied—thereby bringing the supplemental fee award of O'Quinn & Hagans to $7,800.00.

### B. *Expenses*

O'Quinn & Hagans have also requested reimbursement for post-settlement expenses. As with all requests, only those expenses incurred in connection with compensable activities should be reimbursed.

One of the firm's largest expenses was Ms. Pettiette's combined trip to Pittsburgh and New York to work on the fairness brief. Reasonable expenses related to this trip are reimbursable. However, the key word is "reasonable." Ms. Pettiette was one of several attorneys authorized to stay overnight at the Remsen Street house rented by the PMC, a fully reimbursed expense. Remsen Street is within walking distance of the PMC's Brooklyn office and the courthouse. Although originally rented in anticipation of a lengthy trial, the house was available through March, 1985 and many PMC members made frequent use of the accommodation. Nevertheless, Ms. Pettiette opted to stay at the Helmsley Palace in midtown Manhattan for $165.00 per night. Ms. Pettiette has given no reason as to why she needed to stay at the Palace instead of the Remsen Street house. The fund should not be required to make duplicative payments. Therefore, I recommend that Ms. Pettiette not be reimbursed for her five-night, $825.00 hotel bill.

In total, O'Quinn & Hagans requested $1,613.68 for Ms. Pettiette's Pittsburgh/New York trip. After applying the guidelines of $90.00 per night for Ms. Pettiette's Pittsburgh hotel expenses and $50.00 per day for her documented meals, I

find $497.67 to be a reasonable reimbursement for this trip.[22]

O'Quinn & Hagans has also requested reimbursement for expenses it incurred on behalf of Benton Musslewhite, such as air fare to the San Francisco fairness hearing. I have recommended that Mr. Musslewhite not receive any supplemental fees or expenses primarily because of his failure to provide contemporaneous time records or other documentation. *See* Introduction, 611 F.Supp. at 1348. In reviewing these expenses, however, this court has endeavored to avoid penalizing O'Quinn & Hagans for Mr. Musslewhite's failure to comply with court rules. Therefore, where O'Quinn & Hagans paid for compensable trips and submitted proper documentation for the related expenses, I recommend that the firm be reimbursed. These expenses total $638.00.

In sum, O'Quinn & Hagans incurred $2,188.58 in reimbursable expenses.

### C. *Conclusion*

I therefore recommend that O'Quinn & Hagans be awarded $7,800.00 in supplemental fees and $2,188.58 in supplemental expenses—a total supplemental award of $9,988.58.

### 6. STEPHEN SCHLEGEL

Stephen J. Schlegel of Stephen J. Schlegel, Ltd., has submitted a supplemental petition for fees and expenses incurred after June 15, 1984.

### A. *Fees*

Mr. Schlegel has requested compensation for 1,093.45 hours worked between June 16, 1984 and March 28, 1985. A majority of those hours were devoted to work on the case against the government, work for individual clients, and work concerning attorneys' fees. However, Mr. Schlegel also expended a substantial amount of time on compensable activities such as: preparation for and attendance at the fairness hearings; work on the plan for administration

---

**22.** Ms. Pettiette's meal receipts for this trip are, at best, confusing. No indication was made as to which receipt accompanied which meal. Moreover, there was at least one day for which only one receipt was submitted.

and distribution of the settlement fund; and meetings with the Special Masters and the court. A careful review of this supplemental petition under the recommended post-settlement guidelines reveals that Mr. Schlegel should receive compensation for 328.25 hours. Applying the partner's $150 per hour rate with no multiplier, Mr. Schlegel's post-settlement award amounts to $49,237.50.

### B. *Expenses*

Mr. Schlegel has requested reimbursement for time his paralegals spent on post-settlement activities. Five paralegals worked a total of 1,293.95 hours between May 9, 1984 and March 25, 1985. Much of this work concerned non-class related activity, such as office filing; organization and mailing; contact with individual clients; preparation of fee petitions; and preparation of government and civilian cases. Only 32.10 hours of paralegal time was spent on compensable class related activities. Compensated at the paralegal rate of $20 per hour, I recommend that Mr. Schlegel receive $642.00 for paralegal expenses.

Mr. Schlegel has also requested reimbursements for other post-settlement disbursements amounting to $69,938.75. Although copies of bills, receipts, and cancelled checks were submitted, it is difficult to discern which of these general expenses relate to compensable activities. For example, Mr. Schlegel's firm might incur Federal Express charges for a variety of reasons, such as mailing briefs in support of the settlement or a suit against the government, or mailing a pleading on behalf of an individual client.

Nonetheless, I recommend that Mr. Schlegel be awarded the same proportion of general expenses as he received in his fee award. Mr. Schlegel was awarded 30% of his requested fees (328.25 hours awarded out of 1,093.45 hours requested). I shall assume, therefore, that 30% of his general expenses were related to compensable post-settlement activities. It is thus my recommendation that Mr. Schlegel be reimbursed $13,448.73 for all expenses, general and specific.[23]

In addition, Mr. Schlegel requested reimbursement for three months' rent paid for the PMC house at 18 Remsen Street, Brooklyn, New York. This house was a benefit to the class in that it spared the fund from the high expense of New York hotel rates. Reimbursement for the full year's term of the lease has therefore been awarded to the PMC and to the several firms that paid the rent as it came due. Mr. Schlegel brought to my attention that an additional two months' rent remains unpaid. However, Mr. Schlegel was previously credited with one month's rent (3,600.00) in the original expense award, and another month's rent (3,600.00) is credited to the PMC supplemental expense award. Consequently, I recommend that rent for three months, totaling $10,800.00, be awarded to the Schlegel firm for the purpose of defraying its obligation for rental expenses on the Remsen Street house. The firm's total expense award, including paralegal expenses, thus amounts to $24,890.73.

### C. *Conclusion*

I respectfully recommend a combined supplemental fee and expense award to Stephen J. Schlegel Ltd. of $74,128.23.

---

**23.** It should be noted that many of the specific expenses were either vague or in excess of the guidelines. For example, Mr. Schlegel submitted a $738.45 American Express receipt for a San Francisco hotel, part of which was attributed to meals and lodging for the Australian and New Zealand representatives. No further documentation of this expense was submitted. Consequently, Mr. Schlegel's award for this trip is limited to his own expenses for three days hotel and meals.

Mr. Schlegel also paid expenses for Vietnam veteran leader Chris Johnson and representative plaintiff Christina Ford to attend the Chicago Fairness Hearings. Their testimony at the hearings, however, was voluntary not mandatory. Consequently, reimbursement for these expenses should be denied. I have found several instances where attorneys have spent more than $20 per day on "home-town" meals. Chief Judge Weinstein has determined that this $20.00 per day limit for "home-town" meals is adequate and reasonable. *See, e.g.,* Original Petition of Henderson & Goldberg: Meal Expenses of Antonio Pyle. Where overcharges have occurred I have limited reimbursement.

## 7. WAITE, SCHNEIDER, BAYLESS & CHESLEY

Waite, Schneider, Bayless & Chesley, a Cincinnati firm, submitted a petition for supplemental fees and supplemental expenses. The firm requested compensation for 1511.75 attorney hours and 243.55 non-attorney hours. It also requested reimbursement for expenses totaling $62,-880.58. Waite, Schneider is a member of the PMC.

### A. *Fees*

The submission of Waite, Schneider evinces a significant amount of time and money expended on every aspect of the Agent Orange litigation. Waite, Schneider participated at the fairness hearings and in the development of an investment strategy for the settlement fund, and continued its research on the case against the government. As a member of the PMC it also participated in meetings concerning the internal affairs of the committee. However, as set forth in the Introduction, 611 F.Supp. at 1351–1352, it is my recommendation that only certain post settlement activities be compensable. Therefore, the hours and money expended on the case against the government, on internal affairs of the PMC and in preparing a fee petition have not been compensated.

The firm requested that Stanley M. Chesley be compensated for 527.5 hours of work. Mr. Chesley attended fairness hearings in New York, Chicago, Houston and San Francisco, and participated in the preparation of fairness briefs. Mr. Chesley also consulted with financial experts on investment strategies. As a member of the PMC, Mr. Chesley should receive compensation for these activities. Based on his work, I recommend that Mr. Chesley be compensated for 143.72 hours at a rate of $150, for a total of $21,558.00.

The firm also asked that Phillip B. Allen be compensated for 641 hours. Mr. Allen's time records were often inadequate, sometimes simply stating "Review correspondence and pleadings." On many occasions, he simply listed "Conference with [Stanley M. Chesley]." Such an entry would nor-mally not be compensable. However, the court cross-referenced Mr. Allen's entries with Mr. Chesley's, and if Mr. Chesley listed the conference with any specificity, Mr. Allen received the standard 50% award for intra-office conferences.

Mr. Allen did not receive compensation for attending those fairness hearings that Mr. Chesley also attended. Nor were his expenses on these trips reimbursed. In addition, Mr. Allen spent a good deal of time on the firm's fee petition. That time is not compensable.

Mr. Allen should be compensated for his efforts in developing an investment strategy for the settlement fund, for his research on the fairness brief, and for his attendance on the last day of the New York fairness hearing. I recommend that Mr. Allen be compensated for 117.38 hours at $150 per hour, which totals $17,607.00.

An additional 24.25 hours of time spent by other attorneys in the firm should also be compensated, resulting in $3,637.50 in fees. The total recommended fee award is thus $42,802.50.

### B. *Expenses*

Waite, Schneider sought $62,880.58 for reimbursement of expenses, as well as reimbursement for non-attorney time amounting to 243.55 hours.

The time sheets submitted for non-attorney hours are so vague as to be almost useless. During the time period for which these hours are submitted the firm was involved with the case against the government and with assembling a fee petition. Without more specific entries it is not possible to determine how these hours were spent. I therefore recommend no reimbursement to Waite, Schneider for these non-attorney hours.

The firm incurred the largest portion of its expenses on trips made by Mr. Chesley and Mr. Allen, who have expensive tastes. This court views with disapproval their inability to stay at hotels that charge reasonable rates when the bill is to be paid out of a limited settlement fund. On all nine of

their trips to New York City, Mr. Chesley and Mr. Allen stayed at the Helmsley Palace Hotel. At a rate per room of $175.00, the Palace is arguably the most expensive hotel in a city known for its expensive hostelries. This court knows of no unique service essential to Messrs. Allen and Chesley that would justify their stays at the Palace, as opposed to any number of more reasonably priced hotels in New York. Moreover, on at least two occasions for which they claim compensation, these gentlemen stayed at the Palace through the entire weekend even though their time sheets indicate that their work in New York was completed on a Friday. They should not receive reimbursement for these weekend stays. Finally, the firm should not be reimbursed for trips if the attorney's time spent during the trip is not compensable.

Waite, Schneider requested $33,351.38 for all travel expenses. After reviewing the submitted receipts and applying the guidelines of $90 per day for lodging and $50 per day for food, I find that $8,453.05 should be awarded in travel expenses.

In addition, Waite, Schneider requested $5,500 for advances made to Jan Levien. This expense is not adequately documented. Therefore, it is not reimbursable.

The firm also sought $16,829.40 for such expenses as express mail service, United Parcel Service, photocopying, and telephone charges. There is no certain way to determine which expenses were incurred in conjunction with compensable activities. I have determined that the fairest approach is to reimburse Waite, Schneider for expenses in the same proportion that it received attorney's fees. Waite, Schneider requested $209,600.00 in attorney's fees. I have recommended above that it be awarded $42,802.50 or approximately 20% of its request. I therefore recommend that Waite, Schneider be awarded $3,365.88 for

these miscellaneous expenses—20% of $16,829.40. The firm's entire expense award would then total $11,818.93.

### C. Conclusion

In sum, I recommend that Waite, Schneider, Bayless & Chesley be awarded $42,802.50 in supplemental fees and $11,818.93 in supplemental expenses, for a total award of $54,621.43.

### 8. PLAINTIFFS' MANAGEMENT COMMITTEE ("PMC")

Stephen J. Schlegel has submitted an updated supplemental expense petition on behalf of the PMC. Because the PMC had already received expense awards through the first week of September, 1984, this supplemental petition covers the post-settlement period from September 8, 1984 to March 15, 1985. The PMC has requested reimbursement for $279,771.42 in post-settlement expenses.

### A. General Expenses

The PMC has requested reimbursement for general expenses in the amount of $68,329.35. It is impossible to determine the extent to which these expenses, such as telephone costs, clerical help, car service, and office supplies were related to compensable post-settlement activities. Rather than deny reimbursement altogether, I recommend that the PMC be awarded the same proportion of these general expenses that the PMC members received in their fee awards. Six PMC members received an average of 29.27% of their requested post-settlement hours.[24] Applying this percentage to the amount requested, the reimbursement for general expenses should be $20,150.85.

### B. Specific Expenses

The PMC has requested approximately $99,000.00 in specific expenses. These expenses relate to both compensable and non-

---

**24.** The six PMC members received the following awards: Greitzer & Locks requested 515.5 hours and were awarded 326.25 for a 63% award; Henderson & Goldberg requested 668.1 hours and received 191.85 for a 29% award; Hoberg, Finger requested 773.25 hours and were granted 81 hours for a 10% award; O'Quinn & Hagans requested 299.75 hours and received 76 for a 25.61% award; Stephen J. Schlegel requested 1,093.45 hours and received 328.25 hours for a 30% award. Waite, Schneider requested 1,511.75 hours and received 277.27 hours for an 18% award. Thus the average proportion of hours awarded to hours requested was 29.27%.

■■■■■■■■■■
compensable post-settlement activities. Compensable expenses include payment for travel by PMC members, rent on the PMC offices, moving and storage expenses and transcripts of court proceedings. Expenses incurred in connection with non-compensable activities were not awarded. The total recommended award for compensable expenses is $26,457.36.[25]

### C. *Experts*

Several experts have billed both Benton Musslewhite and the PMC.[26] I recommend that these expenses be treated as part of the PMC supplemental petition because of the PMC's overall responsibility for financial matters. These experts were retained by the PMC prior to settlement. Payment of their expenses was not requested, however, in the original PMC expense submission.

The experts for whom supplemental expenses are requested include both causation and non-causation experts. These terms were used by all parties during the discovery phase of the litigation. I recommend that full reimbursement be made for all bills submitted by causation experts.[27] These experts benefited the class by setting forth plaintiffs' proof of causation, submitting detailed Rule 26(b) statements and being available for deposition. Therefore, they are entitled to full compensation.

However, I strongly recommend against full reimbursement of charges submitted by the non-causation experts.[28] I find that their work was only marginally useful to the class. Their reports were late and inadequate and thus their depositions were never taken. However, I do think some reimbursement is appropriate even though some of the fault for their inadequate contribution must lie with the PMC. In my opinion, $5,000.00 is fair and reasonable compensation for each non-causation expert. Wherever the PMC has received compensation in excess of $5,000.00 for a non-causation expert, I recommend that the surplus payment be subtracted from the PMC supplemental petition. My recommendations as to the non-causation experts are listed in the following chart:

---

**25.** One of the specific expenses requested concerns the house rented by the PMC at 18 Remsen Street, Brooklyn, New York. The PMC paid two months rent at $3,600.00 per month. One month's rent was reimbursed to the PMC in the court's original award. I have included reimbursement for the second month's rent in the recommended award.

**26.** These experts are: Rupert C. Burtan, M.D.; James O. Rasmuson, Ph.D.; R. Kenneth Godwin, Ph.D.; Daniel T. Teitelbaum, M.D.; Dr. Steve Wyatt; Gary M. Bakken, Ph.D.; Clifton D. Crutchfield, Ph.D.; Douglas Muster and Associates; and Litigraphics.

**27.** Causation experts include: Drs. Sonstein, Kaye, Barsotti, Hardell, Ericksson, Kerman, Hay, Silbergeld, Orris and Codario.

**28.** The non-causation experts include: Daniel T. Teitelbaum, M.D.; Clifton D. Crutchfield, Ph.D.; Rupert C. Burtan, M.D.; James O. Rasmuson, Ph.D.; Douglas Muster and Associates; R. Kenneth Godwin, Ph.D.; Gary M. Bakken, Ph.D.; William B. Retallick, Ph.D.; and Dennis G. Haack, Ph.D.

| NON–CAUSATION EXPERT | AMOUNT REQUESTED | AMOUNT PREVIOUSLY AUTHORIZED | RECOMMENDED ALLOWANCE ON SUPPLEMENTAL PETITION |
|---|---|---|---|
| Gary M. Bakken, Ph.D. | $19,679.00 | $ 6,240.00 | $(1,240.00) |
| Rupert C. Burtan, M.D. | 4,821.37 | –0– | 4,821.37 |
| Clifton D. Crutchfield, Ph.D. | 5,150.00 | –0– | 5,000.00 |
| R. Kenneth Godwin, Ph.D. | 5,206.98 | 5,206.98 | (206.98) |
| Dennis G. Haack, Ph.D. | 6,598.72 | 3,598.72 | 1,401.28 |
| Douglas Muster | 9,446.85 | –0– | 5,000.00 |
| James O. Rasmuson, Ph.D. | 12,700.03 | 11,794.08 | (6,794.08) |
| William B. Retallick, Ph.D. | 3,714.00 | 3,714.00 | –0– |
| Daniel T. Teitelbaum, M.D. | 17,669.76 | –0– | 5,000.00 |

In sum, I respectfully recommend that the PMC receive a supplemental expense award of $57,502.79 for all experts.[29]

### D. Conclusion

The total recommended award to the PMC for post-settlement expenses is $108,255.59.

### B. NON–PMC MEMBERS

#### 1. E.W. CROMARTIE, II

E.W. Cromartie, II has submitted a supplemental petition seeking $12,121.65 for expenses and $47,048.50 for fees. Although Mr. Cromartie gave a general breakdown for his hours and expenses, he did not submit any documentation or contemporaneous time records as required by the Second Circuit. See Memorandum and Order on Attorney Fees, 611 F.Supp. at 1306. Further, Mr. Cromartie's petition contains exceedingly vague descriptions such as "Legal Research" and "Legal Drafting."

According to Mr. Cromartie, his office devoted 88 hours to investigating whether the fund could be used to purchase a structured settlement. He indicated that he spent much of this time conferring with the Special Master and his staff. No contemporaneous time records are submitted in support of these hours. In the absence of such records I cannot recommend any fee award. Had such records been produced I would have recommended an award of 88 hours, at Mr. Cromartie's standard hourly rate of $85 for a fee award of $7,480.00. He would also have been entitled to related expenses totaling $1,297.29 if documented.

In conclusion I respectfully recommend no award of fees or expenses to Mr. Cromartie.

#### 2. ELLISON & MANES

Richard Ellison and Marlene Penny Manes, attorneys from Ohio, have submitted a supplemental fee petition requesting compensation for 353.6 hours for activities between June 1, 1984 and March 8, 1985. Further, they claimed to have spent "at least $1,000.00 since September of 1984" on mass mailings to clients and have requested reimbursement for this amount.

All activities listed by Mr. Ellison and Ms. Manes through August 31, 1984 were considered by the court in its Memorandum and Order on Attorney Fees. No reconsideration was requested. I shall therefore consider only the 63.2 hours claimed for the period following August 31, 1984. None of these 63.2 hours is supported by contemporaneous time records as required by the Second Circuit. Therefore, I recommend no compensation for these hours.

Even if documented properly, however, most of this time would not have been compensable. Mr. Ellison and Ms. Manes spent many of these hours filling out

---

**29.** This figure includes all the causation experts, non-causation experts, $1,890 for Steve Wyatt an economist, $421.54 for Litigraphics, a litigation graphics firm, and $947.00 for Grace Laboratories.

claims forms and meeting with their clients.

Mr. Ellison and Ms. Manes have indicated to this court that they expended "at least $1,000.00 since September of 1984." They have offered no documentation of this expense, which in any event is not reimbursable because it was incurred in mass mailings to clients, a non-compensable activity.

In conclusion, I respectfully recommend that no supplemental award be made to Ellison & Manes.

### 3. MAYERSON, SHNIPER & GERASIMOWICZ

Mayerson, Shniper and Gerasimowicz, P.C. has submitted a supplemental fee and expense petition requesting compensation for 12½ hours of attorneys' time and $338.00 in expenses. The petitioner respectfully added, "if it is the policy of the Court to also compensate attorneys for fee applications, petitioners also request this Court to reimburse them for 39 hours of attorney time in preparing their fee application." *See* Supplemental Petition for Attorney's Fees for Class Action Services by Mayerson, Shniper and Gerasimowicz, P.C. at 3. This court's policy is not to compensate attorneys for hours spent preparing a fee application, and I therefore recommend no award for this activity.

The petition of Mayerson, Shniper and Gerasimowicz reveals that the firm engaged in compensable activities. For example, the petition indicates that the firm participated in the "drafting of guidelines for distribution of the fund." *Id.* at 2. However, the firm has submitted no contemporaneous time records or documentation for any hours or expenses. No fees or expenses can be awarded in the absence of such records.

Therefore, I respectfully recommend that no supplemental fees or expenses be awarded to Mayerson, Shniper and Gerasimowicz.

### 4. WILLIAM T. McMILLAN

Mr. William T. McMillan of Brisbane, Australia has submitted a supplemental fee and expense petition for the post-settlement period from August 24, 1984 to March 12, 1985. During this time, Mr. McMillan spent 46 hours preparing a memorandum concerning the allocation of settlement funds to the Australian class members. Although Mr. McMillan performed this work at the request of the court, he has declined to claim compensation for his time. Rather, he has requested this court to reimburse his expenses. Because this work was performed at the court's request and is compensable under the post-settlement guidelines, I recommend that his request for expenses be granted.

Mr. McMillan engaged a secretary for 22 hours to assist him in the preparation of the distribution memorandum. The reimbursement rate for legal assistants is $20 per hour. An award of $440.00 is therefore justified. Mr. McMillan further claimed that he spent $1,241.34 for stationery, photocopies, couriers and a second legal assistant. These costs should also be reimbursed.

In sum, I respectfully recommend a supplemental award of $1,681.34 to Mr. McMillan.

### 5. REILLY, LIKE & SCHNEIDER

Mr. Irving Like submitted a supplemental fee petition on behalf of Reilly, Like & Schneider. He requested compensation for 243.05 hours expended during the post-settlement period between June 15, 1984 and December 9, 1984.

A majority of these hours were spent in non-compensable activities, such as pursuing the plaintiffs' claims against the United States government. Mr. Like's compensable hours were spent primarily in consultation with representatives of the Prudential Insurance Company, Touche Ross & Company, and Irving Trust Company, with whom he discussed the administration, investment, and distribution of the settlement fund. Consequently, I recommend that supplemental fees for 33.85 hours be awarded to Reilly, Like & Schneider. Application of the $150 per hour rate is warranted. No request was submitted for reimbursement of supplemental expenses.

I therefore respectfully recommend a total supplemental fee award of $5,077.50.

### 6. SCHROETER, GOLDMARK & BENDER

The law firm of Schroeter, Goldmark & Bender has submitted a petition requesting $187,673.00 in supplemental fees and $14,237.81 in supplemental expenses. In support of its petition, Schroeter, Goldmark submitted voluminous time sheets and expense records.

#### A. *Fees*

Nothing in the petition of Schroeter, Goldmark suggests that it engaged in activities at the request of the PMC. Therefore, it must be assumed that the vast majority of time and money expended by the firm was for the benefit of its individual clients. Schroeter, Goldmark was never a member of the PMC.

Schroeter, Goldmark seeks compensation for time spent by two attorneys and two paralegals. Paralegal time is treated as an expense.

The firm requests that Robert E. McCluskey be compensated for 981.9 hours at a rate of $100 an hour. After carefully reviewing Mr. McCluskey's time sheets, I recommend that he be compensated for the 72.45 hours he spent researching the fairness briefs and consulting with others concerning the distribution plan.

The balance of Mr. McCluskey's requested hours were spent helping the firm's individual clients. Mr. McCluskey's attendance at the San Francisco fairness hearings did not benefit the class. Similarly, his attendance at a Brooklyn hearing where he sought to extend the time to object to the settlement was not beneficial to the class as a whole. The PMC co-ordinated these activities, and, as stated earlier, this court has no reason to believe that Schroeter, Goldmark's participation was at the PMC's request. I respectfully recommend, therefore, that Mr. McCluskey be compensated only for 72.45 hours at the requested rate of $100 an hour, for a total of $7,245.00 in supplemental fees.

The firm also requested that Leonard W. Schroeter be compensated for 206.1 hours at a rate of $150 per hour. All of Mr. Schroeter's time was spent furthering the interests of the firm's individual clients. I therefore recommend that he receive no supplemental fee award.

#### B. *Expenses*

Schroeter, Goldmark has requested reimbursement for $14,237.81 in expenses, as well as $58,568.00 for paralegal time. All the paralegal time was spent to further the interests of individual clients, not those of the class. The paralegals prepared claim forms and attended to client inquiries. Therefore, no paralegal time is reimbursable.

Schroeter, Goldmark grouped their expenses for such items as postage, copies, and telephone. An additional category was submitted for all other expenses including travel, meals, transcript charges and express mailings.

Under this last, miscellaneous category, Schroeter, Goldmark requested reimbursement for $8,144.50. For the reasons set forth below, I recommend no reimbursement. Of the 46 separate expenses listed, 36 had no supporting documents. Although firm "expense reports" were submitted, these are not the "detailed documentation" required by the court. *See* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1314. Of the remaining ten expenses, none were incurred in conjunction with any compensable activity. Thus I do not recommend an award for expenses.

The postage, copies, and telephone costs total $6,093.31. In support of these expenses, Schroeter, Goldmark submitted lengthy, coded computer print-outs that listed expenses for all its accounts including Agent Orange. These print-outs do not establish that these expenses were incurred in connection with any activity that was beneficial to the class. I therefore respectfully recommend no reimbursement for the firm's copying, telephone and postage expenses.

#### C. *Conclusion*

I respectfully recommend that Schroeter, Goldmark & Bender be awarded $7,245.00 in supplemental fees and no supplemental expenses.

## 7. SEARCY & SMITH

Margie T. Searcy, of Searcy & Smith, P.C., has requested reimbursement for two trips to New York for hearings held on February 6, 1985 and March 8, 1985. These hearings concerned the attorneys' fees award and Ms. Searcy's motion for reconsideration. Time spent on fee applications is not compensable under the recommended post-settlement guidelines. *See* Introduction, 611 F.Supp. at 1352; *see also* Memorandum and Order on Attorney Fees, 611 F.Supp. at 1307 (citing *Seigal v. Merrick*, 619 F.2d 160, 165 (2d Cir.1980); *Grinnell*, 560 F.2d at 1102).

Consequently, I respectfully recommend no further award of expenses to Ms. Searcy.

## 8. SULLIVAN & ASSOCIATES

Sullivan & Associates, a Chicago firm, has submitted a petition requesting $15,-637.50 in supplemental fees. The firm does not request reimbursement for any supplemental expenses.

The award Sullivan & Associates received for its pre-settlement activities reflected, for the most part, time and money spent in the earliest days of the Agent Orange litigation. As the case progressed, Sullivan & Associates spent more time furthering the interests of their individual clients than those of the class. During the post-settlement period, Sullivan & Associates worked on the fairness hearings, the case against the government, the "causation brief," and the fee petition. None of these activities are compensable for non-PMC attorneys pursuant to this court's guidelines.

I therefore respectfully recommend that Sullivan & Associates not be awarded any supplemental fees.

## 9. CHARLES A. WADE

Charles A. Wade has petitioned this court for $3,946.67 in supplemental fees.

Mr. Wade is an independent counsel who represents individual clients. He did not participate in any fairness hearings, nor did he assist in the preparation of the distribution plan. Moreover, he submitted no contemporaneous time records.

I therefore respectfully recommend that no compensation be awarded to Charles A. Wade for any activities after June 15, 1984.

## 10. DON S. WILLNER

Don S. Willner, an attorney from Oregon, has submitted a supplemental petition requesting compensation for 7.01 hours for his post-settlement activities and 35.80 hours for those of his legal assistant. Mr. Willner also requested $242.61 in expenses.

As stated above in my recommended guidelines, time spent on attorneys' fees, opt-out cases, as well as meetings with the media and veterans are not compensable activities. These activities account for nearly all the time for which Mr. Willner requested compensation.[30] Likewise, the time claimed for Mr. Willner's assistant was spent primarily on organizing files, preparing claim forms, and preparing the fee application. I therefore recommend no supplemental fee award.

Mr. Willner also asked to be reimbursed for $242.61 in expenses. Because expenses are awarded only if incurred in conjunction with compensable activities, Mr. Willner is not entitled to an expense award.

In conclusion, I respectfully recommend that Don S. Willner receive neither a supplemental fee award nor supplemental expenses.

## 11. WOLL, CROWLEY, BERMAN & OLSMAN, P.C.

Jules B. Olsman of Woll, Crowley, Berman & Olsman, P.C., has submitted a petition for supplemental fees and expenses.

Mr. Olsman requested reimbursement for 140.50 hours that he and Arthur S. Woll

---

**30.** There is one entry in Mr. Willner's petition for 15 minutes in which he claims to have prepared for a settlement conference and worked on both his fee application and "supplemental rent." I do not know exactly how many minutes were spent on preparing for this settlement conference, the only compensable item in that entry. Further, Mr. Willner never suggests that he attended this conference. For these reasons, I do not recommend any compensation for this entry.

worked during the post-settlement period between August 6, 1984 and September 2, 1984. All of these hours were spent in traveling to, preparing for, and attending various fairness hearings. Only those attorneys who were members of the PMC were required to participate in the fairness hearings; non-PMC members attended them voluntarily. Consequently, I recommend that no payment be authorized for attendance at fairness hearings by non-PMC attorneys. I therefore respectfully recommend no supplemental fee award to this firm.

Mr. Olsman has also submitted a petition for supplemental expenses totaling $3,991.35. Since all of these expenses are directly related to his firm's participation in the fairness hearings, I recommend no award of supplemental expenses.

Therefore, I respectfully recommend that the request for an award of supplemental fees and expenses to Woll, Crowley, Berman & Olsman be denied.

## IV. CONCLUSION

### A. *Reconsideration Petitions*

As a result of this court's reconsideration of the fee petitions conducted pursuant to Fed.R.Civ.P. 59, it is respectfully recommended that the PMC receive an increase in its fee and expense award of $608,316.28 as indicated below.

EXHIBIT A
PMC—RECONSIDERATION

| PETITIONER | ADDITIONAL FEES | ADDITIONAL EXPENSES | TOTAL |
|---|---|---|---|
| David J. Dean | $ 83,846.25 | $ 4,779.45 | $ 88,625.70 |
| Greitzer & Locks | 86,877.00 | 10,800.00 | 97,677.00 |
| Henderson & Goldberg | 28,833.75 | 2,574.83 | 31,408.58 |
| Hoberg, Finger | 35,187.75 | 23,822.64 | 59,010.39 |
| Benton Musslewhite | 40,000.00 | 9,000.00 | 49,000.00 |
| O'Quinn & Hagans | 75,069.00 | 1,567.99 | 76,636.99 |
| Stephen J. Schlegel | 86,533.13 | –0– | 86,533.13 |
| Newton Schwartz | 12,741.00 | 2,411.00 | 15,152.00 |
| Waite, Schneider | 33,783.75 | –0– | 33,783.75 |
| PMC | –0– | 70,488.74 | 70,488.74 |
| TOTAL | $482,871.63 | $125,444.65 | $608,316.28 |

■■■■■■■■■■■

It is further recommended that non-PMC attorneys and the firm of Liquori Associ- ates Ltd. receive a total increase in their fee and expense award of $397,707.43 as indicated below.

EXHIBIT B
NON–PMC—RECONSIDERATION

| PETITIONER | ADDITIONAL FEES | ADDITIONAL EXPENSES | TOTAL |
|---|---|---|---|
| Ashcraft & Gerel | $ 59,853.00 | $ 8,664.21 | $ 68,517.21 |
| Baskin & Steingut | 25,582.50 | –0– | 25,582.50 |
| Epstein & Kesselman | 16,320.00 | –0– | 16,320.00 |
| Thomas Grasso | –0– | –0– | –0– |
| John Higgins | –0– | –0– | –0– |
| Frederick Hollow | 32,325.00 | 1,274.44 | 33,599.44 |
| Kraft & Hughes | 2,425.00 | 630.00 | 3,055.00 |
| Liquori | –0– | 141,725.36 | 141,725.36 |
| Litvin, Blumberg | –0– | –0– | –0– |
| Racine, Olson | –0– | 1,253.37 | 1,253.37 |
| Searcy & Smith | 24,825.00 | –0– | 24,825.00 |
| Charles Wade | –0– | –0– | –0– |
| Don Willner | 3,582.00 | –0– | 3,582.00 |
| Victor Yannacone | 81,750.00 | 2,846.00 | 84,596.00 |
| TOTAL | $246,662.50 | $156,393.38 | $403,055.88 |

The total recommended increase in fee and expense awards upon reconsideration is $1,011,372.16.

B. *Supplemental Petitions*

It is respectfully recommended that the PMC and its members receive a total sup- plemental fee and expense award of $366,- 408.73, as set forth below.[31]

---

**31.** The total recommended award to the PMC including both reconsideration and supplemen- tal petitions is $974,725.01.

EXHIBIT C
PMC—SUPPLEMENTAL

| PETITIONER | FEES | EXPENSES | TOTAL |
|---|---|---|---|
| Greitzer & Locks | $ 53,062.50 | $ 9,443.24 | $ 62,505.74 |
| Henderson & Goldberg | 28,777.50 | 11,947.96 | 40,725.46 |
| Hoberg, Finger | 12,150.00 | 4,033.70 | 16,183.70 |
| Benton Musslewhite | –0– | –0– | –0– |
| O'Quinn & Hagans | 7,800.00 | 2,188.58 | 9,988.58 |
| Stephen J. Schlegel | 49,237.50 | 24,890.73 | 74,128.23 |
| Waite, Schneider | 42,802.50 | 11,818.93 | 54,621.43 |
| PMC | –0– | 108,255.59 | 108,255.59 |
| TOTAL | $193,830.00 | $ 172,578.73 | $366,408.73 |

It is further recommended that non-PMC attorneys receive a supplemental fee and expense award of $14,003.84 as set forth below.

EXHIBIT D
NON–PMC—SUPPLEMENTAL

| PETITIONER | FEES | EXPENSES | TOTAL |
|---|---|---|---|
| Cromartie | $ –0– | $ –0– | $ –0– |
| Ellison | –0– | –0– | –0– |
| Mayerson | –0– | –0– | –0– |
| McMillan | –0– | 1,681.34 | 1,681.34 |
| Reilly, Like | 5,077.50 | –0– | 5,077.50 |
| Schroeter | 7,245.00 | –0– | 7,245.00 |
| Searcy | –0– | –0– | –0– |
| Sullivan | –0– | –0– | –0– |
| Wade | –0– | –0– | –0– |
| Willner | –0– | –0– | –0– |
| Woll | –0– | –0– | –0– |
| TOTAL | $ 12,322.50 | $ 1,681.34 | $ 14,003.84 |

The total recommended supplemental fee and expense award is $380,412.57.

C. *Total Award*

The court originally awarded $9,325,113.14 in attorneys' fees. The addition of the recommended award upon reconsideration and the recommended supplemental award brings the total fee award to $10,716,897.87.

A copy of this Report and Recommendation is being mailed today to all counsel, who are hereby advised that objections to the report may be served and filed with the District Court, with a copy to the undersigned, within ten (10) days.